# Exhibit 1

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**

**ICC Case 19958/AGF/RD/MK**

**ABS HOLDINGS, LTD. (Bermuda)**
**and**
**ABS GLOBAL, LTD. (Bermuda),**

*Claimants,*

**versus**

**KT CORPORATION (Republic of Korea)**
**and**
**KTSAT CORPORATION (Republic of Korea),**

*Respondents.*

**PARTIAL AWARD**

**July 18, 2017**

## REPRESENTATION OF THE PARTIES

*Representing the Claimants:*

Michael D. Nolan
Kamel Aït-El-Hadj
Brett P. Lowe
Milbank, Tweed, Hadley & McCloy LLP
International Square Building
1850 K Street, N.W., Suite 1100
Washington, D.C. 20006
USA

*Representing the Respondents:*

Kap-You (Kevin) Kim
John P. Bang
Junu Kim
David MacArthur
Mino Han
Yenping Seng
Bae, Kim & Lee LLC
133 Teheran-ro, Gangnam-gu
Seoul 135 723
Republic of Korea

Brian Weimer
Paul Werner
Matthew Riemer
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006-6801

TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................4
   A.   THE PARTIES .....................................................................................................................4
   B.   THE ARBITRATORS ............................................................................................................4
   C.   NATURE AND CIRCUMSTANCES OF THE DISPUTE ...............................................................5
   D.   PROCEDURAL HISTORY ......................................................................................................6

II.     BACKGROUND .............................................................................................................13
   A.   RELEVANT CONTRACTUAL PROVISIONS ..........................................................................13
   B.   RELEVANT FACTS ...........................................................................................................14
   C.   POLITICAL AND FACTUAL MATRIX ..................................................................................21

III.    JURISDICTION ..........................................................................................................24

IV.    APPLICABLE LAW .....................................................................................................29
   A.   LAW APPLICABLE TO THE DISPUTE GENERALLY ..............................................................29
   B.   LAW APPLICABLE TO DETERMINING THE EFFECT OF THE MSIP ORDER ...........................29
      1.   *Respondents' Position* ........................................................................................29
      2.   *Claimants' Position* ...........................................................................................32

V.     CLAIMS AND COUNTERCLAIMS SET FORTH BY THE PARTIES...........................34
   A.   CLAIMS SET FORTH BY CLAIMANTS .................................................................................34
   B.   DEFENSES AND COUNTERCLAIMS SET FORTH BY RESPONDENTS .......................................36

VI.    THE CLAIM FOR TITLE TO THE SATELLITE AND BASEBAND EQUIPMENT .......40
   A.   WHETHER ALL CONDITIONS PRECEDENT TO THE TRANSFER OF TITLE WERE SATISFIED......40
      1.   *Claimants' Position* ...........................................................................................40
      2.   *Respondents' Position* ........................................................................................43
   B.   WHETHER RESPONDENTS CAN DEFEAT THE TRANSFER OF TITLE BASED ON FAILURE TO SATISFY A CONDITION
      PRECEDENT ...................................................................................................................45
      1.   *Claimants' Position* ...........................................................................................45
      2.   *Respondents' Position* ........................................................................................51
   C.   WHETHER THE MSIP ORDER DECLARING THE SALE OF THE SATELLITE "NULL AND VOID" RENDERS THE PURCHASE
      CONTRACT UNENFORCEABLE ..........................................................................................55
      1.   *Respondents' Position* ........................................................................................55
      2.   *Claimants' Position* ...........................................................................................58
   D.   WHETHER FAILURE TO OBTAIN AN FTA EXPORT PERMIT IS A MUTUAL MISTAKE THAT WARRANTS RESCISSION OF
      THE PURCHASE CONTRACT ..............................................................................................61
      1.   *Respondents' Position* ........................................................................................61
      2.   *Claimants' Position* ...........................................................................................64

VII.   RELIEF REQUESTED BY THE PARTIES ...................................................................68

VIII.  THE HOLDINGS OF THE ARBITRAL TRIBUNAL, BY MAJORITY .............................72
   A.   ARBITRAL TRIBUNAL'S DECISION ON APPLICABLE LAW ..................................................73
      1.   *Law Applicable to Determining the Export Nationality of the Satellite* ...................73
      2.   *Law Applicable Generally and to Determine the Effect of the MSIP Order*...............82
   B.   THE ARBITRAL TRIBUNAL'S ANALYSIS OF THE TITLE ISSUE ............................................91
      1.   *All Conditions Precedent to the Transfer of Title Were Satisfied* .........................91
      2.   *The MSIP Order Does Not Render the Purchase Contract Unenforceable*...............94

3.  *Respondents Cannot Defeat the Transfer of Title Based on Failure to Satisfy a Condition Precedent* ........................................................................................................................ *105*

4.  *Failure To Obtain an FTA Export Permit Is Not a Mutual Mistake Warranting Rescission of the Purchase Contract* .................................................................................................................. *109*

IX.   **COSTS** ............................................................................................................................... **113**

X.    **CONCLUSION** .................................................................................................................... **114**

XI.   **DISPOSITIF** ....................................................................................................................... **114**

## INTRODUCTION

### A. *The Parties*

1.   The Claimants are ABS Holdings, Ltd. ("ABSH") and ABS Global, Ltd. ("ABSG") (collectively, "ABS" or "Claimants"). ABSH is a company organized and existing under the laws of Bermuda. ABSH's registered address is at O'Hara House, 3 Bermudiana Road, Hamilton 08, Bermuda.

2.   ABSG is an operating company owned by ABSH. ABSG's registered address is at O'Hara House, 3 Bermudiana Road, Hamilton 08, Bermuda.

3.   The Respondents are KT Corporation ("KT Corp.") and KTSAT Corporation ("KTSAT")[1] (collectively, "KT" or "Respondents"). KT Corp. is a company incorporated in the Republic of Korea. KT Corp.'s primary place of business is 90 Buljeong-ro (Jeongja-dong), Bundang-gu, Seongnam-si, Gyeonggi-do, Republic of Korea.

4.   KTSAT is a company incorporated in the Republic of Korea. KTSAT's primary place of business is 14F, Chungjeong Tower 21, Seosomun-ro, Seodaemun-gu, Seoul, Republic of Korea.

### B. *The Arbitrators*

5.   The co-arbitrator nominated by Claimant ABSH and confirmed by the Secretary General of the ICC International Court of Arbitration ("Secretary General") on April 22, 2014, pursuant to Article 13(2) of the Rules of Arbitration of the International Chamber of Commerce in force as of January 1, 2012 ("ICC Rules"):

Daniel M. Price
Daniel M. Price PLLC
800 Connecticut Ave., NW, Suite 800
Washington, DC 20006

---

[1] KTSAT was formed in December 2012, when KT Corp. spun off its satellite business.

6.    The co-arbitrator jointly nominated by Respondents and confirmed by the Secretary

General on April 22, 2014, pursuant to Article 13(2) of the ICC Rules:

> Gary Born
> Wilmer Cutler Pickering Hale and Dorr LLP
> 49 Park Lane
> London W1K 1PS
> United Kingdom

7.    The third arbitrator and President of the Arbitral Tribunal, jointly nominated by Claimant

ABSH and Respondents and confirmed by the Secretary General on June 19, 2014,

pursuant to Article 13(2) of the ICC Rules:

> Arthur W. Rovine
> Fordham University Law School
> 215 East 68th Street
> New York, N.Y. 10065

### C.  *Nature and Circumstances of the Dispute*

8.    This dispute arises out of the sale of a geostationary satellite by KT, a Korean company, to

ABS, a Bermudan company.  The Parties completed the sale in April 2010[2] and, in the

ensuing months, sale of the satellite was publicized in numerous Korean media outlets.[3]

More than three years after the sale of the satellite, and following a change in leadership in

the Korean government, certain members of the Korean Congress began publicly

challenging the legality of the sale.[4]  After a formal governmental investigation by a

newly-formed governmental agency, an order was issued declaring the sale of the satellite

---

[2] *See* Contract for the Purchase of Koreasat 3 Between Asia Broadcast Satellite Holdings, Ltd. And KT Corporation, April 30, 2010 (CE-1).

[3] *See, e.g.*, Asia Broadcast Satellite to Acquire Koreasat-3, ABSatellite.net, May 24, 2010 (CE-8); ABS Acquired Koreasat-3, Media Research Asia, May 24, 2010 (CE-18).

[4] *See, e.g.*, Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on October 31, 2013 (CE-137); Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on November 7, 2013 (CE-138).

"null and void" for failure to obtain certain governmental approvals.[5]  This order led to the present dispute.

### D.  *Procedural History*

9.      On December 22, 2013, ABSH filed with the ICC Secretariat a Request for Arbitration against KT Corp. and KTSAT for claims arising out of the contract for the purchase of the KOREASAT 3 satellite.

10.     On June 6, 2014, KT Corp. and KTSAT filed with the ICC Secretariat an Answer and Counterclaim against ABSH.

11.     Claimant ABSH nominated an arbitrator, Mr. Daniel M. Price, and the two Respondents jointly nominated an arbitrator, Mr. Gary Born; the two party-nominated arbitrators were confirmed by the Secretary General on April 22, 2014.  Claimant ABSH and Respondents jointly nominated the President of the Arbitral Tribunal, Mr. Arthur W. Rovine, who was confirmed by the Secretary General on June 19, 2014.

---

[5] Translation of MSIP Order to KTSAT, December 18, 2013 (CE-54). The text of the translated MSIP Order (which refers to the satellite in dispute as the Mugungwha 3 Satellite) is as follows:
*[Letterhead of the Ministry of Science, ICT and Future Planning]*
To:     Representative Director of KTSAT
(Via)
Subject: Notification of the Sale Agreement of the Mugungwha 3 Satellite being Null and
        Void, and Corrective Order, etc.
1. Reference is made to Article 15-2, Paragraph (1), Item 4 of the Radio Waves Act and Article 92, Paragraph (2), Item 3 of the Telecommunications Business Act.
2. We hereby notify you that the Sale Agreement regarding the Mugungwha 3 Satellite (including TT&C equipment, etc.) (the "Agreement") that you entered into with ABS, an overseas satellite business operator, is null and void, since it is in violation of the mandatory law (Foreign Trade Act).
3. Therefore, we hereby request for the appropriate management of the Mugungwha 3 Satellite equal to the level of management pursued prior to the Agreement, management based on the spectrum usage plan submitted upon your application for reallocation of spectrum (March 2011) and active deliberation of measures to protect the satellite orbit and the spectrum, both of which are national resources. End.
                **Minister of Science, ICT and Future Planning** *(official seal affixed)*

12.     On June 18, 2014, the Parties submitted a joint letter to the ICC International Court of Arbitration ("ICC Court") stating that claims pertaining to the Satellite Operation Services Agreement for KOREASAT 3 between the Parties had been brought by ABSG in a separate AAA (ICDR) proceeding pursuant to an arbitration clause in the Operations Agreement (the "ICDR Arbitration") and that Respondents had also raised counterclaims. Given the common subject matter of this proceeding and the ICDR Arbitration, the Parties requested the ICC Secretariat to consolidate the claims and counterclaims brought in the ICDR Arbitration into this proceeding.

13.     On June 18, 2014, the ICC Secretariat responded by letter and informed the Parties that the ICC Secretariat took note of the Parties' agreement with respect to the claims and counterclaims and informed the Parties "that by application of Article 23(4) of the [ICC] Rules, new claims may be brought into the proceedings with the authorization of the Arbitral Tribunal before the Terms of Reference have been established." On this basis, the ICC Secretariat informed the Parties that it would "join to the file the claims and counterclaims brought in the ICDR Arbitration" and "transmit them to the Arbitral Tribunal when constituted." The ICDR Arbitration was dismissed on December 18, 2014.

14.     In response to an invitation by the Secretariat, on June 13 and June 15, 2014, Claimant ABSH and Respondents agreed to New York City, New York (U.S.A.) as the place of arbitration.[6]

15.     On December 19, 2014, after consulting with the Parties, the Arbitral Tribunal issued the Terms of Reference. On that same day, the Arbitral Tribunal issued Procedural Order No.

---

[6] Article 19.3(b) of the contract provides for "New York (U.S.A.)" as the place of arbitration.

1, which, among other things, established the procedural timetable for the Parties' submissions.

16.     In response to inquiries from the Arbitral Tribunal regarding potential dates for a case management conference, Respondents notified the Arbitral Tribunal by letter, dated January 15, 2015, that the Parties waived the case management conference in light of the detailed procedural timetable.   Claimants confirmed their agreement with the letter by email, also dated January 15, 2015, and the Arbitral Tribunal accepted the Parties' waiver.

17.     Pursuant to the procedural timetable, Claimants filed the Statement of Claim on February 13, 2015, Respondents filed the Statement of Defense on April 10, 2015, Claimants filed the Reply on August 15, 2015, Respondents filed the Rejoinder on September 25, 2015, and Claimants filed the Sur-Rejoinder on October 2, 2015.

18.     On June 5, 2015, the Parties submitted to the Arbitral Tribunal completed Redfern Schedules setting forth their respective disputed document discovery requests.   On June 19, 2015, the Arbitral Tribunal issued Procedural Order No. 2, which resolved each of the disputed requests.

19.     On November 2, 2015, the Arbitral Tribunal issued Procedural Order No. 3, which, among other things, admitted into evidence certain witness statements submitted by Claimants and objected to by Respondents and granted Respondents' requests to cross-examine these witnesses upon application by Respondents.

20.     On November 30, 2015, as agreed by the Parties, the Arbitral Tribunal convened a telephonic pre-hearing conference with the Parties to discuss the Parties' positions with respect to certain pre-hearing organizational matters.   On December 4, 2015, the Arbitral

Tribunal issued Procedural Order No. 4, which resolved those matters upon which the Parties were not in agreement.

21.    In accordance with the timetable established in Procedural Order No. 1, the hearing took place at the American Arbitration Association's office in New York City from December 14 to December 18, 2015.

22.    At the conclusion of the hearing, the Arbitral Tribunal encouraged the Parties to discuss the possibility of settlement and expressed its intent, in the event that the Parties were unable to reach a settlement, to convene an additional hearing to further address specific issues in the case.  The Arbitral Tribunal directed the Parties to report on the status of their discussions within three weeks following conclusion of the hearing.[7]

23.    The Parties requested an additional two weeks to explore the possibility of settlement. The Arbitral Tribunal granted this extension on January 11, 2016.  Thereafter, on January 22, 2016, Respondents informed the Arbitral Tribunal that the Parties were unable to reach settlement; Claimants confirmed on January 26, 2016.

24.    On February 23, 2016, the Arbitral Tribunal held a case management conference with the Parties to discuss the topics and proposed witnesses for the additional evidentiary hearing.

25.    In a letter dated March 9, 2016, Claimants requested that the Arbitral Tribunal issue a determination solely with respect to the issue of title to the Satellite; Respondents objected in a letter dated March 11, 2016.  On March 14, 2016, the Arbitral Tribunal issued Procedural Order No. 5, which, by majority, granted Claimants' request.

---

[7] *See* December 18, 2015, email from A. Rovine, on behalf of the Arbitral Tribunal, to M. Nolan, P. Werner, K. Ait-El Hadj, K. Kim, J. Bang, J. Kim, D. MacArthur, Y. Seng, B. Weimer, and M. Riemer.

26.  On March 25, 2016, Respondents submitted a Request for Reconsideration of Procedural Order No. 5; on April 8, 2016, Claimants submitted a Response objecting to Respondents' Request.  On May 11, 2016, the Arbitral Tribunal issued Procedural Order No. 6, which granted Respondents' Request and, upon reconsideration, revoked Procedural Order No. 5.  The Arbitral Tribunal informed the Parties that it would convene an additional evidentiary hearing; asked that the Parties inform the Arbitral Tribunal whether they authorized the ICC International Centre for ADR to administer that portion of the proceedings that would be devoted to the examination of an expert on valuation and damages pursuant to the 2015 Administration of Expert Proceedings Rules; and requested that the Parties inform the Arbitral Tribunal of their "utmost best efforts" to secure the attendance of a witness from Korea's Ministry of Science, ICT and Future Planning ("MSIP").  The Arbitral Tribunal also directed the Parties to submit, within 60 days of the date of the Order, written statements on any issues they believed warranted further analysis by the Arbitral Tribunal.

27.  On May 16, 2016, Claimants submitted a letter asking that the Arbitral Tribunal consider whether the additional proceedings are "truly necessary"; Claimants did not authorize the ICC International Centre for ADR to administer the expert proceedings.  On May 18, 2016, Respondents submitted a letter granting this authorization; on May 23, 2016, Respondents submitted a second letter, endorsing the procedures established by the Arbitral Tribunal in respect of the additional evidentiary hearing.  On May 25, 2016, the Arbitral Tribunal issued Procedural Order No. 7, in which it, among other things, reiterated its intent to hold an additional evidentiary hearing and its directive that the

Parties keep the Arbitral Tribunal apprised, in writing, of their "utmost best efforts" to secure the attendance of an MSIP witness.

28.     In response to a joint communication dated June 3, 2016, in which the Parties informed the Arbitral Tribunal that an MSIP official would not appear in the proceedings despite their utmost best efforts, on June 15, 2016, the Arbitral Tribunal issued Procedural Order No. 8, inviting MSIP to submit to the Arbitral Tribunal any clarification of its order nullifying contract for the purchase of the KOREASAT 3 satellite it wished to offer.  No clarification was submitted.

29.     On July 4, 2016, the Arbitral Tribunal issued Procedural Order No. 9, which established that the additional hearing would be held on September 1, 2016, at 9:30 a.m.

30.     On July 11, 2016, the Parties each submitted a Supplemental Statement in accordance with Procedural Order No. 6 ("First Supplemental Statement").

31.     On July 16, 2016, the Arbitral Tribunal issued Procedural Order No. 10, denying Claimants' suggestion that the Arbitral Tribunal examine Mr. Tom Choi, Chief Executive Officer of ABS, via written questions but accepting Claimants' suggestion that the Arbitral Tribunal conduct the examination via videoconference.

32.     On August 4, 2016, the Arbitral Tribunal issued Procedural Order No. 11, establishing the timetable for the September 1 hearing, including the scope of the examination of Mr. Choi.  On August 12, 2016, the Arbitral Tribunal issued Procedural Order No. 12, which clarified the permissible scope of the Parties' examination of Mr. Choi.

33.     In accordance with Procedural Order No. 9 and subsequent communication with the Parties regarding venue, the additional hearing took place at the American Arbitration Association's office in New York City on September 1, 2016.

34.   Shortly after the hearing, on September 2, 2016, the Arbitral Tribunal issued Procedural Order No. 13, granting Respondents' request for permission to submit additional briefing and directing the Parties to submit any additional briefing within seven days of the date of the Order.

35.   In accordance with Procedural Order No. 13, the Parties each submitted a Supplemental Statement on September 9, 2016 ("Second Supplemental Statement").

36.   On September 10, 2016, the President of the Arbitral Tribunal notified the Parties that the proceedings were formally closed.

37.   According to an email dated June 30, 2017, from Marek Krasula, Counsel at the ICC, to the Arbitral Tribunal and to the Parties, the time limit for rendering the Final Award (Partial Award) in this case is July 31, 2017.  As to previous extensions, the first extension was to November 30, 2016, decided by the ICC Court on June 2, 2016, and communicated to the Parties and the Arbitral Tribunal on June 29, 2016.  The second extension was to December 30, 2016, granted by the ICC Court on November 3, 2016 and communicated to the Parties and the Arbitral Tribunal on November 30, 2016.  The third extension was to January 31, 2017, granted by the ICC Court on December 1, 2016, and communicated to the Parties and the Arbitral Tribunal on December 19, 2016.  However, President Rovine was in the hospital (emergency room, ICU, regular hospital room) for one week, after which he was transferred to a rehabilitation unit for three weeks.[8]  He was unable to work during the entire month of January 2017.  The fourth extension was to March 31, 2017, granted by the ICC Court on February 1, 2017, and communicated to the Parties and the Arbitral Tribunal on February 24, 2017.  The fifth extension was to June 30, 2017,

---

[8] See email from A. Rovine to R. Digon and C. Ng, January 13, 2017.

granted by the ICC Court on May 4, 2017, and communicated to the Parties and to the Arbitral Tribunal on May 31, 2017.

## II. BACKGROUND

### A. *Relevant Contractual Provisions*

38. Purchase Contract, Art. 5.2

   [KT shall] obtain all necessary licenses, consents and approvals for the sale of the Satellite and the Baseband Equipment, including, without limitation, the [International Traffic in Arms Regulations] Approval, for which KT shall submit the necessary application immediately after the [Effective Date of Contract], and cancellation, termination and/or release of any mortgage or lien on the Satellite and the Baseband Equipment[.]

39. Purchase Contract, Art. 5.3

   [KT shall] grant the permission for the Orbital Slot Use to enable and authorize ABS to operate the Satellite at, and to use, the Designated Orbital Position during the Orbital Slot Use Period[.]

40. Purchase Contract, Art. 10.1

   The Title of the Satellite and the TT&C Equipment shall transfer to ABS at the end of the design life of the Satellite, which is September 4, 2011, provided that (a) KT receives the required payment due prior to the end of the design life of the Satellite consistent with Article 8 and (b) any necessary approvals and licenses, including the U.S. State Department Approval and the approvals and consents required for and during the Orbital Slot Use Period, have been received. KT shall issue a bill of sale to ABS in a form acceptable to ABS.

41. Purchase Contract, Art. 12.1

   KT is and shall remain responsible for obtaining and maintaining for the term of this Contract, all governmental and regulatory licenses and authorizations required of KT to perform its obligations herein. In particular, KT shall work with the manufacturer of the Satellite and submit the relevant U.S. State Department license application necessary for it to sell the Satellite prior to the date of Title transfer.

42. Purchase Contract, Art. 12.2

This Contract or any of the attachments hereto may be subject to filing and/or approval by one or more regulatory authorities with jurisdiction over one or both Parties hereto.

43.  Purchase Contract, Art. 18.1

Each Party represents and warrants to the other Party as of the [Effective Date of Contract] as follows:

(a) It is an entity duly incorporated, validly existing and in good standing under the laws of the country in which it was incorporated, capable of suing and being sued, and with the power and authority to own its assets, including in the event of KT, the Satellite, and to conduct its business.

(b) It has the necessary power and authority to enter into, exercise its rights, perform and comply with its obligations under this Contract.

(c) No consent, approval, order or authorization of, and/or registration, declaration or filing with, any court, administrative agency or commission or other governmental authority or instrumentality, other than those which have already been obtained or complied with after execution of this Contract, are required in connection with the execution, delivery or performance of this Contract.

[…]

(e) The execution and performance of this Contract shall not: (i) violate any applicable laws.

## B. *Relevant Facts*

44.  In the course of these arbitral proceedings, the Arbitral Tribunal has benefitted from extensive documentary and written evidence as well as detailed written and oral submissions.  Although it has been the subject of very full and careful consideration by the Arbitral Tribunal, this Section provides a distillation of the relevant background facts, as well as the contracts at issue, by way of context for this Partial Award.  The Sections that follow focus on specific factual matters, insofar as these are relevant to the issues in dispute.

45.  The Parties' written memorials indicate that on **June 30, 2009**, the business relationship between the Parties began, when ABSH purchased the KOREASAT 2 ("KS-2") satellite from KT.  The Parties never sought nor received any regulatory approval from the Korean

government with respect to the sale of this satellite.[9]  However, the record shows a prior sale of KS-1 from KT to ABS.[10]

46.   On **April 30, 2010**, ABSH and KT entered into a contract for the purchase and sale of the KOREASAT 3 satellite ("ABS-7" or the "Satellite") and related equipment (the "Baseband Equipment") (the "Purchase Contract").[11]  On that same day, ABSG and KT entered into a contract, pursuant to which KT agreed to perform certain services in connection with operating the Satellite on behalf of ABSG (the "Operations Agreement,"[12] and together with the Purchase Contract, the "Agreements").

47.   On **May 24, 2010**, the Parties issued a joint press release announcing the sale of the Satellite.  The press release referenced relevant U.S. regulatory approvals obtained in connection with the sale of the Satellite but did not make any reference to any Korean regulatory approvals.[13]

48.   On **February 18, 2011**, KT delivered the Satellite to ABSH.[14]

49.   On **July 4, 2011**, the Korean Communications Commission (the "KCC")[15] received a letter from the Government of Pakistan noting, among other things, KT's sale of the Satellite to ABS.[16]

---

[9] Statement of Claim, para. 8; Statement of Defense, para. 5.

[10] Prof. K. Choi Declaration, para. 59.

[11] Contract for the Purchase of Koreasat 3 Between Asia Broadcast Satellite Holdings, Ltd. And KT Corporation, April 30, 2010 (CE-1).

[12] Satellite Operation Services Agreement Between KT Corporation and Asia Broadcast Satellite, Ltd., April 30, 2010 (CE-2).

[13] *See, e.g.*, Asia Broadcast Satellite to Acquire Koreasat-3, ABSatellite.net, May 24, 2010 (CE-8); ABS Acquired Koreasat-3, Media Research Asia, May 24, 2010 (CE-18).

[14] *See* Letter from Y. Kwon to T. Choi, February 28, 2011 (CE-27).

[15] The KCC was the relevant regulatory authority at the time.  It was replaced in March 2013 by a newly-formed government ministry, the Ministry of Science, ICT and Future Planning.  *See* "English names of government ministries finalized," Yonhap News Agency, March 28, 2013 (CE-46) ("[T]he incoming government will create a

50.    On **September 7, 2011**, ABSH paid the purchase price of $500,000 for the Satellite to KT.[17]

51.    On **September 18, 2011**, KT delivered to ABS two warranty bills of sale for the Satellite and the Baseband Equipment (together, the "Bills of Sale").[18]  The Bills of Sale, which transferred title to the Satellite and Baseband Equipment, were dated **September 4, 2011**.

52.    On **October 12, 2011**, ABS sent to KT its signed acceptance of the Bills of Sale.[19]

53.    On **August 15, 2012**, the KCC received a second letter from the Government of Pakistan again noting, among other things, KT's sale of the Satellite to ABS.[20]

54.    In late **October 2013**, Korean news publications began reporting statements by Korean politicians criticizing the sale of the Satellite and, in particular, noting (1) that KT had not sought governmental approval prior to the sale, and (2) that KT had sold the Satellite at a "rock-bottom price."[21]  During this time-frame, one publication reported that MSIP had taken the position that KT was not required to seek prior approval for the sale of the Satellite because valuation of the Satellite did not meet the threshold of 5 billion won, which was identified by MSIP as the minimum valuation figure that would invoke the requirement of prior approval.[22]

---

new ministry in charge of science and information technology . . . with the 'future' ministry being named the 'Ministry of Science, ICT and Future Planning.'").

[16] *See* Letter from M. Noor to B. Rha, July 4, 2011 (CE-23).

[17] *See* Compilation of ABS Payments to KT, p. 1 (CE-29).

[18] *See* Email from R. Pak to A. Kahng, T. Choi, and W. Chow, September 15, 2011, attaching Satellite Health Status Report and Bills of Sale executed by KT (CE-30).

[19] *See* Email from R. Pak to C. Oh, October 12, 2011, attaching Bills of Sale executed by KT and accepted by ABS (CE-31).

[20] *See* Letter from M. Noor to H. Oh, August 15, 2012 (CE-24).

[21] *See, e.g.*, KT sells retired satellites at giveaway price, www.globalpost.com, October 31, 2013 (CE-45).

[22] *See, e.g.*, KT sells retired satellites at giveaway price, www.globalpost.com, October 31, 2013 (CE-45).

55.     On **October 31, 2013**, Ms. Seung-Hee Yoo, a member of the Korean Congress, conducted

a hearing regarding the legality of the sale of the Satellite.[23]  During the hearing, Ms. Yoo

expressed incredulity regarding MSIP's lack of knowledge regarding KT's sale of the

Satellite:

> Congresswoman Seung-Hee Yoo: Very recently? The timing of the sale . . . They
> were sold in 2011 and 2010. You were not able to get any information around the
> time?
>
> Witness Hae-Kwan Lee: I think [he] sold it rather quietly.
>
> Congresswoman Seung-Hee Yoo: With regard to this aspect, the fact that [KT],
> regardless that it is a private corporation, sold the satellites in violation of the
> law? I think the public nature, I think the sale damaged the public nature of
> communication. What is your judgment?

Ms. Yoo also expressed uncertainty regarding the precise law under which she would

attempt to hold KT accountable for the sale of the Satellite:

> Congresswoman Seung-Hee Yoo: Yes. Thank you. Thank you. I will now ask
> questions to the Minister.
>
> Minister Moon-Ki Choi: You mentioned earlier that you will hold hearings and
> take actions for the violation of law, and admitted that four laws have been
> violated.  Which law do you intend to apply? The laws affecting us, the Radio
> Act, the Telecommunication Business Act, and . . .

She also made clear that her goal was to find and apply the law that would impose

criminal punishment:

> Congresswoman Seung-Hee Yoo: Among the four, which one[s] provide criminal
> punishment? Minister Moon-Ki Choi: I think the Telecommunication Business
> Act probably will . . .
>
> Congresswoman Seung-Hee Yoo: Criminal charge is not allowed under the Radio
> Act, is it? So, I just heard that the current policy of the Ministry of Science, ICT,
> and Future Planning is to apply the Telecommunication Business Act.  Is this
> correct?

---

[23] *See* Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on October
31, 2013 (CE-137).

Minister Moon-Ki Choi: We will review and pursue the punishment provided under the law if it is allowed.

Finally, Ms. Yoo acknowledged that KT's alleged violation of the Korean Foreign Trade Act ("FTA") was a matter that was properly addressed by the Korean Ministry of Trade, Industry and Energy ("MOTIE") and that the penalties under the FTA were limited to fines and imprisonment:

Congresswoman Seung-Hee Yoo: Yes.  It must be done to the full extent according to the law.  Also, I presume that the violation of the Foreign Trade Act would be handled by the relevant agency, the Ministry of Trade, Industry, and Energy?  The law provides civil punishment of imprisonment up to five years, a fine up to three times the transaction price, doesn't it?

56.   On **November 1, 2013**, an article was published in the Korean media reporting that KT took the position that the Satellite was not a strategic asset because it was retired.[24]

57.   On **November 5, 2013**, MSIP held a hearing regarding the legality of KT's sale of the Satellite.  During the hearing, an MSIP official took the position that ABS did not have the right to use the frequencies allocated to Korea by the International Telecommunication Union (the "ITU") at its designated orbital slot, 116.0° East.[25]

58.   On **November 7, 2013**, Congresswoman Yoo held a second hearing regarding the legality of the sale of the Satellite.  During the hearing, Ms. Yoo addressed the possibility of various regulatory actions to address the issue.[26]  She also specified the actions that she expected MSIP to take to address the allegedly illegal sale of the Satellite:

Congressperson Seung-Hee Yoo: In the end, this case is about how Chair Seok-Chae Lee of [KT] violated the laws of Republic of Korea and sold the citizens'

---

[24] Satellite Sales, www.businesskorea.co.kr, November 1, 2013 (CE-47).

[25] *See* MSIP considers cancellation of assigned frequencies over KT's sale of satellite, www.mediaus.co.kr, November 7, 2013, (CE-48).

[26] *See* Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on November 7, 2013 (CE-138).

assets including the frequency and the orbit to a Hong Kong firm without any authority.

I think the problem lies in the fact that the citizens' corporation was privatized into a private corporation.

Allowing a foreign firm to use even the orbit can constitute theft or fraud under the Criminal Code.

I think the Deputy Minister should take the full responsibility of the illegal sale of satellite and to press a charge with the Prosecutor's Office against Chair Seok-Chae Lee, who signed and sealed [the sale contract], on the suspicion of violation of the Telecommunications Business Act, etc.

What would you do?

59.    On **November 18, 2013**, KTSAT sent ABS an email to update ABS on the status of its efforts to address the MSIP issues and to inform ABS that KTSAT would seek its input and approval on KTSAT's proposals to MSIP.  ABS responded that it would not agree to any proposal unless KTSAT first secured certain approvals from the Korean government regarding operation of the Satellite.[27]

60.    On **November 19, 2013**, KTSAT offered to ABS a "Buy Back and Lease Option" designed to address MSIP's concerns regarding sale of the Satellite; ABS rejected this proposal.[28]

61.    On **November 24, 2013**, ABS notified KT by letter that the Purchase Contract was terminated, effective immediately, and that the Operations Agreement would be terminated unless KT cured its alleged breaches thereunder within a seven-day period.[29]

---

[27] *See* SY Paik Declaration, para. 32 (*citing* emails between S. Paik and T. Choi, November 18, 2013 (RE-43)).

[28] *See* SY Paik Declaration, paras. 33 to 34.

[29] *See* Letter from T. Choi to KT, November 24, 2013 (CE-49).

62. On **November 27, 2013**, KT notified ABS by letter that it objected to the termination of the Purchase Contract and that the seven-day cure period under the Operations Agreement would be impossible to meet.[30]

63. On **December 1, 2013**, Claimants deemed the Operations Agreement terminated.[31]

64. On **December 18, 2013**, MSIP issued an order (the "MSIP Order") that, among other things, (1) declared the Purchase Contract "null and void" due to KT's failure to comply with the Foreign Trade Act (the "FTA"), (2) cancelled KT's permission to use Ka-band frequencies for the 116.0° East orbital slot, and (3) directed KT to return the Satellite to its original operating condition.[32]

65. Also on **December 18, 2013**, KT sent a letter to ABS and Lockheed Martin asserting ownership of the Satellite.[33]

66. On **February 28, 2014**, ABS sent a letter to KT communicating its views that (1) the portion of the MSIP Order declaring the Purchase Contract "null and void" was without legal effect because MSIP did not have the authority to nullify the Purchase Contract, and (2) that ABS expected KT to appeal the remaining portions of the MSIP Order to a Korean court.[34]

67. On **March 14, 2014**, KT responded to ABS's February 28 letter and stated that it would not appeal the MSIP Order to a Korean court asserting that (1) with respect to that portion of the MSIP Order nullifying the Purchase Contract, the validity of the Purchase Contract

---

[30] *See* Letter from Y. Kim to T. Choi, November 27, 2013 (RE-46).

[31] *See* Statement of Claim, para. 56.

[32] The translation of the MSIP Order is at CE-54 and at footnote 5 above.

[33] *See* Letter from Y. Kim to T. Choi (ABS) and M. Hamel (Lockheed Martin), December 18, 2013 (CE-58).

[34] *See* Letter from M. Nolan to K. Kim, February 18, 2014 (CE-61).

was a matter to be determined in this Arbitration, and (2) challenging the remaining portions of the MSIP Order would not be in the best interest of either of the Parties.[35]

### C. *Political and Factual Matrix*

68.   The Arbitral Tribunal believes that an appreciation of the contentions of the Parties can only be understood in light of the political and factual context in which KTSAT and MSIP were under siege by various Korean politicians.

69.   KTSAT was formerly the state-owned telecommunications monopoly.   While it was privatized in 2002, press reports indicate that the government still viewed it as one of its "trophies or possessions."[36] Those same press reports indicate KTSAT's "bitter history of having its CEO replaced at the start of new administrations."[37] The new Park administration reportedly wanted Chairman Lee to resign but he refused to do so, wishing to complete his three-year term.  This is when the trouble began.

70.   On October 22, 2013, prosecutors raided the offices of KT and the residence of Chairman Lee to investigate breach of trust allegations including in respect of the sale of 39 buildings at an alleged loss of $83 million dollars.[38] The alleged sale of assets below a "fair price" became a theme of the political attacks on KTSAT and was a focus of interest of the National Assembly.

71.   At a hearing of the Telecommunications Committee, opposition Congresswoman Yoo asserted the sale was at an "unjustly low price" and constituted "leakage of national

---

[35] *See* Letter from K. Kim to M. Nolan, March 14, 2014 (CE-62).

[36] KT Chairman Lee's residence, offices raided, Korea JoongAng Daily, October 23, 2013 (CE-42).

[37] KT Chairman Lee's residence, offices raided, Korea JoongAng Daily, October 23, 2013 (CE-42).

[38] KT Chairman Lee's residence, offices raided, Korea JoongAng Daily, October 23, 2013 (CE-42).

wealth."[39]  Of course, as the record shows and as KTSAT tried to explain, the economic

benefits of the deal lay not in the purchase price of the hardware but in the fees that would

be generated under the Operations Agreement.

72.     The facts did not deter the attack on KTSAT and the sale of the Satellite.  Congresswoman

Yoo pivoted to another line of criticism alleging regulatory failures.  At the same hearing,

she stated: "I presume that the violation of the Foreign Trade Act would be handled by the

relevant agency, MOTIE?"[40]   But MOTIE was not before her at the hearing.   She

continued:

> MSIP must immediately start its review on the legality of the KT's satellite
> sale.  It is a violation of law, isn't it? Therefore I ask that an action suitable for the
> condition is implemented immediately.  Especially, I urge the Prosecutor's Office
> to immediately start an investigation on possible malpractice of Chairman Lee in
> connection with the sale of satellites at the unjustly low prices.[41]

73.     A press report on the hearing both quotes Congresswoman Yoo and recounts her view that

KT should have "earned approval . . . ahead of the sell-off as satellites are regarded as

strategic assets."[42]   That same press report records MSIP's disagreement with that

view.  MSIP's view is that "while a sell-off deal of strategic goods valued below 5 billion

won does not need prior approval, KT was still obligated to report the sale to the

Ministry."[43]

---

[39] Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on October 31, 2013 (CE-137).

[40] Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on October 31, 2013 (CE-137).

[41] Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on October 31, 2013 (CE-137).

[42] KT sells retired satellites at giveaway price, www.globalpost.com, October 31, 2013 (CE-45).

[43] KT sells retired satellites at giveaway price, www.globalpost.com, October 31, 2013 (CE-45).

74.     It is interesting to note that at this point in the drama, MSIP appeared to hold the view that no approval prior to the sale was necessary, only post-sale notification. This is of course at odds with MSIP's eventual order.

75.     That MSIP did not then believe that prior approval was needed is borne out at subsequent hearing on November 7, 2013. At that hearing the same Congresswoman berated an MSIP Deputy Minister, stating: "I think that [MSIP] bears great responsibility in the matter."[44]   The Deputy Minister explained that the regulatory problems related to frequency allocation, leading Congresswoman Yoo to conclude by remarking: "Isn't it obvious that frequency allocation must be revoked?"[45]

76.     The last point to bear in mind is simply this: The sale in question was the third such transaction between these Parties.  No claim of non-compliance with regulatory requirements was made in relation to the two prior sales although no prior approval was sought.  Similarly, no claim that the satellites were a "strategic asset" was ever asserted. The political environment was apparently the only thing that was different when those prior sales were executed.  What is *not* different is the subject matter of the transactions: satellites at the end of their design life.

77.     It is in this fraught political environment, which is all in the record and that Respondent's counsel itself acknowledged was a "political firestorm,"[46] that the contentions of the Parties, including their characterizations of various Korean regulatory actions, must be assessed by the Arbitral Tribunal.

---

[44] Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on November 7, 2013 (CE-138).

[45] Translation of KT's Transcript of Hearing Conducted by Congresswoman Seung-Hee Yoo on November 7, 2013 (CE-138).

[46] *See* Hearing Transcript 1115:13-17 (Mr. Werner).

## III. JURISDICTION

78.     The Parties' agreement to arbitrate arises from two arbitration agreements: (i) Article 19 of the Purchase Contract; and (2) the Parties' joint letter to the ICC Secretariat dated June 18, 2014, in which they amended Article 13.1 of the Operations Agreement.

79.     The arbitration clause in the Purchase Contract provides as follows:

19.1    If any dispute, claim or conflict . . . between the Parties ("Dispute") arise under this Contract, the Parties shall continue to meet their obligations and rights under this Contract while the Dispute resolution procedures set forth herein are carried out.  Each Party shall appoint a representative who shall investigate the facts and circumstances related to the Dispute and negotiate in good faith with the representative so appointed by the other Party for the purpose of finding a[n] equitable and just resolution to the Dispute within a reasonable period of time, but in no event later than thirty (30) days from the date that either Party informs the other in writing that such Dispute exists.

19.2    If any such Dispute is not settled to the satisfaction of the Parties in accordance with the procedure set forth in Paragraph 19.1, the Dispute shall be referred to the respective senior management of each Party and a representative of each senior management shall meet and seek resolution of the Dispute in good faith within thirty (30) days from the notice of the Dispute to the respective senior managements.

19.3    Any Dispute not settled pursuant to Paragraphs 19.1 and 19.2 above shall be finally settled through binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("Rules") in effect on the date that such notice of Dispute is given.  The arbitration shall follow the procedure below.

(a) Each Party shall select an arbitrator and the two (2) arbitrators shall mutually select a third arbitrator, the three (3) of whom shall serve as an arbitration panel.  If no agreement on the third arbitrator can be reached within the thirty (30) days of the confirmation of the second arbitrator, then the third arbitrator shall be appointed by the ICC.[47]

---

[47] The Parties modified the method for choosing the third (presiding) arbitrator in a "Protocol on Appointment of Presiding Arbitrator," dated April 23, 2014.  In the Protocol, ABSH and Respondents agreed on a list of required qualifications of the presiding arbitrator and agreed to send the list to the two co-arbitrators.  ABSH and Respondents further agreed to ask the co-arbitrators to agree on and present to the Parties a list of five recommended candidates who met the qualifications.  ABSH and Respondents agreed on an approach in case of conflicts, and agreed that each Party could strike one candidate from the list supplied by the co-arbitrators, without explanation.  It was agreed that ABSH and Respondents would rank the candidates in order of preference, with 1 being the most favored and 5

    (b) The place of arbitration shall be New York, U.S.A and the arbitration proceedings shall be governed by and conducted in accordance with the Rules applicable to the arbitration procedure. If the Rules are silent, the procedure shall be determined in accordance with the governing law of this Contract.

    (c) All documentation and oral proceedings shall be conducted in the English Language. The arbitrators shall have a command of the English language and, subject to the Rules of the ICC, shall not be or have been affiliated in any way with either Party or any branch, parent, affiliate, or subsidiary of either Party.

    (d) The award of the arbitration panel shall be the sole and exclusive remedy between the Parties regarding any claims, counterclaims, issues, or accountings presented or pled to the arbitration tribunal. Monetary awards shall be made and shall be payable promptly in USD free of any tax, deduction, or offset.

    (e) The prevailing Party shall recover all costs of the arbitration, including but not limited to the fees and expenses of the arbitrators(s) and reasonable attorney fees, unless the award otherwise provides.[48]

80.    The arbitration clause in the Operations Agreement provides as follows:

    13.1    <u>Arbitration</u>. Subject to a pre-requisite to attempt to resolve any dispute(s) in accordance with Article 12 (Dispute Resolution), the Parties agree to submit any dispute arising out of this Agreement to arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce, in effect on the date that such notice is given (the "Rules").[49] Arbitration shall be held in New York, New York, U.S.A. Arbitration proceeding[s] shall be conducted in English. A tribunal consisting of three (3) arbitrators selected in accordance with Paragraph 13.2 below shall conduct the arbitration.

    13.2    <u>Procedure</u>. A Party demanding arbitration of a controversy shall, in writing, specify the matter to be submitted to arbitration and, simultaneously, choose and nominate a competent individual to act as an arbitrator. The Party initiating arbitration of a dispute shall be treated as the claimant party in the arbitration. Thereafter, within fifteen (15) days after receipt of such written notice, the other Party shall, in writing, choose

---

the least favored. The candidate with the lowest combined score would be nominated jointly by those Parties as the presiding arbitrator. In case of ties, conflicts or unavailability, Claimant ABSH and Respondents would go to lower-ranked candidates and, if necessary, to the ICC Court for its decision.

[48] Purchase Contract, Arts. 19.1-19.3 (CE-1). Section XVI of the Terms of Reference, which were issued on December 19, 2014, makes clear that the 2012 version of the ICC Rules governs these proceedings.

[49] Note that this version of Article 13.1 includes the amendments agreed upon by the Parties in their June 18, 2014, letter to the ICC Court.

and nominate a second competent arbitrator. The two arbitrators so chosen shall promptly meet and select a third arbitrator, giving written notice to both Parties of their choice and fixing a time and place at which both Parties may appear and be heard with respect to the controversy at hand. In the event the two arbitrators fail to agree upon a third arbitrator within a period of fifteen (15) days, or if, for any other reason, there is a lapse in the naming of an arbitrator or arbitrators, or in the filing of a vacancy, or in the event of failure or refusal of any arbitrator(s) to attend to or fulfill his or their duties, then upon application by either Party, an arbitrator or arbitrators shall be named by the American Arbitration Association in accordance with the Rules.

13.3   <u>Award</u>. The arbitration award made shall be final and binding upon the Parties and judgment may be entered thereon, upon the application of either Party to any court having jurisdiction. Any relief awarded by the arbitrators shall not exceed any limitation of liability specified in Article 8 (Limitation of Liability and Indemnification).

13.4   <u>Costs and Expense</u>. Each Party shall bear the cost of preparing and presenting its case. The cost of arbitration, including the fees and expenses of the third arbitrator, will be shared equally by the Parties unless the award otherwise provides.

13.5   <u>Equitable Relief</u>. Notwithstanding Paragraph 13.1 above, ABS and KT shall each have the right to obtain injunctive relief, if necessary, in order to prevent the other Party from willfully breaching its obligations under this Agreement or to compel the other Party to perform its obligations under this Agreement.

81.   The Parties agreed in their written submissions that the Arbitral Tribunal has jurisdiction to consider claims alleging breaches of the Purchase Contract and Operations Agreement, including claims for ownership of the Satellite and Baseband Equipment.[50]   Respondents contest the jurisdiction of the Arbitral Tribunal to consider the various tort claims raised by Claimants.[51]

---

[50] *See* Statement of Claim, para. 69; Statement of Defense, para. 103.

[51] *See* Statement of Defense, paras. 104 to 107; Rejoinder, paras. 151 to 159.

82.    The Arbitral Tribunal has jurisdiction over all claims and counterclaims raised by the Parties in this case.[52]  As discussed in paragraph 81 above, this is not disputed by any of the Parties.  The Arbitral Tribunal withholds decision on jurisdiction over the tort claims, asserted by Claimants, until and unless the Arbitral Tribunal has been informed by the Parties that they have failed to settle their dispute as called for in this Partial Award.

83.    As to the merits, this Partial Award will resolve only the issue of title, which all Parties and the Arbitral Tribunal agree fall within the jurisdiction of the Arbitral Tribunal.

84.    The Arbitral Tribunal's authority to focus on the issue of title in this Partial Award is derived from:

(1) Article XVII of the Terms of Reference, which provides that "[t]he Arbitral Tribunal shall be free, after consultation with the Parties, to decide any issue by way of a partial or interim award, or by a final award, as may be deemed appropriate."

(2) Procedural Order No. 1, which provides that "[t]he Arbitral Tribunal shall be free to decide any issue by way of an order, a partial or interim award or a final award, as it may deem appropriate."[53]  Indeed, the authority to render a partial award is "inherent in the arbitrators' mandate to resolve the parties' dispute in an efficient manner."[54]

(3) Appendix IV of the ICC Rules, which contemplates the issuance of partial/interim awards as a case management technique, and specifically provides that an arbitral tribunal may "*[b]ifurcat[e] the proceedings or render[] one or more partial awards on key issues, when doing so may genuinely be expected to result in a more efficient resolution of the case*" (emphasis added).  Appendix IV to the ICC Rules further provides that, among the "case management techniques that can be used by the arbitral tribunal and the parties for controlling time and cost" is the possibility of "rendering one or more partial awards on key issues."

---

[52] These claims and counterclaims are discussed in Sections V and VI below.

[53] Procedural Order No. 1, para. 68.

[54] Gary B. Born, *International Commercial Arbitration* (Kluwer 2d ed. 2014), p. 3015.  None of the Parties objected to the text of Procedural Order No. 1 or to Appendix IV of the ICC Rules with respect to the authority of the Arbitral Tribunal.

85.   The Arbitral Tribunal's authority under the ICC Rules to render a partial award in which the sole question of title would be decided was not controverted or questioned by either Party at any time.   There is nothing in the ICC Rules that would permit the Parties to prevent the Arbitral Tribunal from deciding, in accordance with Appendix IV of the ICC Rules, a key issue, as a case management technique.   Indeed, Article 2 of the ICC Rules defines "award" to include an "interim, partial or final award."   And, in the instant case, the bulk of the Parties' argumentation addressed the issue of title.

86.   It is true that Respondents did not want the Arbitral Tribunal to issue a determination solely with respect to the title issue, as Claimants had requested in their March 9, 2016, letter to the Arbitral Tribunal, and preferred a hearing to discuss all issues.[55]   But Respondents did not at any time question the Arbitral Tribunal's authority to issue a determination solely with respect to the title issue pursuant to the Terms of Reference, Procedural Order No. 1, and Appendix IV to the ICC Rules.   In view of Claimants' request, the Terms of Reference, Procedural Order No. 1, and Appendix IV of the ICC Rules, the Parties knew that a partial award solely on title might be issued, even though that was not Respondents' preference, as noted in their letter dated March 11, 2016, cited in footnote 55 above.   Claimants wanted a determination solely with respect to the title issue, as requested in their March 9, 2016 letter to the Arbitral Tribunal.   Thus, there was no agreed-upon preference or expectation.   After careful consideration of the matter, the Arbitral Tribunal, by majority, has decided to issue a partial award on the title issue accompanied by a request to the Parties to try to settle the entire dispute.   In any event, as

---

[55] *See* Letter from M. Nolan to Arbitral Tribunal, March 9, 2016; Letter from P. Werner to Arbitral Tribunal, March 11, 2016.   *See also* paras. 25 to 26 above.

Gary Born has written, and cited in paragraph 84(2) above, the authority to render a partial

award is "inherent in the arbitrators' mandate to resolve the parties' dispute in an efficient

manner."

## IV. APPLICABLE LAW

### A. *Law Applicable to the Dispute Generally*

87.     Article 20 of the Purchase Contract provides as follows:

> This Contract shall be governed by and construed in accordance with the federal
> and state laws in effect in the State of New York of the United States of America,
> without giving effect to the conflict of law principles thereof."

88.     Article 11 of the Operations Agreement provides as follows:

> This Agreement shall be governed by, and interpreted and enforced in accordance
> with, the Laws of the State of New York of the United States of America,
> exclusive of its choice of law rules.

### B. *Law Applicable to Determining the Effect of the MSIP Order*

89.     Notwithstanding Article 20 of the Purchase Contract, which is acknowledged and

accepted by the Parties as establishing that New York law is the law applicable to the

question of title, during the course of the arbitral proceedings Respondents raised an issue

with respect to the law applicable to the Arbitral Tribunal's assessment of the impact of

the MSIP Order, which declared the contract "null and void" on the basis of failure to

comply with certain Korean regulatory provisions.  Initially, the Parties agreed that the

law applicable to the assessment of this issue was the law of New York but Respondents

now assert that Korean law governs this issue.

#### 1. *Respondents' Position*

90.     Respondents' position, which was consistent throughout its written submissions and at the

December 2015 hearing, had been that New York law governs the determination of the

impact of the MSIP Order.  For example, in its Statement of Defense and Counterclaim, Respondents stated as follows:

> Under New York law, "[i]n cases where foreign law is violated, the *existence* of illegality is to be determined by the local law of the jurisdiction where the illegal act is done, while the *effect* of illegality upon the contractual relationship is to be determined by the law of the jurisdiction which is selected under conflicts analysis." . . . The impact of that illegality under New York law is equally clear.[56]

91.   Respondents maintained this position in their Statement of Rejoinder, in which they argued their position solely under New York law.[57]  Respondents also maintained this position at the December 2015 hearing.[58]

92.   In their First Supplemental Statement, submitted on July 11, 2016, Respondents reversed course and asserted, for the first time, that the Arbitral Tribunal should disregard the Parties' choice of New York law and apply Korean law directly:

> The Parties' contractual agreement to apply New York law is properly overridden under the circumstances here because this case involves "mandatory national laws [and] public policies [that] override contractual obligations." . . . Here, the most applicable law is Korean law because the [FTA] is a mandatory law and is intended to safeguard Korea's fundamental sovereign prerogative in its peace and national security.[59]

93.   Alternatively, Respondents argued that, by virtue of a conflict-of-laws analysis, the application of New York law ultimately leads to Korean law:

> Where, as here, a foreign law is violated, the "*existence* of illegality is to be determined by the local law of the jurisdiction where the illegal act is done, while the *effect* of illegality upon the contractual relationship is to be determined by the law of the jurisdiction which is selected under conflict analysis." In determining the effect of this illegality, conflicts analysis once again directs the Tribunal back to Korean law – given Korea clearly has a stronger interest in this issue than New

---

[56] Statement of Defense, paras. 135-136.

[57] *See* Rejoinder, paras. 98-103.

[58] *See* Hearing Transcript at 1149:7-9 (Mr. Werner); Hearing Transcript at 1150:10-15 (Mr. Werner).

[59] Respondents' First Supplemental Statement (*citing* Gary B. Born, *International Arbitration: Law and Practice*, 39-40 (2d ed. 2014)).

York – and the conclusion that the effect of the illegality is that the sale transaction is unwound.[60]

94.   In their Second Supplemental Statement, Respondents argued that, contrary to Claimants' assertion, New York General Obligations Law § 5-1401 does not undermine the Arbitral Tribunal's authority to give effect to the MSIP Order because, under New York law, the "boilerplate" choice-of-law clause must be harmonized with the "broad arbitration provision" conferring upon the Arbitral Tribunal authority to settle "any dispute, claim, or conflict."[61]

95.   Respondents assert that the Arbitral Tribunal is dealing with both a choice-of-law clause and a broad dispute resolution provision that incorporates the ICC Rules. According to Respondents, "[b]ecause the Parties expressly agreed to apply the ICC Rules, the limiting principles of Section 5-1401 are irrelevant, and the [Arbitral] Tribunal should give effect to the Parties' entire Agreement," which incorporates both the ICC Rules and New York state and federal law.[62] Respondents also argue that, even if the Arbitral Tribunal finds that Section 5-1401 applies, it has the authority to give effect to the MSIP Order based on principles of comity.[63]

---

[60] Respondents' First Supplemental Statement, paras. 62-63 (*citing* Restatement (Second) of Conflict of Laws, § 187 (2)(b)).

[61] Respondents' Second Supplemental Statement, paras. 35-37.

[62] Respondents' Second Supplemental Statement, para. 38.

[63] Respondents' Supplemental Statement, para. 39.

### 2. *Claimants' Position*

96.   Claimants' position is, that the existence of the illegality is to be determined by Korean law while the effect of the illegality is to be determined by New York law, and has been consistent throughout this Arbitration.[64]

97.   In their Second Supplemental Statement, Claimants contest both Respondents' reversal of its previously held position and Respondents' reliance on the Restatement (Second) of Conflict of Laws.[65]   Claimants argue that New York does not follow the Restatement with respect to this issue.[66]

98.   Claimants assert that the only question for the Arbitral Tribunal is whether, pursuant to a New York conflicts analysis, the Arbitral Tribunal can displace the Parties' choice of New York law.[67]

99.   Claimants argue, as a threshold matter, that a conflicts analysis is not necessary because there is no true conflict.   According to Claimants, the effect of the MSIP Order on the validity of the Purchase Contract is the same under New York law and Korean law, which both require a repugnant violation implicating important public policy concerns. Claimants submit that Respondents cannot make such a showing.[68]

---

[64] *See* Reply, paras. 243-246; Sur-Rejoinder, paras. 30-35; *see also* Claimants' First Supplemental Statement, para. 23 (emphasizing that "although Korean law issues arise in this Arbitration, they do so only because they inform the required factual analysis; the legal analysis is dominated by New York law, which governs the Agreements); paras. 39-40 (arguing that a conflict-of laws analysis leads to the application of New York law because, under New York conflicts rules, the choice of law agreed to by the Parties is to be given presumptive effect).

[65] Claimants' Second Supplemental Statement, para. 4.

[66] Claimants' Second Supplemental Statement, para. 2.

[67] Claimants' Second Supplemental Statement, para. 5.

[68] Claimants' Second Supplemental Statement, para. 6.

100.   If the Arbitral Tribunal were to find a true conflict between New York law and Korean law, Claimants submit that the Arbitral Tribunal must first determine (1) whether the Korean law Respondents argue should be applied, the FTA, is "fundamental" for conflicts purposes, and (2) whether the applicable conflict-of-laws rules mandate that the FTA, rather than New York law, should apply to the issue of the validity of the Purchase Contract.[69]

101.   With respect to the first question, Claimants argue that the FTA cannot be considered "fundamental" for conflicts purposes.  According to Claimants, this is evidenced by the fact that the Korean government did not declare KT's earlier sale of KS-2 "null and void."[70]

102.   With respect to the second question, Claimants argue that New York conflict-of-laws rules do not permit the application of Korean law.  Claimants rely on New York General Obligations Law § 5-1401, which requires courts to enforce parties' selection of New York law in commercial contracts of $250,000 and more, and New York cases holding that parties' election of New York law is not to be derogated from, irrespective of any comity concerns or interests/policies of any foreign nation.[71]

---

[69] Claimants' Second Supplemental Statement, para. 7.

[70] Claimants' Second Supplemental Statement, para. 8.

[71] Claimants' Second Supplemental Statement, para. 9.

## V.  CLAIMS AND COUNTERCLAIMS SET FORTH BY THE PARTIES

### A.  *Claims Set Forth by Claimants*

103.   Claimants assert that they hold title to the Satellite and Baseband Equipment because all conditions precedent contained in the Purchase Contract were met.[72]

104.   According to Claimants, if the Arbitral Tribunal finds that title did not transfer, Respondents are liable for breaching several provisions of the Purchase Contract:

- Article 5.2, which obligated Respondents to "obtain all necessary licenses, consents and approvals for the sale of the Satellite and the Baseband Equipment";[73]
- Article 12.1, which obligated Respondents to "remain responsible for obtaining and maintaining . . . all governmental and regulatory licenses and authorizations required of KT to perform its obligations herein";[74]
- Article 12.2, which obligated Respondents to "obtain and maintain all required approvals and consents to enable ABS to use the Designated Orbital Position through the end of the Orbital Slot Use Period";[75] and
- Article 18.1, pursuant to which Respondents represented and warranted that (1) "[n]o consent, approval, order or authorization of . . . any court, administrative agency or commission or other governmental authority or instrumentality, other than those which have already been obtained or complied with . . . are required in connection with the execution, delivery or performance of this Contract; and (2) "[t]he execution and performance of this Contract shall not . . . violate any applicable laws."[76]

105.   Claimants also assert that, irrespective of the Arbitral Tribunal's decision on the question of title, Respondents have failed to meet several of their contractual obligations under the Purchase Contract and Operations Agreement.

106.   *First*, according to Claimants, Respondents' failure to deliver the Baseband Equipment constitutes a breach of Article 5.8 of the Purchase Contract, which obligated Respondents

---

[72] Statement of Claim, paras. 72-74; Reply, paras. 207-208; Claimants' First Supplemental Statement, paras. 24, 26.  The Parties' arguments in respect of title to the Satellite and Baseband Equipment are set forth in greater detail in Section VI below.

[73] Statement of Claim, para. 94.

[74] Statement of Claim, para. 95.

[75] Statement of Claim, para. 96 (see Article 1 of the Purchase Contract (CE-1) for defined terms).

[76] Statement of Claim, para. 97.

to ship and install in ABS's facilities the Baseband Equipment within 30 days after a request by ABS.[77]

107.   *Second*, Claimants allege, Respondents failed to provide ABSH with the opportunity to jointly form a special purpose entity to develop a successor satellite, thereby breaching Article 23 of the Purchase Contract.[78]

108.   *Third*, Respondents' alleged failure to obtain authorization for ABSH to use certain transponders on the Satellite breached two provisions of the Purchase Contract: Article 5.3, which obligated Respondents to enable and authorize ABS to operate the Satellite at, and to use, the 116.0° East orbital slot; and Article 12.3, pursuant to which Respondents were solely responsible for "the settlement of potential interferences to the Satellite and any coordination with other satellite operators."[79]

109.   *Fourth*, Respondents' alleged failure to obtain the legal authority to operate the Satellite at the 116.0° East orbital slot violated Articles 5.3[80] and Articles 12.1, 12.2, and 18.1 of the Purchase Contract,[81] as well as Articles 5.1.1, 5.1.3, and 6.1 of the Operations Agreement.[82]

110.   Claimants assert that Respondents are liable not only for direct damages arising from their breaches of the Purchase Contract, but also for indirect, consequential, special, incidental, or punitive damages because these breaches were a result of either willful misconduct or

---

[77] Statement of Claim, para. 107; Reply, para. 280.

[78] Statement of Claim, para. 110; Reply, paras. 281 to 287.

[79] Statement of Claim, para. 113; Reply, paras. 293 to 296.

[80] Statement of Claim, para. 117.

[81] Statement of Claim, para. 118.

[82] Statement of Claim, para. 122-123.

gross negligence on the part of Respondents.[83]   Claimants seek only direct damages resulting from Respondents' alleged breaches of the Operations Agreement.[84]

111.   Claimants also assert four tort claims against Respondents: (1) tortious interference with Claimants' relationship with Lockheed Martin;[85] (2) tortious interference with Claimants' prospective economic advantage from their relationship with Lockheed Martin;[86] (3) fraud/intentional misrepresentation by Respondents with respect to their representations that they had procured all necessary governmental approvals;[87] and (4) negligent misrepresentation, in the event that Respondents' representations were not intentional.[88]

112.   Claimants assert that Respondents are liable for direct damages resulting from each of these tortious actions.[89]

## B. *Defenses and Counterclaims Set Forth by Respondents*

113.   Respondents have contested each of the claims asserted by Claimants and have raised several counterclaims.

114.   As an initial matter, Respondents assert that title to the Satellite and Baseband Equipment did not transfer because the condition precedent of securing all necessary approvals was not met.[90]

---

[83] *See* Statement of Claim, paras. 98, 99, 108-109, 111-112, 114-115, and 119-120.

[84] *See* Statement of Claim, para. 124.

[85] Statement of Claim, para. 125.

[86] Statement of Claim, paras. 127-130.

[87] Statement of Claim, para. 132.

[88] Statement of Claim, para. 133-134.

[89] *See* Statement of Claim, paras. 126, 131, and 135.

[90] Statement of Defense, paras. 109-111.

115.   Respondents argue that, contrary to Claimants' assertions, they did not breach their contractual obligation to deliver the Baseband Equipment[91] because Claimants did not request delivery until after they "purported to terminate" the Purchase Contract.[92]

116.   Respondents argue that they did not breach Article 23 of the Purchase Contract[93] because, in the first instance, Article 23 is too vague to be enforceable[94] and, in any case, because they offered Claimants a "first opportunity" to negotiate a future business arrangement concerning a successor satellite.[95]

117.   Respondents contest Claimants' contention that they breached Articles 5.3 and 12.3 of the Purchase Contract by failing to obtain authorization for ABSH to use certain transponders on the Satellite.[96] According to Respondents, neither Article 5.3 nor Article 12.3 imposed upon them an obligation to do anything more than coordinate with the responsible administration to discuss issues that might arise.[97]

118.   With respect to Claimants' tort claims,[98] Respondents maintain that these do not fall within the scope of the Arbitral Tribunal's jurisdiction.[99]   Alternatively, Respondents argue that these claims fail because Claimants have not alleged that a legal duty,

---

[91] Claimants' argument is set forth at para. 106 above.

[92] Statement of Defense, paras. 159-160; Rejoinder, paras. 113-119.

[93] Claimants' argument is set forth at para. 107 above.

[94] Statement of Defense, para. 162; Rejoinder, paras. 120-130.

[95] Statement of Defense, para. 165; Rejoinder, para. 131.

[96] Claimants' argument is set forth at para. 108 above.

[97] *See* Statement of Defense, para. 167-169; Rejoinder, paras. 135-138.

[98] *See* para. 111 above.

[99] Statement of Defense, para. 174.

independent of the contract, has been violated.[100]   In any case, Respondents argue, Claimants cannot set forth a claim for any of the torts they allege.

119.   According to Respondents, Claimants cannot establish a claim for tortious interference with contract because Lockheed Martin has not, in fact, breached its agreement with ABS and because Claimants have not alleged damages related to the actual performance of any contractual obligations.[101]   Claimants are unable to establish a claim for tortious interference with prospective economic advantage because (a) there was no interference with the relationship between ABS and Lockheed; (b) Respondents' statements to Lockheed concerning Claimants were not defamatory or otherwise improper; and (c) Claimants cannot establish the existence of damages.[102]   Respondents also maintain that Claimants' claims for both fraud/intentional misrepresentation and negligent misrepresentation fail because both Parties understood, based on their prior course of dealings, that no regulatory approvals were necessary and no representations in this regard were made by KTSAT.[103]

120.   Respondents assert that most of ABS's claimed damages are barred by both the Purchase Contract and the Operations Agreement, which limit the ability of the Parties to impose liability beyond the contract amounts and expressly bar indirect or consequential damages and damages for lost profits.[104]   Respondents take the position that their actions do not

---

[100] Statement of Defense, para. 175.

[101] *See* Statement of Defense, paras. 178 to 180.

[102] *See* Statement of Defense, paras. 182 to 186.

[103] See Statement of Defense, para. 187 to 188.

[104] Statement of Defense, para. 190; Rejoinder, paras. 179-185.

constitute willful misconduct or gross negligence and, thus, that Claimants cannot escape the contractual limitations on liability.[105]

121.   Respondents assert that the remainder of Claimants' damage claims are either speculative, not caused by KTSAT, or otherwise unsupported.[106]   Respondents maintain that some of the damages claimed were, in fact, caused by Claimants' unreasonable actions, which Claimants characterize as mitigation but Respondents characterize as a breach of the Purchase Contract.[107]

122.   Respondents assert that Claimants have committed several breaches of the Purchase Contract and Operations Agreement.

123.   *First*, according to Respondents, Claimants improperly terminated KTSAT's provision of service under the Operations Agreement and, as a result, failed to pay amounts due under Article 4.[108]

124.   *Second*, Respondents assert that Claimants breached Article 8.3 of the Purchase Contract when they improperly took control of and moved the Satellite from the 116.0° East orbital slot.[109]   According to Respondents, this was an unreasonable mitigation tactic that caused substantial harm to KTSAT and Korea.[110]   Respondents take the position that these actions reflected willful misconduct and gross negligence on the part of Claimants and, as

---

[105] *See* Statement of Defense, paras. 195 to 196; Rejoinder, para. 186.

[106] Statement of Defense, para. 202; Rejoinder, paras. 187 to 190.

[107] *See* Statement of Defense, para. 203.

[108] Statement of Defense, paras. 148 to 150; Rejoinder, paras. 196-199.   Claimants maintain that their termination of the Operations Agreement was proper and that it was effected only after it became clear that Respondents had breached their fundamental obligation to obtain and maintain the authority to operate the Satellite. Reply, para. 267.

[109] Statement of Defense, paras. 151 to 152; Rejoinder, paras. 200-203.

[110] *See* Statement of Defense, paras. 154-158; Rejoinder, paras. 191 to 195.   Claimants maintain that this was a prudent and reasonable mitigation measure that cannot properly be characterized as a breach of contract.   *See* Reply, paras. 273, 275-288, 350-355.

such, they are not bound by the limitations of liability imposed by the Purchase Contract with respect to the damages arising from this breach.[111]

125. Finally, Respondents argue if Claimants are entitled to the purchase price for the Satellite because title never transferred, then, Claimants are liable in *quantum meruit* for lease payments to Respondents for their use of the Satellite.[112]

## VI. THE CLAIM FOR TITLE TO THE SATELLITE AND BASEBAND EQUIPMENT

126. Claimants and Respondents both assert title to the Satellite and Baseband Equipment. The Parties' arguments focus on four principal issues: (1) whether all conditions precedent to the transfer of title contained in the Purchase Contract were satisfied; (2) whether, assuming that a condition precedent was not satisfied, Respondents can defeat the transfer of title on this basis; (3) whether the declaration in the MSIP Order that the sale of the Satellite was "null and void" renders the Purchase Contract unenforceable; and (4) whether Respondents' failure to obtain an FTA export permit prior to the transfer of title is a mutual mistake that warrants rescission of the Purchase Contract.

### A. *Whether All Conditions Precedent to the Transfer of Title Were Satisfied*

#### 1. *Claimants' Position*

127. Claimants assert that title to the Satellite and Baseband Equipment transferred because all conditions precedent contained in the Purchase Contract were satisfied. According to Claimants, FTA approval in the form of an export permit was not a "necessary approval" required under the Purchase Contract.

---

[111] Statement of Defense, para. 153; Rejoinder, para. 204.

[112] Statement of Defense, paras. 204 to 205. Claimants argue that Respondents are barred from bringing this equitable claim by their numerous breaches of the Agreements, tortious behavior, and gross negligence and willful misconduct. Reply, paras. 356-357.

### a. *Title Transferred Because All Conditions Contained in Article 10.1 of the Purchase Contract Were Satisfied*

128. Claimants argue that title to the Satellite and Baseband Equipment transferred to ABSH on September 4, 2011, because all conditions precedent to the transfer of title contained in Article 10.1 of the Purchase Contract – that Respondents secure "any necessary approvals" and that Claimants furnish payment in accordance with the Purchase Contract – were satisfied and because Respondents had represented and warranted that all necessary approvals had been received.[113]  Claimants emphasize their reliance on Respondents' contractual obligations and representations that they had obtained all necessary approvals.[114]

129. Claimants note that Respondents issued Bills of Sale to ABSH evidencing the transfer of title, as required by Article 10.1 of the Purchase Contract, and that Claimants subsequently confirmed acceptance.[115]

130. According to Claimants, the reference in Article 10.1 to "any necessary approvals" is properly understood as any approvals that KT understood to be necessary prior to its issuance of the Bills of Sale.[116]  It is not properly understood as including approvals that the Parties did not understand to be necessary at the time or approvals that would be imposed retroactively; such an understanding would, according to Claimants, "make any purported transfer of title illusory."[117]

---

[113] Statement of Claim, paras. 72-74; Reply, paras. 207-208; Claimants' First Supplemental Statement, paras. 24, 26; *see also* Purchase Contract, Arts. 18.1(a), (b), (c), (e) (CE-1).

[114] Reply, para. 207.

[115] Statement of Claim, paras. 72-73; Reply, para. 208; Claimants' First Supplemental Statement, para. 26.

[116] Claimants' First Supplemental Statement, para. 25; *see also* Hearing Transcript 42:11-19.

[117] Reply, para. 209; *see also* Claimants' First Supplemental Statement, para. 29 (arguing that such an understanding would lead to "absurd and undesirable results").

**b.** ***The FTA Permit Was Not a "Necessary Approval" Within the Meaning of Article 10.1 of the Purchase Contract***

131. Claimants argue that FTA approval in the form of an export permit for the sale of the Satellite was not a "necessary approval" because the Satellite was not a Korean export.[118] According to Claimants, the Satellite was a U.S. export subject to U.S. export control laws because it was manufactured in the United States by Lockheed Martin.[119]

132. In support, Claimants rely on the written testimony of Respondents' legal expert, Professor Kyoungjin Choi, that the position taken by MSIP that the Satellite is a Korean export is "a controversial and debatable interpretation of the law."[120] Claimants also rely on the conclusion of their own legal expert, Professor Eon-Kyung Park, that Respondents' failure to obtain an FTA export permit prior to transferring title did not violate the FTA.[121]

133. Claimants also argue that an FTA export permit was not a "necessary approval" even if an export permit was required for sale of the Satellite because, according to their expert, Professor Hyo-Soon Nam, failure to obtain the permit prior to the sale of the Satellite would not, under Korean law, have resulted in the invalidation of the Purchase Contract.[122]

134. As to the MSIP Order, Claimants argue that it is not a reliable source for determining whether an FTA export permit was a "necessary approval" under Korean law because (1) the Korean courts, and not MSIP, are the proper authority for determining the validity of a

---

[118] Statement of Claim, paras. 78-79; Reply, para. 212; Claimants' First Supplemental Statement, para. 33(ii)-(iii).

[119] Statement of Claim, para. 79; Reply, para. 212.

[120] Reply, para. 213 and Claimants' First Supplemental Statement, para. 33(ii) (*quoting* Prof. K. Choi Declaration, para. 33).

[121] Reply, para. 214 (*citing* Prof. Park Expert Statement, p. 8); Claimants' First Supplemental Statement, para. 33(iii) (*citing* Hearing Transcript 781:23-782:3; 782:9-14; and 780:11-14 (Prof. Park)).

[122] Reply, para. 215 (*citing* Prof. Nam Expert Statement, p. 13).

contract;[123] and (2) the MSIP Order's application of Korean law is "highly suspect," particularly because, as Respondents acknowledge, (a) MSIP has not required parties to obtain an FTA export permit in nearly identical transactions, (b) MSIP did not initially take the position that an FTA export permit was required to sell the Satellite, and (c) MSIP took this position only in response to political pressure.[124]

### 2. *Respondents' Position*

135. Respondents assert that title to the Satellite and Baseband Equipment did not transfer because the condition precedent contained in Article 10.1 of the Purchase Contract – that "any necessary approvals" be obtained – was not met. According to Respondents, an FTA export permit was a "necessary approval."

### a. *Title Did Not Transfer Because the Condition Precedent of Securing "Any Necessary Approvals" Was Not Satisfied*

136. Respondents argue that, irrespective of what the Parties' understanding may have been at the time, the MSIP Order confirms that a critical condition precedent – that of obtaining all necessary approvals requisite to the transfer of title – was not met.[125] According to Respondents, Claimants acknowledged this point when they terminated the Purchase Contract.[126]

137. In Respondents' view, the condition in Article 10.1 of the Purchase Contract that title would transfer after "any necessary approvals and licenses" were received includes any

---

[123] Reply, para. 216 (*citing* Prof. Kim Expert Statement, pp. 3-4).

[124] Reply, para. 217.

[125] Statement of Defense, paras. 109, 111; Rejoinder, para. 83; Respondents' First Supplemental Statement, paras. 15-17.

[126] Respondents' First Supplemental Statement, para. 16 (*citing* Letter from T. Choi to KT, November 24, 2013 (CE-49)).

necessary approvals from the Korean government because "any" means "all"[127] and there is no textual support or logical basis for imposing a temporal limitation.[128]  According to Respondents, this condition is consistent with New York case law and UCC § 2-401, which authorize parties to place conditions on the transfer of title.[129]

### b. *An FTA Export Permit Was a "Necessary Approval" Within the Meaning of the Purchase Contract*

138.  Respondents argue that the MSIP Order establishes that an FTA export permit was a "necessary approval" under Korean law, even though that may not have been clear before the Order was issued.[130]  Respondents clarify that, although Professor Choi stated that predicting such an interpretation by MSIP would have been difficult at the time,[131] Professor Choi also made the point that MSIP had the authority to declare the Purchase Contract "null and void."[132]

139.  Respondents argue that the testimony provided at the December 2015 hearing confirms that an FTA export permit was a "necessary approval" because: (1) sale of the Satellite required *ex ante* FTA approval;[133] (2) the FTA governs the export of strategic goods and protects Korea's national security interests as well as international peace;[134] and (3) the Satellite is an "export" within the meaning of the FTA.[135]

---

[127] Statement of Defense, para. 110.

[128] Rejoinder, para. 85; Respondents' First Supplemental Statement, para. 55.

[129] Statement of Defense, paras. 112-113.

[130] Rejoinder, para. 86.

[131] Rejoinder, para. 87 (*citing* Prof. K. Choi Declaration, para. 13).

[132] Rejoinder, para. 87 (*citing* Prof. K. Choi Supplemental Declaration, paras. 27-30).

[133] Respondents' First Supplemental Statement, para. 18 (*citing* Hearing Transcript 497:1-3 (Mr. Paik)).

[134] Respondents' First Supplemental Statement, para. 18 (*citing* Hearing Transcript 755:10-14 (Prof. Nam)).

[135] Respondents' First Supplemental Statement, para. 18 (*citing, e.g.*, Hearing Transcript 892:24-893:1 (Prof. Choi)).

140. According to Respondents, the testimony provided at the December 2015 hearing also confirms that the Parties' failure to comply with the FTA in advance of the sale rendered the sale void *ab initio*.[136]

141. As to the MSIP Order, Respondents argue that the testimony provided at the December 2015 hearing confirms that the Order is valid and binding[137] and that an appeal of the Order was not practically available.[138]

**B.** ***Whether Respondents Can Defeat the Transfer of Title Based on Failure to Satisfy a Condition Precedent***

    **1.** ***Claimants' Position***

142. Claimants argue that, even if an FTA export permit were a necessary approval required under the Purchase Contract, Respondents cannot defeat the transfer of title by invoking the failure of this condition precedent because: (1) Section 2-401 of New York's Uniform Commercial Code[139] ("UCC § 2-401") does not permit parties to extend the transfer of title beyond the date of delivery; (2) the receipt of any necessary approvals was for the benefit of ABSH; (3) Respondents waived the condition; and (4) Respondents cannot rely on their own failure to satisfy a condition precedent.

---

[136] Respondents' First Supplemental Statement, para. 20 (*citing* Hearing Transcript 912:21-25 (Prof. Choi)).

[137] Respondents' First Supplemental Statement, para. 21 (*citing* Hearing Transcript 665:17-18 (Prof. Kim); Hearing Transcript 766:24-25 (Prof. Nam)).

[138] Respondents' First Supplemental Statement, para. 21 (*citing* Hearing Transcript 58:2-14 (Mr. Paik)).

[139] N.Y. U.C.C. § 2-401 (McKinney 2002).

### a. *UCC § 2-401 Does Not Permit Parties to Extend the Transfer of Title Beyond the Date of Delivery*

143. According to Claimants, UCC § 2-401 does not permit a seller to retain title after goods are delivered.[140]   On this basis, Claimants argue that title to the Satellite passed on February 18, 2011 – the date on which Respondents delivered the Satellite – even if the Parties intended to transfer title at a later date and even if Claimants had not yet paid the purchase price.[141]

144. In Claimants' view, Respondents' argument that UCC § 2-401 permits parties to place conditions on the transfer of title without limitation is based on an incomplete reading of that section.[142]   According to Claimants, a full reading of the statutory language makes clear that, while parties may place conditions on the transfer of title, their autonomy to do so is limited to conditions occurring before the goods are delivered; after goods are delivered, the seller may retain only a security interest.[143]   Claimants assert that this interpretation has been uniformly adopted by state and federal courts in New York.[144]

145. Claimants reject Respondents' attempt to narrow that interpretation to those situations in which the seller purports to retain title pending receipt of payment.[145]

146. Claimants distinguish case law cited by Respondents' argument that UCC § 2-401 does not contain such a limitation as either (1) dealing with a different provision of the UCC;[146]

---

[140] Statement of Claim, para. 82; Reply, para. 218; Sur-Rejoinder, para. 29; Claimants' First Supplemental Statement, para. 36(i).

[141] Statement of Claim, para. 84.

[142] Statement of Claim, para. 80.

[143] Statement of Claim, paras. 81-82.

[144] Statement of Claim, para. 83.

[145] Reply, para. 221.

[146] Reply, para. 219.

(2) addressing the failure to obtain a specific approval (*i.e.*, an architect's certificate) rather than a general approval (*i.e.*, any necessary approvals);[147] or (3) not addressing the specific situation in which a party attempts to claw-back performance years after completion because of failure to satisfy a condition precedent.[148]

147. Claimants respond to case law authority cited by Respondents for the proposition that UCC § 2-401 permits parties to agree on the passage of title after delivery as long as they use explicit language stating precisely when title will pass as dictum,[149] emphasizing form over substance,[150] and creating a distinction without a difference.[151]

### b. *Respondents Cannot Invoke Failure to Satisfy a Condition Precedent In This Case Because the Condition Was For the Benefit of Claimants*

148. Claimants argue that Respondents cannot invoke failure to obtain an FTA export permit to defeat the transfer of title because the receipt of any necessary approvals was for the benefit of ABSH.[152]  According to Claimants, this is made clear by the fact that the Purchase Contract allocates to Respondents the responsibility of securing all necessary approvals.[153]

149. Claimants disagree with Respondents' argument that, because the transaction could not proceed without such approvals, the condition was for the benefit of both Parties. According to Claimants, the condition was clearly for the protection and benefit of ABS

---

[147] Reply, para. 220.

[148] Reply, para. 220.

[149] Reply, para. 222.

[150] Reply, para. 223.

[151] Reply, para. 224.

[152] Statement of Claim, para. 86.

[153] Statement of Claim, para. 87; *see also* Purchase Contract, Art. 5.2 (CE-1).

as the buyers so that, even if Respondents stood to benefit in some way from the condition, ABS is still entitled to waive the condition and enforce the contract.[154]

### c. *Even If the Condition Precedent Was For the Benefit of Respondents, Respondents Waived the Condition*

150.  Claimants argue that Respondents cannot defeat the transfer of title for failure to satisfy a condition precedent because Respondents waived the condition (a) explicitly, when they delivered the Bills of Sale in September 2011, and (b) implicitly, by failing to invoke it for more than two years after delivering the Bills of Sale.[155]

151.  Claimants reject the argument that Respondents cannot waive a condition precedent that mandates compliance with the law. In Claimants' view, Respondents can waive the condition precedent requiring any necessary approvals because it is "inherently ambiguous" in that the Parties understood that all necessary approvals had been obtained when title transferred; an FTA export permit was not asserted by MSIP to be a necessary approval until years after the transfer of title, even though the Parties had previously engaged in a nearly identical transaction; and, in any case, failure to obtain an FTA export permit does not render the Purchase Contract void[156] and does not involve a violation of any U.S. statute[157] or of any Korean statute.[158]

---

[154] Reply, para. 228.

[155] Statement of Claim, para. 89; Reply, para. 229; Sur-Rejoinder, para. 29; Claimants' First Supplemental Statement, para. 36(iii).

[156] Reply, para. 229; *see also* Reply, paras. 243-247.

[157] Reply, para. 230; *see also* Prof. Nam Expert Statement, pp. 10-11, 13.

[158] Reply, para. 230; *see also* Reply, paras. 210-217.

152.   Claimants disagree with the position taken by Respondents that a bill of sale is legally ineffective to transfer title.  According to Claimants, a bill of sale can evidence transfer of title and effectively waive conditions precedent to the transfer of title.[159]

153.   As to Respondents' argument that transferring title to Claimants could not obviate the need to obtain requisite regulatory approvals because the Bills of Sale were issued before the Parties were informed of the necessity for such approvals, Claimants again assert that an FTA export permit was not a "necessary approval" and that, even if it was, failure to obtain the permit would not result in invalidation of the Purchase Contract.[160]

154.   Finally, Claimants characterize as defying legal principles and logic Respondents' assertion that they could not have waived a legal requirement of which they were unaware and could not have reasonably known existed.   According to Claimants, conditions precedent are based on the parties' intentions at the time of contract formation and, as such, there can be no "unknown" condition precedent.[161]  Accepting Respondents' argument, Claimants contend, would lead to absurd results because the Parties could never be certain if and when title passed.[162]

### d.  *In Any Case, Respondents Cannot Rely on Their Own Failure to Satisfy a Condition Precedent*

155.   Claimants argue that Respondents cannot invalidate the transfer of title for failure to obtain an FTA export permit because any failure to satisfy this condition precedent was

---

[159] Reply, para. 232; Sur-Rejoinder, para. 29.

[160] Reply, para. 233.

[161] Reply, para. 234.

[162] Reply, para. 234.

due to Respondents' non-performance of its obligations under the Purchase Contract,[163] and, as such, Respondents cannot rely on this failure.[164]

156. In Claimants' view, Respondents' arguments that Korean regulators were responsible for Respondents' alleged failure to obtain the necessary approvals for the sale of the Satellite and that it was out of Respondents' ultimate control are irrelevant because Respondents assumed the risk associated with obtaining all necessary approvals under the Purchase Contract.[165]

157. Claimants also discount Respondents' assertions that they did not cause the Korean government to disapprove the sale of the Satellite and that the issuance of the MSIP Order was not Respondents' fault.  According to Claimants, none of Respondents' arguments state the proper inquiry; the proper inquiry, in Claimants' view, is whether Respondents made a good faith effort to obtain all necessary Korean regulatory approvals.[166]

158. Claimants identify two ways in which Respondents failed to make a "good faith effort" to secure an FTA export permit: (1) by not making any effort at all to ensure that all necessary approvals were received, including by failing to report the sale of the Satellite to the Korean government, which, Claimants allege, Respondents knew they were required to do; and (2) by refusing to appeal the MSIP Order.[167]  In Claimants' view, Respondents could have raised on appeal the arguments that an FTA export permit was not required

---

[163] Statement of Claim, para. 91; *see also* Purchase Contract, Art. 5.2, Art. 5.3, and Art. 18.1 (CE-1).

[164] Statement of Claim, para. 90.

[165] Reply, para. 236.

[166] Reply, paras. 237-238, 240; Sur-Rejoinder, para. 23; Claimants' First Supplemental Statement, para. 36(iv).

[167] Reply, paras. 239-240; Sur-Rejoinder, paras. 21, 23, 28 (*citing* Prof. Kim Expert Witness Statement, para. 1); Claimants' First Supplemental Statement, para. 36(iv).

because the Satellite was not an export and that, in any case, failure to obtain the permit could not result in invalidation of the sale.[168]

159.   As to Respondents' contention that they neither actively prevented the Parties from securing an FTA export permit nor passively caused the condition precedent to fail, Claimants maintain that Respondents failed to make a good faith effort to secure all necessary approvals both at the outset and following the issuance of the MSIP Order and emphasize that Respondents were obligated to obtain those approvals and knew the risks associated with failing to do so.[169]

### 2. *Respondents' Position*

160.   Respondents disagree with Claimants' argument that the Respondents cannot invoke the failure to satisfy a condition precedent to defeat the transfer of title.   According to Respondents, (1) UCC § 2-401 does not limit a party's ability to place express conditions precedent on contracts involving the sale of goods; (2) the receipt of any necessary approvals was for the benefit of both Parties; (3) KTSAT did not waive any required governmental authorizations; and (4) KTSAT did not fail to obtain receipt of all necessary Korean government approvals.

### a. *UCC § 2-401 Does Not Limit a Party's Ability to Place Express Conditions Precedent on Contracts Involving the Sale of Goods*

161.   Respondents urge the Arbitral Tribunal to conclude that UCC § 2-401 allows parties to establish express conditions precedent on contracts involving the sale of goods and that these agreed-upon conditions are enforceable terms of their contract.[170]   According to

---

[168] Sur-Rejoinder, para. 27.

[169] Reply, para. 242.

[170] Statement of Defense, para. 120.

Respondents, this "commonsense" reading of UCC § 2-401 is supported by the Purchase Contract, the UCC, and uniform New York case law.[171]

162.   Respondents argue that the rule asserted by Claimants – that, pursuant to UCC § 2-401, a seller retains only a security interest in goods that have been delivered – only applies to cases in which a seller purports to retain title pending receipt of payment for goods.[172] Respondents assert that there is a difference between a condition precedent designed to ensure lawful transfer and a condition precedent designed to ensure legal recourse in the event of nonpayment.[173]  In this case, Respondents argue that the purpose of the condition precedent in the Purchase Contract was to ensure lawful transfer of the Satellite, not to retain legal recourse in the event of nonpayment, and that the condition is both valid and enforceable.[174]  In addition, Respondents characterize Claimants' distinction between specific approvals and general approvals as both irrelevant and erroneous.[175]

163.   According to Respondents, New York courts have confirmed that parties may agree, consistent with UCC § 2-401, that title passes either before or after delivery as long as they use explicit language stating precisely when title will pass.[176]

   **b.  *Conditioning Transfer of Title On Receipt of Any Necessary Regulatory Approvals Was For the Benefit of Both Parties***

164.   Respondents argue that the condition to obtain all necessary approvals is clearly for the benefit of both Parties because it serves to ensure that the transaction complies with all

---

[171] Statement of Defense, para. 119.

[172] Statement of Defense, para. 115; Rejoinder, para. 92.

[173] Statement of Defense, para. 115.

[174] Statement of Defense, para. 118; Rejoinder, para. 93.

[175] Rejoinder, para. 93.

[176] Statement of Defense, paras. 116-117.

legal requirements.[177]   Moreover, according to Respondents, this view is confirmed by the text of the Purchase Contract, which expressly contemplates oversight by multiple regulatory authorities.[178]   Respondents assert that the MSIP Order also demonstrates that the condition was for the benefit of both Parties, as it was directed only to Respondents.[179]

165.   Respondents argue that if a condition is for the benefit of both parties, it can only be waived by mutual assent of the parties.   According to Respondents, because the condition of securing necessary approvals was for the benefit of both Parties because it served to ensure compliance with Korean law regarding the transfer of strategic Korean assets, it cannot be waived solely by Claimants.[180]

### c.   *KTSAT Did Not Waive Required Governmental Authorizations*

166.   Respondents disagree with Claimants' assertion that KTSAT "waived" the condition precedent to obtain regulatory approvals.[181]

167.   *First*, Respondents contend that neither they nor Claimants can waive a condition precedent that mandates compliance with the law, and that the Bills of Sale could not constitute a waiver of a legally-imposed condition.[182]

168.   *Second*, Respondents dispute Claimants' reliance on the Bills of Sale as evidence of Respondents' explicit waiver.   According to Respondents, a bill of sale is not a legal instrument that operates to transfer title under New York law and therefore cannot have

---

[177] Statement of Defense, paras. 121-123.

[178] Statement of Defense, para. 122; *see also* Purchase Contract, Art. 12.2 (CE-1).

[179] Statement of Defense, para. 123.

[180] Rejoinder, para. 88.

[181] Statement of Defense, para. 124.

[182] Statement of Defense, para. 125.

the legal effect of either transferring title or waiving a condition for regulatory approval.[183]

169.   *Third*, Respondents contend that the "boilerplate" language in the Bills of Sale transferring title to Claimants could not obviate the need to obtain *requisite* regulatory approvals because the Bills of Sale were issued before the Parties were informed of their necessity.[184]

170.   *Fourth*, Respondents assert that they could not have waived a legal requirement they did not know existed at the time the purported waiver took place.[185]

### d. *KTSAT Did Not Fail to Obtain Receipt of All Necessary Korean Government Approvals*

171.   Respondents do not disagree with Claimants' assertion, generally, that a party may not invalidate a contract by relying on its own failure to satisfy a condition precedent.[186] However, according to Respondents, Claimants overlook the fact that the Korean regulators were responsible for their failure to satisfy the condition, which was not within KTSAT's "ultimate control."[187]

172.   Respondents argue that Claimants cannot rely on this general principle because KTSAT did not cause the Korean government to disapprove the sale of the Satellite and proceeded with "complete diligence, cooperation, and good faith" in attempting to secure regulatory approval.[188]   According to Respondents, MSIP's decision not to approve the sale of the

---

[183] Statement of Defense, para. 126; Rejoinder, paras. 95-96.

[184] Statement of Defense, para. 127.

[185] Statement of Defense, para. 128.

[186] Statement of Defense, para. 130

[187] Statement of Defense, para. 129; Rejoinder, para. 89.

[188] Statement of Defense, para. 130; Rejoinder, paras. 89-90.

Satellite was not their fault; it simply "underscores the uncertainty and unpredictability of the Korean regulatory approval process for the sale of retired satellites."[189]   Moreover, Respondents argue, they neither actively prevented the Parties from obtaining any regulatory approval nor passively caused the condition precedent to fail.[190]

### C.  *Whether the MSIP Order Declaring the Sale of the Satellite "Null and Void" Renders the Purchase Contract Unenforceable*

#### 1.  *Respondents' Position*

173.  Respondents assert that (1) because the Purchase Contract was deemed illegal under Korean law, it is unenforceable; and (2) if the Arbitral Tribunal finds that passage of title results in an unlawful contract, it should hold that title remains with KTSAT.

#### a.  *The Purchase Contract is Unenforceable Because It Was Deemed Illegal Under Korean Law*

174.   As discussed more fully in the Applicable Law section (Section IV above), Respondents argue that the Arbitral Tribunal should apply Korean law to assess the impact of the MSIP Order on the enforceability of the Purchase Contract but that an analysis applying New York law renders the same result – that the Purchase Contract is unenforceable and that title remains with KT.[191]

175.  Applying Korean law directly, Respondents argue, the transaction is properly unwound as unlawful because regulatory orders are presumed enforceable and will not be disturbed by a Korean court unless manifestly unlawful.[192]   Moreover, Respondents argue, because the FTA is a mandatory law and the relevant provisions are "validity" provisions, the sale of

---

[189] Statement of Defense, para. 131.

[190] Statement of Defense, para. 133; Rejoinder, para. 90.

[191] Respondents' First Supplemental Statement, para. 54.

[192] Respondents' First Supplemental Statement, para. 59 (*citing* Translation of Jung-Kwon Kim, "Lecture on Administrative Law," 257 (2d ed. 2016) (RA-140)).

the Satellite without approval under the FTA is null and void *ab initio* irrespective of the MSIP Order.[193]   According to Respondents, this illegality does not need to be confirmed by any Korean court.[194]

176.   According to Respondents, the MSIP Order confirms the illegality of the Purchase Contract under Korean law[195] and, as such, should be viewed by the Arbitral Tribunal as "the end of the matter under New York law."[196]   Respondents contend that the MSIP Order is entitled to deference and a presumption of validity, and, consistent with the doctrine of comity, is entitled to respect.[197]

177.   As to Claimants' arguments that the MSIP Order does not render the Purchase Contract illegal under Korean law because an FTA export permit was not a necessary approval, that the sale of the Satellite could not be invalidated by an administrative agency under Korean law, and that only Korean courts can determine the effectiveness of a contract, Respondents emphasize Professor Choi's testimony to the contrary.   Professor Choi explained that prior approval for sale of the Satellite was necessary even if this was not known to the Parties at the time; he also clarified that Korean regulatory agencies are empowered to invalidate sales contracts.[198]

---

[193] Respondents' First Supplemental Statement, para. 60.

[194] Respondents' First Supplemental Statement, para. 60.

[195] Statement of Defense, para. 135.

[196] Respondents' First Supplemental Statement, para. 56.

[197] Respondents' First Supplemental Statement, para. 57.

[198] Rejoinder, para. 98 (*citing* Prof. K. Choi Supplemental Declaration, paras. 27-30).

178. Respondents argue that, even if the Arbitral Tribunal were to apply New York law,[199] a conflicts analysis would ultimately lead to the application of Korean law to determine the effect of the illegality given Korea's stronger interest in the issue.[200]

179. However, Respondents argue, even if the Arbitral Tribunal were to determine the effect of the illegality under New York law, the ultimate outcome would be the same – title to the Satellite never passed because the MSIP Order declared the Purchase Contract null and void.[201] According to Respondents, New York courts consider several factors, including: the repugnance of the illegality, the express provision of the statute violated, and the public policy considerations in refusing enforcement.[202] In Respondents' view, these factors weigh in favor of finding the Purchase Contract unenforceable because the sale of the Satellite violated a statute designed to protect Korea's national security interest and raises sensitive political issues within the Korean government.[203]

180. Respondents distinguish case law cited by Claimants in support of their argument that the Purchase Contract is not the type of illegal contract that New York courts hold unenforceable as (1) not necessarily involving a statutory violation;[204] (2) alternatively,

---

[199] Statement of Defense, para. 135 (arguing that New York law analyzes the existence of illegality under the law of the jurisdiction where the illegal act is done and the effect of illegality upon the contractual relationship under the law of the jurisdiction which is selected under conflicts analysis).

[200] Respondents' First Supplemental Statement, paras. 62-63.

[201] Rejoinder, para. 98; *see also* Statement of Defense, paras. 134-136.

[202] Statement of Defense, para. 136.

[203] Statement of Defense, para. 136; Respondents' First Supplemental Statement, para. 63.

[204] Rejoinder, para. 99.

only involving a ministerial violation;[205] and (3) acknowledging that courts may refuse to enforce contracts that are closely connected with an unlawful act.[206]

181.   Respondents also disagree with Claimants' assertion that this case does not involve any grave issues of public policy; to the contrary, Respondents argue, regulating control of strategic assets is precisely the type of public policy concern that weighs in favor of not enforcing the Purchase Contract. Further, Claimants acknowledge the political issues in Korea concerning sale of the Satellite.[207]

   **b.  *If the Tribunal Finds That Passage of Title Results in an Unlawful Contract, It Should Hold That Title Rightfully Remains With KTSAT***

182.   Respondents argue that, because recognition of the transfer of title would be contrary to public policy, the Arbitral Tribunal should not hold that title to the Satellite and Baseband Equipment remains with KTSAT.[208]

   **2.  *Claimants' Position***

183.   Claimants argue that (1) the MSIP Order declaring the Purchase Contract "null and void" does not render the Purchase Contract unenforceable; and (2) even if the Arbitral Tribunal finds that passage of title results in an illegal contract, it should nevertheless hold that title remains with ABS.

   **a.  *The MSIP Order Declaring the Purchase Contract "Null and Void" Does Not Render the Purchase Contract Unenforceable***

184.   As discussed more fully in the Applicable Law section (Section IV above), Claimants disagree with Respondents' position that the Arbitral Tribunal should apply Korean law to

---

[205] Rejoinder, para. 100.

[206] Rejoinder, para. 101.

[207] Rejoinder, paras. 102-103.

[208] Statement of Defense, para. 138.

assess the impact of the MSIP Order on the enforceability of the Purchase Contract. According to Claimants, this inquiry is properly made under New York law.

185.   Claimants reject Respondents' argument that the Purchase Contract is unenforceable under New York law because the MSIP Order declared it null and void.  As an initial matter, Claimants argue that, notwithstanding the MSIP Order, the Purchase Contract is not illegal under Korean law because an FTA export permit was not a necessary approval[209] and because, in any case, only a Korean court can determine the effectiveness of a contract.[210]   Claimants argue that, even if an FTA export permit was a necessary approval under Korean law, because the FTA is a "Regulatory Provision," transfer of title may not be invalidated for failure to obtain such a permit.[211] Claimants also argue that the only penalties contemplated in the FTA are sanctions, fines, or imprisonment not invalidation of the contract.[212]

186.   Claimants argue that, even if Respondents are able to demonstrate that the transfer of title was illegal under Korean law, the Purchase Contract is not the type of "illegal" contract that New York courts hold unenforceable because it involves a business regulatory violation and not a serious infraction or criminal illegality.[213]

187.   Further, Claimants argue, even if Respondents are able to demonstrate that the transfer of title was illegal under Korean law, the Purchase Contract should nevertheless be enforced

---

[209] Reply, para. 243 (*citing* Prof. Nam Expert Statement, pp. 8, 13); Claimants' First Supplemental Statement, para. 33.

[210] Reply, para. 243 (*citing* Prof. Kim Expert Statement, pp. 3-4).

[211] Sur-Rejoinder, para. 27; Claimants' First Supplemental Statement, para. 34 (*citing* Hearing Transcript 745:20-24 (Prof. Nam)).

[212] Claimants' First Supplemental Statement, para. 34 (*citing* Hearing Transcript 762:16-21 (Prof. Nam); Hearing Transcript 785:12-786:11 (Prof. Park)).

[213] Reply, para. 245; Sur-Rejoinder, paras. 30-32.

under New York law because (1) the Purchase Contract is no longer executory;[214] and (2) Respondents are either equally or more at fault for the illegality.[215]

188. In any case, Claimants argue, even if the Purchase Contract is still executory and ABS is more guilty than KT for the alleged illegality of the Purchase Contract under Korean law, the Purchase Contract should not be invalidated under New York law[216] because (1) the purpose of the FTA is not to protect public health or safety, but rather to promote foreign trade;[217] and (2) Respondents are not a member of the class intended to be protected by the FTA but, rather, are a member of the class sought to be regulated by it.[218]

189. Claimants maintain that other considerations taken into account by New York courts when assessing the effect of illegality also weigh in favor of enforcement: (1) the alleged illegality was not repugnant;[219] (2) the alleged illegality does not implicate any grave issues of public policy;[220] (3) any violation of the FTA would not result in the Purchase

---

[214] Claimants' First Supplemental Statement, paras. 42, 44 (arguing that a New York court will not invalidate a contract that is illegal *malum prohibitum* if it has been executed).

[215] Claimants' First Supplemental Statement, paras. 43-44 (arguing that, under New York law, a contract that is illegal *malum prohibitum* generally will be invalidated only if the not equally or more party asserting the defense of illegality is less culpable for the illegality).

[216] Claimants' First Supplemental Statement, para. 45 (arguing that, when an illegal contract is still executory and the party asserting the defense of illegality is less culpable for the illegality, a New York court will evaluate whether the statute that was violated was enacted to protect public health and safety and, more importantly, whether the party asserting the defense of illegality is part of the class of persons intended to be protected by the statute when deciding whether to invalidate the contract).

[217] Claimants' First Supplemental Statement, para. 46 (*citing* Prof. Nam Expert Statement, p. 12; Prof. Nam Supplemental Expert Statement, p. 2).

[218] Sur-Rejoinder, para. 33; Claimants' First Supplemental Statement, para. 45.

[219] Reply, para. 246; Claimants' First Supplemental Statement, para. 48(i).

[220] Reply, para. 246; Sur-Rejoinder, para. 34; Claimants' First Supplemental Statement, para. 48(iii).

Contract being invalidated under Korean law;[221] and (4) in any event, there was no

violation of the FTA because the Satellite is not an export.[222]

190.    Finally, Claimants argue that the Purchase Contract should be enforced under New York

law because (1) the FTA explicitly delineates penalties and sanctions to redress violations

but makes no mention of invalidating contracts;[223] and (2) Respondents are attempting to

regain title to the Satellite through the "sword of an improper illegality defense."[224]

### b. *If the Tribunal Finds That Passage of Title Results in an Unlawful Contract, It Should Hold That Title to the Satellite Remains with ABS*

191.    Claimants reject Respondents' argument that, because recognition of the transfer of title

would be contrary to public policy, the Arbitral Tribunal should not "recognize rights

purportedly arising from" the Purchase Contract.  According to Claimants, Respondents

are merely seeking to gain by relying on their own failures.[225]

### D. *Whether Failure to Obtain an FTA Export Permit is a Mutual Mistake That Warrants Rescission of the Purchase Contract*

### 1. *Respondents' Position*

192.    According to Respondents, mutual mistake warrants rescission of the Purchase Contract.

Respondents argue that (1) failure to obtain the Korean government's approval for the sale

of the Satellite is a mutual mistake shared by the Parties; (2) the mistake is properly

characterized as a mistake of fact, not a mistake of law; (3) the Parties shared the risk of

mistake; and (4) rescission is the appropriate remedy.

---

[221] Reply, para. 246.

[222] Reply, para. 246; Claimants' First Supplemental Statement, para. 48(ii).

[223] Claimants' First Supplemental Statement, paras. 50, 33.

[224] Claimants' First Supplemental Statement, para. 50.

[225] Reply, para. 248.

### a. *Failure to Obtain the Korean Government's Approval for the Sale of the Satellite Is a Mutual Mistake Shared by the Parties*

193.   Respondents argue that, because both Parties believed in good faith that no Korean regulatory approvals were required for the sale of retired satellites, the Parties labored under a mutual mistake warranting rescission of the Purchase Contract.[226]   In Respondents' view, while this mistake is most appropriately characterized as a mistake of fact, the distinction is ultimately irrelevant because the Parties "clearly operated under a fundamental misconception" about Korean law as it related to sale of the Satellite.[227]   In particular, Respondents highlight the fact that the prior sale of KS-2 to Claimants was never subject to any regulatory approvals and that Korean regulators did not determine that the FTA applied to the sale of the Satellite until several years after the sale.[228]

### b. *The Mistake Is Properly Characterized as a Mistake of Fact, Not a Mistake of Law*

194.   Respondents assert that the "modern view is that the existing law is part of the state of facts at the time of the agreement."[229]   According to Respondents, the record demonstrates that at the time of the Purchase Contract, the state of facts – *i.e.*, that sale of the Satellite required approval from the Korean government – was unknown to either of the Parties.[230]

195.   Respondents reject Claimants' assertion that failure to understand that sale of the Satellite required approval from the Korean government constitutes a mistake of law.[231] Respondents distinguish the cases cited by Claimants as involving parties seeking to

---

[226] Statement of Defense, para. 140.

[227] Statement of Defense, para. 141.

[228] Statement of Defense, para. 141.

[229] Rejoinder, para. 108

[230] Rejoinder, para. 108.

[231] Rejoinder, para. 109.

invalidate contracts to improve their financial positions from this case, in which Respondents assert that they seek rescission in an attempt to bring the Purchase Contract into compliance with Korean law.[232]

### c. *The Parties Equally Shared the Risk of Mistake*

196. Respondents argue that the Parties equally shared the risk of mistake.[233]  While they acknowledge that they are obligated under the Purchase Contract to secure all necessary approvals, Respondents argue that the Purchase Contract does not address the allocation of the risk that a third-party regulator might disapprove the transaction.  Although the Purchase Contract is silent on this issue, Respondents take the position that the only fair and equitable outcome is a finding that the risk of denial of government approvals is allocated equally to the Parties.[234]

197. Respondents also point out that neither they nor Claimants were aware of the need for any regulatory approval from the Korean government.  In Respondents' view, it would be both incorrect and "fundamentally unjust and inequitable" for the Arbitral Tribunal to allocate the risk solely to Respondents, particularly because the approvals were necessary for both Parties to legally consummate the transaction and outside the Parties' control.[235]

### d. *Rescission of the Purchase Contract Is the Appropriate Remedy*

198. Respondents argue that the Parties' mutual mistake warrants rescission of the Purchase Contract because (1) at the time of contracting, neither of the Parties was aware of the need to obtain approval from the Korean government; and (2) the mistake, which "lies at

---

[232] Rejoinder, para. 110.

[233] Rejoinder, para. 104.

[234] Rejoinder, para. 105

[235] Rejoinder, para. 106.

the very heart" of the Purchase Contract and resulted in a determination by the Korean government that the Purchase Contract was "null and void," was both substantial and material.[236]

199.   Respondents characterize rescission as a "practical solution" because, in their view, they can retake control of the Satellite in a way that does not cause any disruption of service to Claimants.[237]   According to Respondents, this is confirmed by the record.[238]   In particular, Respondents note that, shortly after issuing the MSIP Order, MSIP granted an extension of KTSAT's license to control the Satellite.[239]

   **2.   *Claimants' Position***

200.   Claimants assert, as a threshold matter, that Respondents cannot assert a mutual mistake defense because there is no mistake: an FTA export permit was not a "necessary approval."[240]   Even if an FTA export permit was a necessary approval, Claimants argue, Respondents cannot invoke the mutual mistake defense to invalidate the transfer of title because: (1) Respondents bore the risk of mistake; (2) Respondents mischaracterize a mistake of law as a mistake of fact; (3) even if the mistake can be characterized as a mistake of fact, it was not a mutual mistake of fact; and (4) in any case, rescission is not the appropriate remedy.

---

[236] Statement of Defense, para. 142.

[237] Statement of Defense, para. 143; Rejoinder, para. 111 (*citing* SY Paik Supplemental Declaration, paras. 12-13).

[238] Rejoinder, para. 111 (*citing* SY Paik Supplemental Declaration, paras. 12-13).

[239] Rejoinder, para. 111 (*citing* Translation of Renewal of Koreasat-3 TTC Station License, Dec. 31, 2013 (RE-109)).

[240] Claimants' First Supplemental Statement, para. 52.

### a. *Respondents Bore the Risk of Mistake*

201.  Claimants argue that Respondents fail to set forth the appropriate legal standard for assessing applicability of the mutual mistake defense.[241]   Pursuant to the appropriate standard, a contract cannot be voided for mutual mistake by the party who bears the risk of the mistake.[242]  According to Claimants, the "undisputed facts in this case make it clear that Respondents alone bore the risk" of mistake.[243]

202.  As to Respondents' argument that the Parties equally shared the risk of mistake because the Purchase Contract is silent, Claimants refer to the language in the Purchase Contract allocating to Respondents the obligation to secure all requisite approvals and licenses for the sale and operation of the Satellite.  In Claimants' view, this is sufficient evidence that, if there was a mistake as to the existence of any regulatory approvals, "there can be no doubt that the risk was KT's to bear."[244]

203.  Moreover, Claimants argue, it is immaterial whether Respondents' failure to obtain a necessary approval is attributable to mistake or deliberate concealment because the responsibility for a necessary approval is borne entirely by Respondents.[245]

204.  Finally, Claimants point out that Respondents not only explicitly undertook the risk of obtaining all necessary approvals but also represented that they had in fact obtained all required approvals.[246]

---

[241] Reply, para. 250.

[242] Reply, para. 251; Claimants' First Supplemental Statement, para. 55.

[243] Reply, para. 251.

[244] Sur-Rejoinder, para. 36 (*citing* Purchase Contract, Arts. 5.2, 5.3) (CE-1).

[245] Sur-Rejoinder, para. 37; *see also* Purchase Contract, Arts. 5.2, 5.3 (CE-1).

[246] Claimants' First Supplemental Statement, para. 55.

### b. *Respondents Mischaracterize a Mistake of Law as a Mistake of Fact*

205. In Claimants' view, even if a mutual mistake existed as to the need for certain Korean government approvals, that mistake is properly characterized as a mistake of law because it was a mistake about the interpretation, or the evolution of the interpretation, of a Korean statute[247] and, as such, cannot serve as the basis for rescinding the Purchase Contract.[248]

206. Claimants distinguish between a mistaken belief related to the occurrence of an uncertain event and a failure to predict/determine the necessity of governmental approvals under a purchase agreement.[249] Because MSIP had never applied the FTA to sale of a satellite nor interpreted such a sale as requiring FTA approval, Claimants argue that the MSIP Order reflected a "subsequent change in the law" and, thus, was a mistake of law and not a mistake of fact.[250]

### c. *Even if the Mistake Can Be Characterized as a Mistake of Fact, It Cannot Be Characterized as a Mutual Mistake of Fact*

207. Claimants argue that even if the mistake can be characterized as a mistake of fact, it cannot be characterized as a *mutual* mistake of fact[251] To the extent a mistake was made, Claimants argue, it was a unilateral mistake on the part of Respondents because Claimants had no understanding regarding what approvals were necessary and were entitled to rely on Respondents' obligations and representations, as set forth in the Purchase Contract, that Respondents had obtained all necessary approvals.[252] Even if it was a mutual

---

[247] Reply, para. 254; Sur-Rejoinder, para. 38.

[248] Reply, paras. 252-253; Sur-Rejoinder, paras. 38-40; Claimants' First Supplemental Statement, para. 53.

[249] Sur-Rejoinder, para. 39.

[250] Sur-Rejoinder, para. 40.

[251] Reply, para. 255.

[252] Reply, para. 256; Claimants' First Supplemental Statement, para. 54; *see also* Purchase Contract, Arts. 5.2, 12.1, 12.2, 18.1 (CE-1).

mistake, Respondents explicitly undertook the risk of such a mistake.[253]   Claimants emphasize that the Purchase Contract allocated to Respondents the responsibility for obtaining the necessary approvals, and that Respondents represented and warranted, pursuant to the Purchase Contract, that they had obtained all such approvals.[254]

### d. *In Any Case, Rescission is Not a Practical Solution*

208.   Claimants contest Respondents' assertion that they can retake control of the Satellite without causing a disruption in service.[255]

209.   First, Claimants refer to the directive in the MSIP Order that Respondents "manage the Satellite 'equal to the level of management pursued prior to' the Purchase Contract and frequency use plan."[256]   Claimants interpret this directive to mean that Respondents were required to re-point the Satellite way from the Middle East and back toward the Korean Peninsula[257] and point out that Respondents contemplated doing so in order to be in compliance with the MSIP Order.[258]

210.   Second, Claimants note that Respondents have not, despite numerous requests, ever provided to Claimants any authorization or assurance from Korean regulators verifying that Respondents would indeed be able to operate the Satellite in a way that does not

---

[253] Reply, para. 257.

[254] Reply, para. 258; *see also* Purchase Contract, Arts. 5.2, 18.1(c) (CE-1).

[255] Reply, paras. 260-261; Sur-Rejoinder, paras. 42-43.

[256] Reply, para. 260 (*quoting* Translation of MSIP Order to KTSAT, December 18, 2013 (CE-54)); Sur-Rejoinder, para. 42.

[257] Reply, para. 260 (*citing* Translation of KT Application to the KCC for Frequency Reallocation, March 30, 2011 (CE-133); Translation of Protocol of Interrogation of Suspect YM Kwon, July 2, 2014 (E), p. 32 (RE-4)); Sur-Rejoinder, para. 42.

[258] Reply, para. 260 (*citing* Translation of Email from Y. Kim to S. Park, December 26, 2013 (attaching translation of document entitled "Proposal for Securing Rights of Control of No. 3 Satellite") (CE-132)).

disrupt service to Claimants' customers in the Middle East.[259]  In any case, Claimants cast doubt on the reliability of such an authorization or assurance.[260]

211.   Claimants' characterize the testimony of Respondents' witness, Mr. Paik, that he had received oral assurances from MSIP that Claimants would be permitted to continue providing service outside Korea,[261] as "strain[ing] belief,"[262] "unsubstantiated," [263] and "simply not credible."[264]   Claimants instead rely on the statement of their witness, Mr. Pak, that Respondents only offered their own assurances that MSIP would grant such permission.[265]

## VII.   RELIEF REQUESTED BY THE PARTIES

212.   Claimants have requested that Arbitral Tribunal order the following relief:

(a)   A declaration that ABSH holds title to and thus owns the Satellite and Baseband Equipment, and such other and further relief, including injunctive relief, as the Tribunal may deem just and proper regarding ABSH's ownership of the Satellite and Baseband Equipment.

(b)   An order that Respondents desist from challenging ABSH's ownership of the Satellite.

(c)   An order that Respondents desist from interfering with the ongoing operation of the Satellite.

(d)   An order that Respondents deliver to ABS the Baseband Equipment and all associated flight data related to the operation of the Satellite.

(e)   A declaration that Respondents breached the Purchase Contract.

---

[259] Reply, para. 261; Sur-Rejoinder, para. 42.

[260] Reply, para. 261; Sur-Rejoinder, para. 43.

[261] *See* SY Paik Supplemental Declaration, paras. 12-13.

[262] Sur-Rejoinder, para. 42.

[263] Sur-Rejoinder, para. 42.

[264] Sur-Rejoinder, para. 43.

[265] Sur-Rejoinder, para. 42; *see also* R. Pak Second Supplemental Declaration, para. 8.

(f)    A declaration that Respondents breached the Operations Agreement.

(g)    A declaration that Respondents committed various tortious actions against ABSG.

(h)    Damages to both ABSH and ABSG in amounts to be determined.

(i)    Pre- and post-award interest at the maximum rate or rates permitted.

(j)    An order dismissing Respondents' purported counterclaims entirely.

(k)    Such other and further relief as the Tribunal may deem just and proper.[266]

213.   This is consistent with the relief requested by Claimants, as set forth in the Terms of Reference[267] and below:

(a)    A declaration that ABS Holdings rightly owns the Satellite and Baseband Equipment under the Purchase Contract and Bills of Sale, and such other and further relief, including injunctive relief, as the Tribunal may deem just and proper regarding the ownership issue.

(b)    An order that Respondents desist from challenging ABS Holdings' ownership of the Satellite, regardless of any contrary orders or directives received by Respondents from the Korean government.

(c)    A declaration that Respondents committed multiple breaches of the Purchase Contract.

(d)    A declaration that Respondents committed multiple breaches of the Operations Agreement.

(e)    An order that Respondents return the ground equipment and all associated flight data related to the operation of the Satellite.

(f)    An order that Respondents desist from interfering with the ongoing operation of the Satellite, regardless of any contrary orders or directives received by Respondents from the Korean government.

(g)    A declaration that Respondents committed various tortious actions.

---

[266] Sur-Rejoinder, para. 101.

[267] *See* Terms of Reference, Section VII.

(h)     Damages in an amount to be determined.

(i)     Pre- and post-award interest at the maximum rate or rates permitted.

(j)     An order dismissing Respondents' purported counterclaims entirely.

(k)     Such other and further relief as the Arbitral Tribunal may deem just and proper.

214.   Respondents have requested that the Arbitral Tribunal order the following relief:

(a)     A declaration that title to KS-3 and the associated Baseband Equipment never passed from KTSAT to ABS and that KTSAT currently holds title to, and owns, KS-3 and the Baseband Equipment.

(b)     A declaration that the termination notice by ABS dated 24 November 2013 was invalid and of no effect.

(c)     A declaration that ABS's alleged tort claims are outside the Parties' arbitration agreement and the Tribunal lacks jurisdiction to resolve them.

(d)     A declaration that, if the Tribunal determines that it has jurisdiction over ABS's tort claims, those claims are without merit and KTSAT is not liable to ABS on such claims.

(e)     A declaration that KTSAT did not breach the Parties' Agreements.

(f)     A declaration that KTSAT is not liable to pay any damages to ABS for any alleged breaches of the Parties' Agreements.

(g)     A declaration that ABS breached its obligations under the Purchase Agreement, including but not limited to its obligation to operate KS-3 at the 116° East orbital slot.

(h)     A declaration that ABS breached the Parties' Operations Agreement, including by contracting with Lockheed to take away control of KS-3 from KTSAT.

(i)     An order that ABS pay KTSAT compensatory damages in an amount quantified during the Arbitration.

(j)     An order that ABS pay KTSAT pre- and post-judgment interest as the Tribunal deems appropriate.

(k)     An order that ABS pay KTSAT lease payments in the amount determined at arbitration to prevent unjust enrichment, if the Tribunal determines that

ABS is entitled to return of the purchase price of KS-3 and the Baseband Equipment.

(l)    An order that ABS reimburse KTSAT for all costs incurred in connection with this Arbitration, including but not limited to reasonable attorneys' fees and costs, expert fees and costs, and the fees and expenses of the arbitrators and the ICC.

(m)    An order and declaration that the award is immediately enforceable.

(n)    An order that ABS pay an appropriate financial penalty for every day from the date of award that it fails to relinquish ownership and/or control of the Satellite.

(o)    Any such further relief the Tribunal deems just and appropriate and/or as KTSAT may request during the course of the Arbitration.[268]

215.    This is consistent, with slight modification, with the relief requested by Respondents set forth in the Terms of Reference[269] and below:

(a) A declaration that:

(1) The title of the Satellite has not transferred to ABS Holdings under the Purchase Contract;

(2) KTSAT holds title to, and owns, the Satellite;

(3) Claimants' notice of termination dated November 24, 2013 did not terminate the Purchase Contract or the Operations Agreement;

(4) Claimants are obligated under the [Agreements] to return control of the Satellite to Respondents;

(5) The Arbitral Tribunal has no jurisdiction to hear and adjudicate Claimants' tort claims; or, alternatively, that Respondents did not commit any tortious actions as alleged by Claimants;

(6) Respondents are not liable to pay any damages to Claimants for any alleged breaches of the [Agreements];

---

[268] Rejoinder, Section IX.

[269] *See* Terms of Reference, Section IX.

(7) Claimants have fundamentally breached their obligations under the Agreements to continuously operate the Satellite at the 116 East orbital slot;

(8) Claimants have, through their actions, breached Respondents' ownership rights over the Satellite;

(9) Claimants have breached Respondents' rights under the Operations [Agreement].

(b) An order that Claimants pay damages to Respondents for, among other grounds:

(1) Damages caused by ABS Holdings' breach of the Purchase Contract which will be further quantified in the course of this arbitration;

(2) Damages caused by ABS Global's breach of the Operations Contract which will be quantified in the course of this arbitration;

(3) Pre- and post-award interest accruing on such amounts, respectively, at the appropriate rate, as determined by the Arbitral Tribunal;

(c) An order that Claimants reimburse Respondents, jointly and severally, for all costs incurred in this arbitration, including, but not limited to, attorneys' fees, experts' fees, and the fees and expenses of the arbitrators and of the ICC International Court of Arbitration; and

(d) Any other or further relief that the Arbitral Tribunal deems appropriate or as may be requested by Respondents in the course of this arbitration.

## VIII.   THE HOLDINGS OF THE ARBITRAL TRIBUNAL, BY MAJORITY

216.   The Parties, in both the Purchase Contract and the Operations Agreement, and the Arbitral Tribunal and the Parties in the Terms of Reference and Procedural Order No. 1, have all agreed that New York law, without reference to New York conflict-of-laws principles, is the law that governs the resolution of this dispute.  There being no mandatory Korean law applicable, New York law – and only New York law – is the law applicable in this proceeding.

217. Every prerequisite prescribed by Article 10.1 of the Purchase Contract as a condition precedent to the passage of title to the Satellite from KT to ABS was met by the Parties, including Respondents. As such, title passed to ABS long before the issuance of the MSIP Order. These requirements included, among others: obtaining export approval by Respondents and Lockheed for a U.S. export under the ITAR regime, delivery of the Satellite by KT to ABS, payment to KT by ABS of $500,000 for the Satellite, and passage of title through the Bills of Sale. At no point in this process did Respondents complain that the requirements of Article 10.1 had not been met.

218. Claimants' legal expert, Counsel for Respondents, and the dissenter all acknowledged at the hearing that MSIP did not have the authority it purported to exercise when it issued the disputed order.

219. Both Claimants and Respondents informed the Arbitral Tribunal that they had received no notice whatsoever that MSIP was contemplating the imposition of a new requirement regarding the sale of KS-3 to ABS and had no reason to believe that an export permit was required at all, given that such a permit had not been required for the sales of KS-1 and KS-2 to ABS. This raised the issue of due process under New York law. In 2016, the United States Court of Appeals for the District of Columbia Circuit invoked U.S. constitutional principles to hold that lack of notice by a regulatory agency was a violation of due process. That decision applies nationwide, including in New York.

### A. *The Arbitral Tribunal's Decision on Applicable law*

#### 1. *Law Applicable to Determining the Export Nationality of the Satellite*

220. The Arbitral Tribunal views the Parties' dispute over whether the Satellite was a U.S. export or a Korean export as part of the applicable law question. Was an FTA permit requirement applicable to the sale of the Satellite or not? Claimants argued that FTA

approval in the form of an export requirement was not a "necessary approval" within the meaning of Article 10.1 of the Purchase Contract because the Satellite was a U.S., not a Korean, export.[270]  Respondents took the position that the FTA applied to the sale because the Satellite constitutes a strategic item and the sale involved its "export."[271]

221.   The dissent argues, citing Korean law proceedings and the MSIP Order, that this was a Korean export.[272]  However, it should be noted that even Respondents' own legal expert, Professor Kyoungjn Choi, has cast doubt on Respondents' position.  Professor Choi, in written testimony, says that the position taken by MSIP that the Satellite is a Korean export is "a controversial and debatable interpretation of the law."[273]  And Claimants' legal expert, Professor Eon-Kyung Park, said that Respondents' failure to obtain an FTA export permit prior to transferring title did not violate the FTA.[274]

222.   In the majority view, the Satellite was a U.S. export subject only to U.S. export control law.  The Satellite was manufactured in the United States, not in Korea, by Lockheed Martin.  The Satellite was never in the territory of Korea.  After the Satellite was manufactured in the United States, it was launched from French Guiana.  The Satellite was thus a U.S. export when Lockheed Martin sold the Satellite to Respondents, and it remained a U.S. export when Respondents re-sold the Satellite to ABSH.  The dissent

---

[270] Statement of Claim, para. 79.

[271] Respondents' First Supplemental Statement. para. 18.

[272] Dissent, paras. 100-104.

[273] Prof. K. Choi Declaration, para. 33.  The dissent dismisses Professor Choi's testimony as "irrelevant"; according to the dissent, "[t]he transfer of the KS-3 satellite involved unusual circumstances . . . and a comparatively new technology" so it is "not surprising that the application of export control legislation might produce unanticipated results."  Dissent, para. 106.  This statement ignores the fact that, to this day, MSIP has not questioned or attempted to invalidate the prior sale of the virtually identical KS-1 and KS-2 satellites by Respondents to Claimants.

[274] See Prof. Park Expert Statement. p. 8.

contends that the Satellite has a closer connection with Korea than with any other state in the world, citing such factors as the nationality of the seller of the Satellite and its geostationary location.[275]   The dissent does not, however, take into account the fact that neither the agency charged with the administration of the FTA – MOTIE[276] – nor the agency that issued the disputed order –MSIP – regarded, or attempted to regulate, the virtually identical KS-1 and KS-2 satellites sold by KT to ABS as "exports" within the meaning of the FTA.  Based on their prior course of dealings with respect to the purchase and sale of virtually identical satellites, the Parties believed the KS-3 satellite to be a U.S. export.[277]

223.   That is why the Purchase Contract required that Respondents work with Lockheed Martin to obtain the ITAR approval legally required for Respondents to sell the Satellite to ABS.[278]   The satellite was a U.S. export under the ITAR regulatory mechanism.   The ITAR regulations, Part 123 and elsewhere, set forth requirements for export and temporary import licenses.[279]   There is nothing in the ITAR regulations which set forth requirements for permanent import licenses.  Temporary import, yes.  Permanent import, as from Korea, for example, no.  The Parties in the instant case did not intend the sale of the Satellite to ABS, manufactured by Lockheed Martin in the United States, to be temporary.   ITAR approval was thus necessary as it was a U.S. export.   That was the intention and action of the Parties to the Purchase Contract, including Respondents, who

---

[275] Dissent, para. 90.

[276] *See* paras. 244-246 below.

[277] *See* Statement of Claim, para. 8; Statement of Defense, para. 5; Reply, paras. 5, 15; Claimants' First Supplemental Statement, n. 120.

[278] *See* Purchase Contract, Art. 12.1 (CE-1).

[279] *See generally* 22 C.F.R. Ch. I, Subch. M (2016).

worked with Lockheed to secure ITAR approval of the U.S. export. It is clear, and is the majority view in this case, that, under the Purchase Contract, the Parties understood and acknowledged the sale of the Satellite to be a U.S. export, governed by the ITAR regulations, and not a Korean export.[280] And there is no relevant public international agreement in this case that would override the ITAR regulations. The dissent's apparent contention that MSIP could legitimately find three years later that the Satellite was also a Korean export is contrary to the evidence in the record.

224. The dissent argues that "[t]his is not an issue that the parties have, or could have, resolved by contract. The need for an export permit is an obvious question of Korean law and regulatory provisions, not a question of contract interpretation."[281] But there are no mandatory Korean regulatory provisions relevant in this case.[282] The dissent fails to appreciate that the understanding of the Parties concerning whether the transaction involved a U.S. or Korean export and what permits were thus required does indeed have evidentiary weight. In fact, the Parties agreed on the need for an export permit, but under mandatory U.S. regulatory provisions, *i.e.*, ITAR approval. Respondents worked with

---

[280] The dissent, at footnote 58, erroneously asserts that the Statement of Claim does not support the foregoing argument. That is plainly incorrect. The Statement of Claim reads in relevant part:

> The Satellite was manufactured in the United States by Lockheed Martin—it was not manufactured in Korea by Respondents or some other Korean company. The Satellite was thus a United States export when Lockheed Martin sold the Satellite to Respondents, and it remained a United States export when Respondents re-sold the Satellite to ABSH. This is precisely why the Purchase Contract required that Respondents work with the manufacturer of the Satellite, Lockheed Martin, in order to obtain the U.S. ITAR approval necessary for Respondents to sell the Satellite to ABS220—the Satellite was still a United States export under the ITAR regulatory structure. At no point did the Satellite ever touch ground in Korea; after it was manufactured in the United States, it was launched from French Guiana. *For the MSIP or Respondents to argue that the Satellite is somehow a "Korean export," subject to Korean laws requiring prior approval for exportation, would be to distort entirely the meaning of the term "exportation."*

Statement of Claim, para. 79 (emphasis added) (internal citations omitted).

[281] Dissent, para. 110.

[282] *See* paras. 213, 215, and 220-222 below.