# Exhibit A

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**

**ICC Case 19958/AGF/RD/MK**

**ABS HOLDINGS, LTD. (Bermuda)**
and
**ABS GLOBAL, LTD. (Bermuda),**

*Claimants*,

**versus**

**KT CORPORATION (Republic of Korea)**
and
**KTSAT CORPORATION (Republic of Korea),**

*Respondents*.

**FINAL AWARD**

**March 9, 2018**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 2

    A.   THE PARTIES............................................................................................................... 2

    B.   REPRESENTATION OF THE PARTIES ................................................................................ 3

    C.   THE ARBITRATORS ..................................................................................................... 3

    D.   TIME LIMIT ............................................................................................................... 4

    E.   SUMMARY OF THE PARTIAL AWARD AND PROCEDURAL HISTORY .................................... 5

DECISIONS ON THE MERITS AND ON JURISDICTION OVER TORTS ................................... 13

    A.   WAS THE TERMINATION BY ABS OF THE AGREEMENTS PROPER ................................... 13

    B.   DID ABS BREACH THE AGREEMENTS BY CONTRACTING WITH LOCKHEED MARTIN TO TAKE AWAY CONTROL OF THE
SATELLITE FROM KTSAT .................................................................................................. 16

    C.   DID ABS BREACH THE AGREEMENTS BY MOVING THE KS-3 SATELLITE TO THE 116.1° EAST ORBITAL SLOT ...... 21

    D.   DID KT BREACH THE AGREEMENTS WITH RESPECT TO PROVIDING ABS WITH THE USE OF THE BSS TRANSPONDERS
ON THE SATELLITE ........................................................................................................... 25

    E.   DID KT BREACH THE AGREEMENTS RELATED TO PROVIDING ABS WITH AN OPPORTUNITY JOINTLY TO DEVELOP
AND OWN WITH KT A SUCCESSOR SATELLITE TO THE SATELLITE ......................................... 28

    F.   THE ARBITRAL TRIBUNAL'S JURISDICTION REGARDING CLAIMANTS' CLAIMS SOUNDING IN TORT ..................... 36

DAMAGES ..................................................................................................................... 41

    A.   CLAIMANTS' DAMAGES CLAIM TO REPLACE THE BASEBAND EQUIPMENT ........................ 41

        1.   *Claimants' Position* ........................................................................................ 41

        2.   *Respondents' Position* .................................................................................... 43

        3.   *Analysis of the Tribunal* ................................................................................. 44

    B.   CLAIMANTS' DAMAGES CLAIMS RELATED TO THEIR MITIGATION ACTIONS.......................... 44

        1.   *Claimants' Position* ........................................................................................ 44

        2.   *Respondents' Position* .................................................................................... 47

        3.   *Analysis of the Tribunal* ................................................................................. 47

    C.   CLAIMANTS' DAMAGES CLAIMS RESULTING FROM ALLEGED HARM TO THEIR BUSINESS AND REPUTATION ......... 48

        1.   *Claimants' Position* ........................................................................................ 48

        2.   *Respondents' Position* .................................................................................... 51

        3.   *Analysis of the Tribunal* ................................................................................. 51

    D.   CLAIMANTS' DAMAGES CLAIM RELATED TO THE SATELLITE'S BSS TRANSPONDERS ........................ 53

    E.   CLAIMANTS' DAMAGES CLAIM RELATED TO THE SUCCESSOR SATELLITE ........................ 54

    F.   CLAIMANTS' DAMAGES CLAIMS SOUNDING IN TORT ................................................... 54

    G.   RESPONDENTS' DAMAGES CLAIM RELATED TO UNPAID SERVICE FEES ........................... 54

    H.   RESPONDENTS' DAMAGES CLAIMS RESULTING FROM CLAIMANTS TAKING CONTROL OF THE SATELLITE............. 55

    I.   TOTAL DAMAGES AND APPLICABLE RATE OF INTEREST ............................................... 55

LEGAL FEES AND ARBITRATION COSTS ........................................................................ 56

DISPOSITIVE ................................................................................................................. 59

**INTRODUCTION**

1.  On July 18, 2017, the Arbitral Tribunal issued a Partial Award (pursuant to the 2012 ICC Rules of Arbitration) in the instant case.  In the Partial Award, a majority of the Arbitral Tribunal held that title to the Satellite in question had properly passed to ABSH, encouraged the Parties to settle all other issues in dispute in the case, and stated that the Arbitral Tribunal would decide the remaining issues in dispute that were not settled by the Parties.  Mr. Born filed a dissenting opinion to the Partial Award and has filed a dissenting statement to this Final Award.  In view of this dissenting statement, it should be understood that the phrase "Arbitral Tribunal" in the text of this Final Award, including in the dispositive, means "Arbitral Tribunal by majority."  Moreover, all terms and acronyms utilized in this Final Award should be understood to have the same meaning as in the Partial Award.

### A.  *The Parties*

2.  The Claimants are ABS Holdings, Ltd. ("ABSH") and ABS Global, Ltd. ("ABSG") (collectively, "ABS" or "Claimants").  ABSH is a company organized and existing under the laws of Bermuda.  ABSH's registered address is at O'Hara House, 3 Bermudiana Road, Hamilton 08, Bermuda.

3.  ABSG is an operating company owned by ABSH.  ABSG's registered address is at O'Hara House, 3 Bermudiana Road, Hamilton 08, Bermuda.

4.  The Respondents are KT Corporation ("KT Corp.") and KTSAT Corporation ("KTSAT") (collectively, "KT" or "Respondents").  KT Corp. is a company incorporated in the Republic of Korea.  KT Corp.'s primary place of business is 90 Buljeong-ro (Jeongja-dong), Bundang-gu, Seongnam-si, Gyeonggi-do, Republic of Korea.

5.      KTSAT is a company incorporated in the Republic of Korea.  KTSAT's primary place of

business is 14F, Chungjeong Tower 21, Seosomun-ro, Seodaemun-gu, Seoul, Republic of

Korea.

###   B.  *Representation of the Parties*

6.      The Claimants are represented by:

        Michael D. Nolan
        Kamel Aït-El-Hadj
        Brett P. Lowe
        Milbank, Tweed, Hadley & McCloy LLP
        International Square Building
        1850 K Street, N.W., Suite 1100
        Washington, D.C. 20006
        USA

7.      The Respondents are represented by:

        Kap-You (Kevin) Kim
        John P. Bang
        Junu Kim
        David MacArthur
        Mino Han
        Yenping Seng
        Bae, Kim & Lee LLC
        133 Teheran-ro, Gangnam-gu
        Seoul 135 723
        Republic of Korea

        Brian Weimer
        Paul Werner
        Matthew Riemer
        Sheppard, Mullin, Richter & Hampton LLP
        2099 Pennsylvania Avenue, NW, Suite 100 Washington, DC 20006-6801

###   C.  *The Arbitrators*

8.      The co-arbitrator nominated by Claimant ABSH and confirmed by the Secretary General

of the ICC International Court of Arbitration ("Secretary General") on April 22, 2014,

pursuant to Article 13(2) of the Rules of Arbitration of the International Chamber of

Commerce in force as of January 1, 2012 ("ICC Rules"):

> Daniel M. Price
> Daniel M. Price PLLC
> 800 Connecticut Ave., NW, Suite 800
> Washington, DC 20006

9.    The co-arbitrator jointly nominated by Respondents and confirmed by the Secretary

General on April 22, 2014, pursuant to Article 13(2) of the ICC Rules:

> Gary Born
> Wilmer Cutler Pickering Hale and Dorr LLP
> 49 Park Lane
> London W1K 1PS
> United Kingdom

10.   The third arbitrator and President of the Arbitral Tribunal, jointly nominated by Claimant

ABSH and Respondents and confirmed by the Secretary General on June 19, 2014,

pursuant to Article 13(2) of the ICC Rules:

> Arthur W. Rovine
> Fordham University Law School
> 215 East 68th Street
> New York, N.Y. 10065

### D. *Time Limit*

11.   The Secretariat notified the Partial Award dated 18 July 2017 (received on 25 July 2017)

to the Parties on 25 July 2017. The extensions since then are as follows:

- At its session of 1 June 2017, the Court extended the time limit for rendering the final

  award until 31 July 2017 (Article 30(2)).

- At its session of 6 July 2017, the Court extended the time limit for rendering the final

  award until 31 August 2017 (Article 30(2)).

- At its session of 3 August 2017, the Court extended the time limit for rendering the final award until 29 September 2017 (Article 30(2)).

- At its session of 7 September 2017, the Court extended the time limit for rendering the final award until 31 October 2017 (Article 30(2)).

- At its session of 5 October 2017, the Court extended the time limit for rendering the final award until 30 November 2017 (Article 30(2)).

- At its session of 2 November 2017, the Court extended the time limit for rendering the final award until 29 December 2017 (Article 30(2)).

- At its session of 7 December 2017, the Court extended the time limit for rendering the final award until 31 January 2018 (Article 30(2)).

- At its session of 11 January 2018, the Court extended the time limit for rendering the final award until 28 February 2018 (Article 30(2)).

- At its session of 1 February 2018, the Court extended the time limit for rendering the final award until 30 March 2018 (Article 30(2)).

### E.  *Summary of the Partial Award and Procedural History*

12.   In the Partial Award, the Arbitral Tribunal held that ABSH holds title to and thus owns the Satellite and Baseband Equipment, ordered that Respondents desist from interfering with the ongoing operation of the Satellite, and ordered Respondents to deliver to ABSH the Baseband Equipment and all associated flight data related to the operation of the Satellite.[1]

---

[1] Partial Award, paras. 299-301.

13.    Further, in deciding the title issue, the Arbitral Tribunal held that all conditions precedent to the transfer of title were satisfied.[2]  These conditions included: (i) obtaining mandatory export approval by Respondents and Lockheed for a U.S. export under the U.S. ITAR regime; (ii) delivery of the Satellite by KT to ABS; (iii) payment to KT by ABS of $500,000 for the Satellite; and (iv) passage of title through the Bills of Sale.[3]  The Arbitral Tribunal held that at no point in this process did Respondents complain that the requirements of Article 10.1 were not being met.[4]  Title passed to ABS by the Bills of Sale more than two years before the issuance of the Ministry of Science, ICT and Future Planning (MSIP) order.[5]

14.    The Arbitral Tribunal held that New York law governed in light of the New York law clauses agreed to by the Parties in the Purchase Contract, the Operations Agreement, the Terms of Reference, and Procedural Order No. 1, without reference to New York conflict-of-laws principles, and that none of these provisions could be changed unilaterally by one side.[6]

15.    The Partial Award rejected various contentions by Respondent, including that "mandatory" Korean law on export controls or national security concerns preempted the application of New York law and required the issuance of a Korean export permit;[7] that failure to obtain such a permit resulted from mutual mistake;[8] and that an order issued by

---

[2] Partial Award, para. 253.

[3] Partial Award, para. 217.

[4] Ibid.

[5] Partial Award, para. 237.

[6] Partial Award, para. 242.

[7] Partial Award, para. 243.

[8] Partial Award, para. 283.

the MSIP effectively blocked transfer of title.[9]  In particular, the Partial Award found Respondent's fact and expert witness testimony regarding the MSIP order and the necessity for a Korean export permit lacking in credibility.  In addition, the Partial Award noted that Claimants' legal expert, Counsel for Respondents, and the dissenter all acknowledged at the hearing that MSIP did not have the authority it purported to exercise when it issued the disputed order.[10]  Further, the Partial Award held that the Satellite was a U.S. export subject mandatorily only to U.S. export control by ITAR as it was manufactured in the United States – not in Korea – by Lockheed Martin, was never in the territory of Korea, and was launched from French Guiana.[11]  The Partial Award held that the Satellite was thus a U.S. export when Lockheed Martin sold the Satellite to Respondents, and remained a U.S. export when Respondent re-sold the Satellite to ABSH.[12]  The Partial Award noted that Respondents agreed without argument, and together with Lockheed, sought and received ITAR approval.  At no point during the ITAR process did anyone maintain that the Satellite was a Korean export, and not a U.S. export.[13]

16.   According to the Partial Award, as for "mandatory" Korean law, even apart from the New York law clauses in the Purchase Contract, Operations Agreement, Terms of Reference, and Procedural Order No. 1, without reference to New York conflict-of-laws principles, on the record before the Arbitral Tribunal, neither MOTIE nor MSIP ever addressed the issue of KT obtaining an FTA export permit in connection with the sale of either the KS-1

---

[9] Partial Award, VIII.B.2.

[10] Partial Award, para. 262.

[11] Partial Award, para. 222.

[12] Ibid.

[13] Partial Award, para. 224.

or KS-2 satellites.[14]   According to the Partial Award, this is key to understanding that the Korean "mandatory" law asserted by the dissent was not mandatory at all, particularly coming long after title had passed to ABS without objection from KTSAT and without any action from MOTIE or MSIP at that time.[15]

17.    The Partial Award could not credit Respondents' national security argument, which was raised for the first time more than three-and-a-half years after the Purchase Contract entered into force and more than two years after title to ABS had passed by means of the Bills of Sale.[16]   Further, according to the Partial Award, the argument that national security considerations rendered an export permit a necessity and thus justified the MSIP in finding an export requirement, even long after the entry into force and implementation of the Purchase Contract, raised both a credibility problem and a retroactivity problem, both discussed in the Partial Award.[17]

18.    With respect to the mutual mistake argument raised by Respondents, the Partial Award held that if there was any mistake at all, it was on the part of Respondents, who were alone obligated to obtain all necessary approvals.[18]   And they bore the risk of their failure.[19]   The Partial Award held that there was no legal basis for saying that ABS should share in the risk,[20] and that it had not occurred to the Parties that an FTA export permit was required because that requirement was not there at the relevant times, and when it was there, *ex post facto*, it was found to exist by MSIP, not by MOTIE, the agency that had

---

[14] Partial Award, para. 238.

[15] Ibid.

[16] Partial Award, para. 270.

[17] Ibid.  Also *see* paras. 258, 264, 275, 277, 283 to 287, and 289.

[18] Partial Award, para. 283.

[19] Ibid.

[20] Ibid.

authority to issue such export permit requirements, as acknowledged at the hearing by legal expert Professor Park, Respondents' Counsel, and Mr. Born.[21]

19.   The issues decided in this Final Award do not relate directly to the issues decided in the Partial Award.  In the Partial Award, the primary issues were passage of title to ABS, New York governing law, the effect of the MSIP order, export nationality, and failure to obtain an FTA export permit not being a mutual mistake warranting rescission of the Purchase Contract.

20.   The Parties were encouraged to settle the remaining issues, and if they could not, the Arbitral Tribunal would decide those issues.[22]

21.   As for the procedural history in this case, *see* first the procedural history as set forth in the Partial Award, pp. 6-13.  That history is incorporated herein by reference.

22.   Concerning the procedural history in this case since the issuance of the Partial Award, in an August 18 letter to the Arbitral Tribunal, Claimants stated that there had been no meetings or settlement discussions with KT, despite ABS' efforts to arrange meetings, and requested the Arbitral Tribunal to "proceed to resolve the remaining issues in dispute." On August 21, 2017, Respondents replied, requesting the Arbitral Tribunal "to complete any remaining tasks as expeditiously as possible," emphasizing several prior Procedural Orders, and noting that the proceedings had been closed.

23.   There followed Procedural Order No. 14, dated August 28, 2017, issued by the Arbitral Tribunal, which took note of the Parties' letters of August 18 and 21, 2017 to the Arbitral Tribunal indicating that the Parties had not reached a settlement and requesting the Arbitral Tribunal to resolve the remaining issues in dispute.  The Arbitral Tribunal re-

---

[21] Ibid. Also *see* para. 296.

[22] Partial Award, paras. 297-298.

opened the proceedings and requested the Parties "no later than September 8, 2017, to submit (1) an agreed list of remaining issues to be resolved and remaining requests for relief, or (2) failing agreement on such a list, separate submissions (not exceeding 5 pages). In either case, the Arbitral Tribunal underscores that no new issue or request for relief may be raised in any submission."

24.   On September 8, 2017, ABS and KT submitted to the Arbitral Tribunal their lists of issues they wished to have decided by the Arbitral Tribunal.

25.   ABS requested the Arbitral Tribunal to determine whether:

   a) ABS should be awarded damages of U.S. $2,500,000 in lieu of delivery of the Baseband Equipment;

   b) ABS rightfully terminated the Agreements in light of the failure by KT to obtain and maintain authority from the Korean government to operate the Satellite on ABS's behalf at the 116.0° East orbital slot, evidenced *inter alia* by the issuance of the MSIP Order;

   c) the steps ABS took to mitigate the impact of KT's failure to obtain and maintain authority from the Korean government to operate the Satellite on ABS' behalf were warranted and reasonable; in the affirmative, whether and to what extent ABS is entitled to compensation for its mitigation actions resulting from KT's contractual failure. The total damages sought for various categories was US $2,218,878;

   d) ABS is entitled to compensation for the damages it incurred as a result of the toll that KT's wrongful claim of ownership placed on ABS's business and reputation as a reliable satellite operator. The total damages sought are U.S. $29,121,963;

e) KT breached the Agreements by refusing to provide ABS with the use of the BSS transponders on the Satellite; in the affirmative, whether ABS is entitled to damages as a result of this breach by KT.  Damages are sought in the amount of U.S. $1,300,000;

f) KT breached the Agreements by refusing to provide ABS with an opportunity jointly to develop and own with KT a successor satellite to the Satellite; in the affirmative, whether ABS is entitled to damages as a result of this breach by KT. No precise amount of damages was sought;

g) the Tribunal has jurisdiction over ABS's tort claims for KT's willful and tortious conduct against ABS; in the affirmative whether ABS is entitled to damages arising from such willful and tortious conduct by KT.  An award of legal fees was sought associated with the representation of ABS respecting these claims; and

h) ABS is entitled to recover all of its legal fees and arbitration costs.

26.    In its submission, Respondents listed as open issues:

a) ABS's breaches of the Purchase Agreement, including but not limited to its obligations to operate the Satellite at the 116.0° East orbital slot;

b) ABS's breach of the Operations Agreement by, including but not limited to, contracting with Lockheed Martin to take away control of the Satellite from KTSAT;

c) the amount of damages ABS owes to KTSAT, including for its breaches of the Purchase Agreement and/or Operations Agreement; and

d) the amounts ABS owes KTSAT for outstanding payments under the Parties' Agreements, including technical engineering fees & TT&C fees.

27.   Respondents requested the Arbitral Tribunal to declare that:

    a)  ABS's alleged tort claims are outside the Parties' arbitration agreement and the Tribunal lacks jurisdiction to resolve them;

    b)  if the Tribunal determines it has jurisdiction over ABS's tort claims, those claims are without merit and KTSAT is not liable to ABS on such claims;

    c)  ABS did not breach the Parties' Agreements;

    d)  KTSAT is not liable for any damages to ABS for any alleged breaches of the Parties' Agreements;

    e)  the termination notice by ABS dated 24 November 2013 was invalid and of no effect;

    f)  ABS breached its obligations under the Parties' Purchase Agreement (sic), including but not limited to its obligation to operate KS-3 at the 116.0° East Orbital slot;

    g)  ABS breached the Parties' Operations Agreement by, including but not limited to, contracting with Lockheed Martin to take away control of KS-3 from KTSAT; and

    h)  ABS breached its obligations continuously to operate the Satellite at the 116.0° East orbital slot by misrepresenting to the ITU the date at which ABS began to operate KS-3 under PNG's orbital slot filings.

28.   Respondents requested the Arbitral Tribunal to order ABS to:

    a)  pay KTSAT's damages as quantified during the arbitration;

    b)  pay KTSAT pre- and post-judgment interest;

    c)  order and declare any award in favor of KTSAT be immediately enforceable;

d)  order and award any such further relief the Tribunal deems just and appropriate in favor of KTSAT;

e)  order ABS to reimburse KTSAT for all costs incurred in connection with this arbitration, including but not limited to reasonable attorney's fees and costs, expert fees and costs, and the fees and expenses of the arbitrators and the ICC; and

f)  deny ABS all of its requested relief.

## DECISIONS ON THE MERITS AND ON JURISDICTION OVER TORTS

### A.  *Was the Termination by ABS of the Agreements Proper*

29.  The Parties in this arbitration have posed as an unresolved issue from the Partial Award whether the termination of the Agreements by ABS was wrongful or not.  On this issue, the Parties focused almost all of their attention on the Operations Agreement, and not the Purchase Contract.  Nevertheless, the Arbitral Tribunal holds that both agreements were rightfully terminated.

30.  ABS maintains, in its communication to the Arbitral Tribunal dated September 8, 2017, listing issues it regards as unresolved, that the Arbitral Tribunal should declare that "(i) KT has breached Articles 5.3, 12.1, and 12.2 of the Purchase Contract and Articles 6.1 and 5.1.3 of the Operations Agreement; and (ii) ABS rightfully terminated the Agreements."[23] These Articles relate to the obligations of KT to obtain and maintain approvals, consents, licenses and authorizations of various kinds. ABS maintains that KT was not in compliance, and that termination was therefore appropriate.  The Arbitral Tribunal agrees.

---

[23] ABS's List of Remaining Issues to Be Resolved and Remaining Requests for Relief Pursuant to PO No. 14, para. 2.

31. Even the dissent to the Partial Award, while concluding that title did not pass to ABS, but that KT should be liable to ABS for damages, stated the following:

> *"This conclusion {as to title} would not leave ABS without a remedy.  On the contrary, as noted above, Article 5.2 of the Purchase Contract obligated KT to 'obtain all necessary licenses, consents and approvals for the sale of the Satellite and the Baseband Equipment, including, without limitation, the ITAR Approval....'  KT bore the responsibility for obtaining, and the risk of not obtaining, necessary governmental approvals. **In my view, KT failed to obtain the export permit required by Korean law for an effective transfer of title to the KS-3 satellite**, and, as a consequence, would presumptively be liable for damages arising from that breach of its obligations."[24]*

32. Respondents argue, in their Rejoinder, that the MSIP Order was issued "*after* ABS's improper seizure of control of KS-3" and that they were  not afforded 30 days to cure a breach, but only 7 days.[25]  Claimants answer that ABS could terminate the Purchase Contract "with immediate effect" if there were a "revo[cation] of any of its permissions, licenses, authorizations or consents required by applicable law."[26]  Claimants then state that "As ABS demonstrated, by the time it decided to terminate the Agreements, there could be no doubt that KT had committed multiple failures with respect to its obtaining and maintaining the regulatory approvals required for ABS to operate the Satellite…."[27]

33. The Arbitral Tribunal concludes that ABS properly terminated the Purchase Contract as a legitimate response to KT's breaches.

---

[24] Dissent to the Partial Award, para. 149, bold type added.

[25] Rejoinder, paras. 75 and 196.

[26] Sur-Rejoinder, pp.41-42, para. 80; Purchase Contract, Art. 14.3 (a) (CE-1).

[27] Sur-Rejoinder, p. 42, para. 80.

34.   As to the Operations Agreement, KT maintains, in its Rejoinder, that "ABS cannot point to *any* evidence, and there is no record evidence, to support the assertion that KTSAT was or is unable or unwilling to provide operational services to KS-3 pursuant to the Operations Agreement.  Since the execution of that Agreement, KTSAT has remained at all times authorized and able to provide services."[28]  ABS similarly maintains that KT has submitted no evidence to support its own assertions.

35.   In the Arbitral Tribunal's view, ABS is correct.  To the very end of the proceedings prior to the issuance of the Partial Award in this case, the Arbitral Tribunal has not seen any such evidence, nor has the Arbitral Tribunal seen evidence that Respondents complied with their obligation to obtain and maintain authority from the Korean government to operate the Satellite on ABS's behalf.

36.   Further, ABS is correct in its conclusion that Respondents are required to point the Satellite not to the Middle East, but rather to the Korean peninsula.  As noted below, KT understood what the MSIP Order would entail and the concomitant risks before the Order was issued.[29]  And in fact, the MSIP Order not only purported to nullify the sale of the Satellite to ABS, but also provided for coverage of the Korean peninsula and not the Middle East.[30]

37.   In their Rejoinder, Respondents maintain that "ABS does nothing to dispute that the 'Korean government official who pressured the MSIP to issue the MSIP Order' took no issue with KTSAT's control of KS-3 on ABS's behalf outside of Korea."[31]  ABS, in its

---

[28] Rejoinder, p. 114, para. 196.

[29] *See* paras. 42-44.

[30] *See* the complete text of the Order, below, para. 46.

[31] Rejoinder, para. 194.

Sur-Rejoinder, maintains that is not true, that the "Korean government official" was Congresswoman Seung Hee Yoo, who said, according to the translation of the transcript, that "ABS's unauthorized occupancy of the orbit of east longitude 116 degrees and providing services using the orbit that was secured by the Republic of Korea cannot be allowed in any aspect" and that "**KT is not entitled to allow a Hong Kong corporation to use the frequency, which is an asset of the citizens of the Republic of Korea.**"[32]

38.   And importantly, as noted below,[33] KT understood full well the likely course of events, the content of the MSIP Order, and the resultant risks posed for KT.

39.   In sum, in the Arbitral Tribunal's judgment, the Operations Agreement was properly terminated in response to Respondents' breaches.

**B.  *Did ABS Breach the Agreements by Contracting with Lockheed Martin to Take Away Control of the Satellite from KTSAT***

40.   The Arbitral Tribunal holds that ABS did not breach the Agreements by contracting with Lockheed Martin to assume control of the Satellite from KTSAT.

41.   The documentary evidence in this case demonstrates to the Arbitral Tribunal that ABS was reasonable in apprehending that the MSIP would issue an order that would revoke Respondents' frequency rights and prevent Respondents from operating the Satellite on ABS's behalf.[34]  On November 24, 2013 Tom Choi emailed Mr. Craig Cooning of Boeing, stating that "From our understanding it looks likely that the Ministry will be

---

[32] Reply, para. 154, (CE-138).  Emphasis in original.

[33] *See* paras. 42-44.

[34] *See, e.g.,* Claimants' Reply Memorial, pp. 64-65, para. 137, fns. 258-262.

moving forward to cancel KT's frequencies and thus indirectly cause us to move out of 116E."[35]   Claimants' fears were realized.

42.   Even prior to the MSIP Order, the record shows that KT understood the likely course of events and the risks posed for KT under the Agreements.

43.   For example, in a November 15, 2013 email from Paik Seung-yoon (KT) to Hur Won-seok (MSIP), Paik tells Hur that "[I]n the event our company's earth station is rendered unable to control the Mugunghwa 3 satellite according to the additional sanctions (proposed), not only will our company be unable to refuse ABS's demand for transfer of the Mugunghwa 3 satellite and control apparatus, but also be held liable for all direct, indirect, and punitive damages demanded by ABS as we will have no grounds for redress at our disposal."   Paik further cautions that "the additional sanctions (proposed) will completely obliterate our control rights on the Mugunghwa 3 satellite in turn sparking other issues and ultimately resulting in irrevocable loss."[36]

44.   Moreover, in a December 2013 KT Internal Document entitled "Suggestion Concerning "KOREASAT Mugunghwa No. 3," KT writes that if it becomes "unable to provide continued control of the satellite or the satellite becomes unable to remain at the current orbit, ABS's operation of the satellite at the east longitude of 116° will obviously be disabled as well."   KT also acknowledges that ABS will then "terminate the aforesaid contract and hold our company accountable for indemnification of all damages, including

---

[35] CE-107.

[36] Translation of Email from P. Seung-yoon (KT) to H. Won-seok (MSIP), re KTSAT brief submission, November 15, 2013 (attaching Brief for submission to the MSIP) (CE-145).

indirect and punitive damages, and there is no question that such an outcome is a business risk to be contemplated and borne by our company."[37]

45.   Claimants point out, with documentary support, that on December 13, 2017, that they would "re-engage" with Respondents to have them operate the Satellite on ABS's behalf if Respondents could provide ABS with documentary evidence that Respondents had the authority to do so.[38]  No documentary evidence was forthcoming at any time.  Boeing, not a party to the dispute in this case, through Mr. Craig Cooning, said in a message to ABS dated November 25, 2017, that "It seems to me the steps you have taken are prudent and appropriate given this unfortunate situation."[39]

46.   On December 18, 2013, the MSIP issued the following Order[40]:

   *The text of the translated MSIP Order (which refers to the satellite in dispute as the Mugungwha 3 Satellite) is as follows:*

   *[Letterhead of the Ministry of Science, ICT and Future Planning]*

   *To:  Representative Director of KTSAT*

   *(Via)*

   *"Subject:   Notification of the Sale Agreement of the Mugungwha 3 Satellite being Null and Void, and Corrective Order, etc.*

---

[37] Translation of KT Internal Document entitled "Suggestion Concerning "KOREASAT Mugunghwa No. 3", December 2013 (CE-143).

[38] CE-26.

[39] CE-107.

[40] Translation of MSIP Order to KTSAT, December 18, 2013 (CE-54).

*1. Reference is made to Article 15-2, Paragraph (1), Item 4 of the Radio Waves Act and Article 92, Paragraph (2), Item 3 of the Telecommunications Business Act.*

*2. We hereby notify you that the Sale Agreement regarding the Mugungwha 3 Satellite (including TT&C equipment, etc.) (the "Agreement") that you entered into with ABS, an overseas satellite business operator, is null and void, since it is in violation of the mandatory law (Foreign Trade Act).*

*3. Therefore, we hereby request for the appropriate management of the Mugungwha 3 Satellite equal to the level of management pursued prior to the Agreement, management based on the spectrum usage plan submitted upon your application for reallocation of spectrum (March 2011) and active deliberation of measures to protect the satellite orbit and the spectrum, both of which are national resources. End".*

*Minister of Science, ICT and Future Planning (official seal affixed)*

47. The MSIP Order also stated at page 2 that "We hereby notify you [KTSAT] of our cancellation of allocation of the spectrum for Ka Band…on the ground of receiving the allocation of spectrum through false or other illegal methods and violation of conditions to the allocation of spectrum, in connection with the spectrum for the purpose of providing satellite service, which was reallocated to you in June 2011, per your application for reallocation in March 2011."[41]

48. On November 25, 2013, ABS entered into a contract with Lockheed Martin, the Satellite's manufacturer, to take control of the Satellite and operate it on ABS's behalf for ABS's commercial and U.S. military customers, something that, in the Arbitral Tribunal's view,

---

[41] Ibid.

could not have been done under the MSIP Order, which Claimants reasonably feared would soon be forthcoming.  The Arbitral Tribunal also finds informative the view of Boeing that "the steps you [ABS] have taken are prudent and appropriate given this unfortunate situation."[42]

49.    As noted in para. 42, *supra*, even prior to the MSIP Order, the record shows that KT understood the likely course of events and the risks posed for KT under the Agreements.[43]  Claimants state in their Reply at pp. 64-65 "as ABS continued its dialogue with the MSIP, via Kim & Chang, it soon became clear that (1) the MSIP had concluded that Respondents had violated Korean law by illegitimately obtaining the approvals necessary to operate the Satellite on ABS's behalf, and that (2) the MSIP would soon be issuing an order that would revoke Respondents' frequency rights and prevent Respondents from operating the Satellite on ABS's behalf."[44]  This conclusion by the MSIP, whether appropriately based on Korean law or not, meant that Respondents had breached their fundamental obligations in the Agreements. Respondents had failed to obtain and/or maintain the approvals necessary to operate the Satellite on ABS's behalf.[45] And even KTSAT recognized the reasonableness of ABS bringing on Lockheed.  In an

---

[42] CE-107.

[43] See particularly para. 43, *supra,* and paras. 44-45, *supra*.

[44] *See* Email from R. Lee to T. Choi, re MSIP Meeting, **November 15, 2013** (CE-109) ("As such, in light of the current direction and posture of the MSIP, *we believe that ABS should be ready for KTSAT's frequency allocation for K-3/ABS-7 to be revoked as early as this month, and that KTSAT may need to stop providing the TT&C services by the end of the year*.") (Emphasis added); Email from T. Choi to C. Cooning, re State Department Assistance, **November 24, 2013** (CE-107) ("Could you please let us know if there has been any feed back from the discussions?  From our understanding *it looks likely that the Ministry will be moving forward to cancel KT's frequencies and thus indirectly cause us to move out of 116E*.") (emphasis added); Email from T. Choi to C. Cooning, re State Department Assistance, **November 25, 2013**(CE-107) ("*The situation has evolved considerably since our last exchange: . . .  The MSIP (ministry) is coming to a conclusion no matter what the outcome, KT made violations of the domestic regulations and law so they will be punished by having their frequencies revoked. This will have the direct consequence of affecting our operations at 116E*.") (emphasis added).

[45] *See also* p. 67, fn. 267.

email dated November 27, 2013, Mr. S. Kim of KTSAT sent an email to Tom Choi of ABS saying that "I may agree fully that if I were you in a same circumstances, maybe I also do not hesitate to do nesecssary [sic] actions in order to care my company and the customers of KTsat."[46]

50.   In sum, both KTSAT and ABS knew what the MSIP Order would likely contain and the risk posed thereby for ABS and for KTSAT. In the judgment of the Arbitral Tribunal, giving control of the Satellite to Lockheed Martin was reasonable, and was not a breach of the Agreements.

### C.   *Did ABS Breach the Agreements by Moving the KS-3 Satellite to the 116.1° East Orbital Slot*

51.   The Arbitral Tribunal holds that ABS did not breach the Agreements by moving the KS-3 satellite to the 116.1° East orbital slot.  On this matter, the Parties differ as to whether the MSIP Order had any effect on ABS's capacity to service its customers.  Claimants say yes and Respondents say no.  On this question, the Arbitral Tribunal holds that Claimants are correct.

52.   At page 2 of the MSIP Order, quoted above, it is clear that MSIP cancelled Respondents' frequency allocation for the Ka-band.  What is not clear is whether this cancellation was global or just within Korea.  Yet Respondents have always claimed they were operating the Satellite under Korea's authority.  Claimants correctly, in the Arbitral Tribunal's view, cite their negotiations with Respondents on December 11-12, 2013, and cite an internal document produced by Respondents stating that "one of ABS' negotiation demands that

---

[46] CE-76.

'exceed[ed] ktsat abilities' was ABS's 'Demand for continued Ka service in the Middle East even in the event of a Ka frequency allocation cancellation.'"[47]

53.     The Ka frequency allocation was in fact cancelled by MSIP, which also ordered Respondents to operate the Satellite "equal to the level of management pursued prior to the Agreement, management based on the spectrum usage plan submitted upon your application for reallocation of spectrum (March 2011)."[48]

54.     In the view of the Arbitral Tribunal, this was not just a matter of good management, or appropriate management, as maintained by Respondents in their Rejoinder,[49] but rather a statement going to the scope of operations tied to the allocation of spectrum. The language of the MSIP Order makes this clear:

> *"We hereby notify you [KTSAT] of our cancellation of allocation of the spectrum for Ka Band…on the ground of receiving the allocation of spectrum through false or other illegal methods and violation of conditions to the allocation of spectrum, in connection with the spectrum for the purpose of providing satellite service, which was reallocated to you in June 2011, per your application for reallocation in March 2011."[50]*

55.     It is thus apparent that KTSAT was not simply being admonished to follow good management practices, but rather its allocation was revoked.  In the application to which the Order refers, KTSAT had said they would provide satellite services to Korea, but they had previously sold the satellite to ABS and re-pointed it to provide services to ABS's

---

[47] CE-144.

[48] Translation of MSIP Order to KTSAT, December 18, 2013 (CE-54).

[49] *See* Rejoinder p. 42, para. 78.

[50] Translation of MSIP Order to KTSAT, December 18, 2013 (CE-54).

customers in the Middle East.  Claimants contend, and the Arbitral Tribunal agrees, that the MSIP Order constituted a "a standing directive to re-point the Satellite away from the Middle East and back towards the Korean Peninsula."[51]  The evidence also shows that in the transcripts from the hearing held by the Korean Congresswoman Seung-Hee Yoo on November 7, 2013, Congresswoman Seung-Hee stated that "ABS's unauthorized occupancy of the orbit of east longitude 116 degrees and providing services using the orbit that was secured by Republic of Korea…cannot be allowed in any aspect."[52]

56.   In the Arbitral Tribunal's view, the MSIP Order made clear that Respondents would not be able to fulfill their obligation under the Agreements to maintain authority from the Korean government to operate the Satellite on ABS's behalf.  ABS reasonably concluded from this that it was fully justified in bringing into use PNG's ITU filings at 116.1° East to provide services to ABS's customers.

57.   As noted above, Claimants were justified in terminating the Agreements given KT's failure to obtain and maintain authority, approvals, licenses and consents from Korea under Articles 5.3, 12.1 and 12.2 of the Purchase Contract, and Articles 6.1 and 5.1.3 of the Operations Agreement.  Each of these provisions are relevant with respect to ABS's action in moving the Satellite to the 116.1° East Orbital Slot.

58.   As Claimants point out in their Reply, the Director of the ITU BR, Francois Rancy, also thought the move was justified.[53]  He wrote to KT by email on September 14, 2014 as follows:

---

[51] Reply, p. 75, para. 133.

[52] CE-138.

[53] Reply, p. 80, para. 157, fn. 314.

*"I also would like to add that KT is largely responsible for the current deadlock: by selling your satellite to ABS and not covering that by a license, you have put them in the obligation to find another administration for a filing and provide them with the means to secure rights at the same location, which is now done. You should therefore be more positive and inventive to propose solutions to the problem that you have created."*[54]

59.   Respondents have maintained that ABS and PNG deceived the ITU with false statements, saying that false dates were submitted as to the bringing into use notification that PNG submitted to the ITU on December 18, 2013 (the date of the MSIP Order).[55]   In view of the false dates, this "denied the validity of Korea's ITU filings" since PNG stated to the ITU that ABS had been operating under PNG's filing at 116.0° East since February 18, 2011.[56]   Respondents say that the PNG statement to the ITU "meant that PNG falsely declared to the ITU that the Satellite was being operated at the 116.1° East orbital slot since February 18, 2011" and that since PNG's filing at 116.1° East was made on July 13, 2011, this "suggests that ABS had engaged in deceitful behavior at the ITU to try to gain an advantage over KTSAT."[57]

60.   The Parties argued in detail about the filings.   But most importantly, in the view of the Arbitral Tribunal, the ITU had no problem with the PNG filings, as quoted in the Rancy email above, citing the failure to obtain a license, and in an earlier letter to PNG from ITU dated April 10, 2014, in which the ITU stated:

---

[54] CE-141.

[55] Statement of Defense, para. 96.

[56] Ibid.

[57] Statement of Defense, para. 96, and S. Choi Declaration para. 62.

*"In the light of this additional information, the Bureau is pleased to inform you that the Resolution 49 information and the notification information (Part-15) are considered receivable and will be published in the BRIFIC 2767 of 15 April 2014."*[58]

61.    The Arbitral Tribunal holds that ABS did not breach the Agreement by moving the KS-3 Satellite to the 116.1° East Orbital Slot.

### D.  *Did KT Breach the Agreements with Respect to Providing ABS with the Use of the BSS Transponders on the Satellite*

62.    The Arbitral Tribunal holds that KT did not breach the Agreements by not providing ABS with the use of the BSS transponders on the Satellite.  Unlike KT's obligation under the Agreements to obtain and maintain authority from the Korean government to operate the Satellite on ABS's behalf, the Arbitral Tribunal agrees with Respondents that the Agreements did not require KT to amend existing regulatory approvals, including as they related to the BSS transponders.

63.    In the view of the Arbitral Tribunal, the Agreements themselves could be understood, as Claimants contend, to provide for ABS's use of the BSS transponders on the Satellite to their customers outside of the Korean Peninsula, and do so without mentioning Korean regulatory approval.[59]  There is no mention in the Agreements of Korean law generally or specific Korean regulatory approvals with respect to the BSS transponders.

64.    Respondents maintain that "the Parties always understood that modifications to the BSS authorizations were contingent upon the Korean government and the ITU regulatory process involving other administrations" and that "KTSAT was required only to maintain existing authorizations, which is expressly enshrined in the Agreement, and the

---

[58] CE-128.

[59] *See* Purchase Contract, Recitals and Art. 1.1 (k) (CE-1).

Agreements did not require KTSAT to obtain new authorizations or modifications to existing authorizations."[60]

65. Respondents also state that ABS was "obligated to 'obtain and maintain' all approvals 'applicable to ABS with respect to its use of the Satellite and operation of the Secondary TT&C Facility,' including the Korean Foreign Trade Act."[61]

66. Article 6.1 of the Operations Agreement, provides in relevant part as follows:

> *"ABS shall obtain and maintain, in all material respects, all necessary licenses, clearances, permits, authorizations or permissions that are applicable to ABS with respect to its use of the Satellite and the operation of the Secondary TT&C Facility."*[62]

67. However, as Claimants point out, "the Secondary TT&C Facility was to be located in Hong Kong, so it is unclear why ABS would need to obtain any Korean approvals to operate a satellite that it purchased from that location."[63] Claimants also maintain that "the Korean Foreign Trade Act is not referenced anywhere in any of the Agreements, and nothing in the Agreements suggests that it was for ABS to obtain Korean approvals in connection with its purchase or potential operation of the Satellite."[64]

68. Claimants point to a draft term sheet for the sale of the Satellite, dated December 17, 2009, which states, *inter alia*, that "KT agrees to bias the Koreasat-3 satellite in order to re-point the coverage for the KU FSS, KU DBS and KA FSS beam to cover the Middle East."[65] Claimants also maintain that the Purchase Offer "contemplated ABS using the

---

[60] Rejoinder, pp.74-75, para. 135.

[61] *See* Statement of Defense, para. 47, which cites Article 6.1 of the Operations Agreement.

[62] Operations Agreement, Art. 6.1 (CE-2).

[63] Reply, p.23, para. 52; *See* Operations Agreement, Art. 1.4 (CE-2).

[64] Reply, p.23, para. 52.

[65] CE-136.

BSS transponders, the value of which was specifically factored into the proposed purchase price."[66]

69.     Significantly, however, in the view of the Arbitral Tribunal, in November 2010, seven months after the Purchase Contract and Operations Agreement were entered into, a presentation was made to the ABS Board in which it was stated that "BSS frequencies [were] planned assignments over Korea only [,] …BSS filing must be amended for use outside of Korea."[67]

70.     Respondents maintain that such amendments were subject to the regulatory approval processes of both the Korean Government and the ITU,[68] and insist that "Nowhere do the Agreements obligate KTSAT to win modifications of existing regulatory approvals on behalf of ABS."[69]  The Arbitral Tribunal agrees.[70]

71.     The Arbitral Tribunal is satisfied by the evidence that KTSAT nevertheless attempted to win approval of the ABS request to use the BSS transponders outside Korea, but their application failed by reason of decision of the Korean Government, based on an objection from Pakistan.[71]

72.     In sum, the Arbitral Tribunal holds that KT did not breach the Agreements with respect to providing ABS with the use of the BSS transponders on the Satellite.

---

[66] CE-9.

[67] *See* RE-73.

[68] *See* Rejoinder, p. 77, fn. 305.

[69] Rejoinder, p. 76, para. 136.

[70] *See* Rejoinder, p. 80, fns. 320 and 321.

[71] *See* Rejoinder, p. 78, fns. 306, 307, 308.

E. ***Did KT Breach the Agreements Related to Providing ABS with an Opportunity Jointly to Develop and Own with KT a Successor Satellite to the Satellite***

73.   Article 23 of the Purchase Contract provides that if KT decides to launch a Successor Satellite, then "KT shall give ABS the first opportunity to jointly (a) develop with KT the business plan for such Successor Satellite on an exclusive basis and (b) form a special purpose entity which would engage in (i) the construction and launch of the Successor Satellite, and (ii) the sale and lease of the capacity on the Successor Satellite."[72]

74.   Respondents maintain that Article 23 is an unenforceable agreement to agree, citing New York case law, both state and federal.[73]

75.   Respondents maintain that under New York law, it is "rightfully well settled in the common law of contracts…that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."[74]  Respondents maintain further that "where, as here, a clause leaves all terms open for future negotiations, the 'principles inherent in [agreement to agree] cases apply [ ] with added force' because the Parties have 'not even committed themselves to contract,' but instead agreed to undertake the 'even more vague' task of *negotiating*, which 'implicates so many factors that are themselves indefinite and uncertain that the intent of the Parties can only be fathomed by conjecture and surmise.'"[75]

76.   In its Reply, Claimants put forward the theory that Article 23 is a "preliminary agreement" and as such is an enforceable agreement under New York law that meets each of the five

---

[72] *See* CE-1.

[73] Rejoinder p. 65, fns. 251 and 252.

[74] *See* Rejoinder, p. 65, fn. 251.

[75] Ibid, fn. 252.

tests urged by the Respondent as set forth in the Second Circuit case of *Bear Stearns Inv. vs. Hitachi Auto. Prods.*[76]

77. The Second Circuit's five cumulative tests for a preliminary agreement are "(a) whether the intent to be bound is revealed by the language of the agreement; (b) whether the context of the negotiations demonstrates an intent of the parties to be bound by a preliminary commitment to negotiate the terms of their final agreement in good faith;  (c) the existence of open terms; (d) partial performance; and (e) the necessity of putting the agreement in final form, as indicated by the customary form of such transaction."[77]

78. Claimants maintain that they have met all of these tests, while Respondents maintain that none have been met.

79. Claimants emphasize the term "shall" in Article 23 to argue that Respondents are legally required to give ABS the first opportunity and that this is an "express manifestation that the Parties were bound by its terms."[78]

80. Respondents answer that Article 23 "is entirely contingent upon KTSAT determining to launch a successor satellite *and* determining to give another entity an 'opportunity' to co-develop that Satellite (which, ultimately, it did not)."[79]  Respondents state that "Such patently conditional language 'strongly supports the conclusion' that Article 23 is not 'a fully binding preliminary agreement.'"[80]

---

[76] *Bear Stearns Inv. vs. Hitachi Auto. Prods.*, 401 B.R. 598, 625 (S.D.N.Y. 2009) (CA-75).

[77] Ibid.

[78] Sur-Rejoinder, pp. 30-31, para. 60, fn. 180.

[79] Rejoinder, pp. 68-69, para. 125.

[80] Ibid.

81. With respect to the Second Circuit's first test, the Arbitral Tribunal holds that Claimants have the more persuasive approach.  As to this first test, Claimants are correct that the term "shall" is the language of legal obligation.

82. The Second Circuit's second factor is "whether the context of the negotiations demonstrates an intent of the parties to be bound by a preliminary commitment to negotiate the terms of their final agreement in good faith."  For reasons cited in paragraphs 90-92, below, the Arbitral Tribunal is not in a position to decide the question of which side was acting in good faith.

83. Respondents maintain that the context was negotiating the KS-3 Purchase Agreement (sic) and that Article 23 was not negotiated as a standalone agreement, but rather as a clause included in another contract.  Respondents argue that the context "demonstrates an intent to be bound by the Purchase Agreement (sic), but it does not reflect any intent of the Parties to be bound by future agreements, including one where none of the key terms have even been identified let alone agreed to."[81]

84. Respondents are correct in pointing out that "the parties did not agree on how the venture would be funded, how equity and risk would be allocated, how the venture would be operated, what the venture would do, or any other of the myriad material terms."[82]

85. Among other material terms, Respondents cite the venture's structure, design responsibility, launch responsibility, coverage area, transponder allotment, licensing responsibility, and indemnification, non-disclosure, termination, and title.[83]

---

[81] Rejoinder, p. 69, para. 126.

[82] Rejoinder, p. 66, para. 121.

[83] Rejoinder, p. 66, fn.254.

86.   The Term Sheets of 2013 and 2014, cited by Respondents, also leave open items that are clearly material, such as launch date, expected life of the satellite, joint investment structure, specifications of transponders, amount of investment for each party, relocation of KS-3, contractual structure, specifications of transponders, lease period, procurement details, launch details, operations, indemnification, and mitigation options.[84]

87.   In the Arbitral Tribunal's judgment, the foregoing are clearly material terms, and Claimants have not been able to point to an agreement between the Parties on any of them.

88.   Claimants state that in late October 2013 "the parties were very close to finalizing the term sheet for the successor satellite," but "just when the parties were ready to sign the term sheet, Korean politicians and representatives of the MSIP began making statements in the media challenging the sale of the Satellite and Respondents' operation of the Satellite on ABS's behalf."[85]

89.   Claimants state further that "Given the uncertainty these statements created over whether Respondents would be permitted to continue operating the satellite on ABS's behalf, let alone launching and operating the Successor Satellite, the Parties agreed to delay executing the term sheet for the time being."[86]

90.   The Parties argued in their submissions over who was acting in good or bad faith throughout the negotiations that followed the MSIP Order of December 2013. But of significance here, in the judgment of the Arbitral Tribunal, is Claimants' statement in their Reply that "the negotiations failed because Respondents could not obtain a written

---

[84] *See* Rejoinder, p. 66, fn. 253.

[85] Sur-Rejoinder, p. 44, para. 103.

[86] Sur-Rejoinder, pp. 44-45, para. 103.

commitment from the MSIP that the Satellite and Successor Satellite would not be interfered with once again."[87]

91.    Claimants repeat the same point in their Sur-Rejoinder, maintaining that "After the MSIP issued its order on December 18, 2013, ABS continued to negotiate in good faith with Respondents to reach a mutually acceptable agreement with respect to a term sheet for the Satellite and the Successor Satellite.   Ultimately, the Parties were unable to reach an agreement due to Respondents' failure to obtain a written commitment from the MSIP that ABS would be allowed to use Korea's ITU filings at 116.0° East to operate the Satellite and the Successor Satellite."[88]

92.    The foregoing statements by Claimants are significant, in the judgment of the Arbitral Tribunal, because they take the matter outside of the realm of good or bad faith, as required by the Second Circuit's second test, and place it within the framework of an outside agency (MSIP) over which neither party had control.   Under these circumstances, it is not possible for the Arbitral Tribunal to conclude with any certainty that Claimants or Respondents were acting in good or bad faith.

93.    The third, fourth, and fifth factors are "the existence of open terms; partial performance; and the necessity of putting the agreement in final form, as indicated by the customary form of such transaction."[89]

94.    There is no question, in the view of the Arbitral Tribunal, that there are material open terms with respect to the Successor Satellite.   Many of those open terms are adumbrated in the listing of the Second Circuit's second test, *supra.*

---

[87] Reply, p. 46, fn. 191; R. Pak Supp. Decl., para. 50.

[88] Sur-Rejoinder, p. 46, para. 106.

[89] *Bear Stearns, op. cit.*

95.    In its Rejoinder, Respondents cite New York cases stating that whether terms of the contract remain open to be negotiated is "always a factor tending against the conclusion that the parties have reached a binding agreement,"[90] citing *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*[91]

96.    However, according to the same case, "open terms obviously have a somewhat different significance where…the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms."[92] *Teachers Ins.* then states that, for example, where a "two page term sheet attached to [a] commitment letter covered the important economic terms of [a] loan...the fact that that countless pages of relatively conventional minor clauses remained to be negotiated does not render the agreement unenforceable."[93]

97.    Respondents then maintain that "ABS is unable to point to a single 'important economic term' for the potential Successor Satellite transaction, let alone a document including multiple important terms.  Tellingly, even in August 2013, six months after the official start of negotiations for the Successor Satellite, on the question of the 'Amount of Investment for each Party,' the Parties agreed only to the language: '[to be discussed].'"[94]

98.    The fourth Second Circuit test is partial performance.  Claimants maintain in their Sur-Rejoinder, that New York courts do not "attach[] great importance" to partial performance

---

[90] Rejoinder, pp. 69-70, para.127.

[91] Rejoinder, fn. 266, *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D. N.Y. 1987) (CA-129)

[92] Ibid.

[93] Rejoinder, fn. 268, 670 F. Supp. 491, 501-502 (S.D.N.Y. 1987) (CA-129).

[94] Rejoinder, fn. 270, Draft Term Sheet, August 12, 2013 (RE-37).

under the preliminary agreement analysis because it "does not necessarily indicate a belief that the other side is bound."[95]

99.    Respondents maintain in their Rejoinder that "Partial performance requires some actual performance of the contract, and the test is therefore the same as for unjust enrichment: … partial performance of the contract must secure a benefit to the other party to be enforceable."[96]

100.   In the judgment of the Arbitral Tribunal, Claimants have the more persuasive approach on this issue.   Partial performance may be real, but bring no benefit to the other party precisely because it is partial, and may not necessarily unjustly enrich the other party.

101.   The *Bergner* case cited by Respondents is inapposite in this context since it appears to be contradictory.   On the one hand, there has to be "some actual performance of the contract," while on the other hand, the partial performance "must secure a benefit to the other party" and the test is the same as unjust enrichment.   But as noted, partial performance may not necessarily secure a benefit to the other party, and the other party may not necessarily be unjustly enriched.

102.   The fifth Second Circuit test is "the necessity of putting the agreement in final form, as indicated by the customary form of such transaction."   Claimants maintain in their Sur-Rejoinder that where "there is no evidence in the record…indicating whether the industry generally views preliminary agreements to negotiate in good faith to be binding," courts will give "little weight" to this factor.[97]

---

[95] Sur-Rejoinder, pp. 32-33, para. 63; Citing *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.,* 670 F. Supp. 491, 502 (S.D.N.Y. 1987) (CA-129).

[96] Rejoinder, p. 70, para. 128; Citing *P.A. Bergner & Co. v. Martinez,* 823 F. Supp. 151, 157 (S.D.N.Y. 1993) (CA-119).

[97] Sur-Rejoinder, p. 33, para. 64; Citing at fn. 196 *Network Enters. v. APBA Offshore Prods.*, 264 F. App'x 36, 38 (2d Cir. 2008) (CA-141).

103. Respondents' answer, in their Rejoinder, is that "[t]o give this factor a broader application, it would better be put in terms of whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue."[98]

104. Respondents then state that "Based on the Parties' transactions for the KS-2 and KS-3 satellites, and their negotiations related to a Successor Satellite, it is clear that the planning and creation of a joint venture that itself would oversee the planning, design, construction, launch, operation, coordination, and leasing of a satellite is a 'transaction of sufficient substance or complexity' such that a preliminary binding agreement would necessarily need more than a single contractual clause to bind two parties."[99]

105. In the judgment of the Arbitral Tribunal, Respondents have the better approach to this issue. The final form requirement is similar to the open terms test, and in the instant case, there are a great many important and material open terms. While the application of the Second Circuit's five tests produce mixed results here, in the judgment of the Arbitral Tribunal, Respondents have made a stronger showing under the applicable law. The Arbitral Tribunal therefore concludes that KT did not breach the Agreements related to providing ABS with an opportunity jointly to develop and own with KT a Successor Satellite to the Satellite.

---

[98] Rejoinder, p. 70, para. 129; Citing *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 503 (S.D.N.Y. 1987) (CA-129).

[99] Rejoinder, pp. 70-71, para. 129; Citing *P.A. Bergner & Co. v. Martinez*, 823 F. Supp. 151,158 (S.D.N.Y. 1993) (CA-119).

### F. *The Arbitral Tribunal's Jurisdiction Regarding Claimants' Claims Sounding in Tort*

106.   The Arbitral Tribunal agrees with Respondents' position that the Arbitral Tribunal has no jurisdiction with respect to Claimants' claims sounding in tort.  The Claimants' claims in this case and the Respondents' defenses address the Parties' disputes pursuant to the Purchase Contract and the Operations Agreement.  Neither of those contracts indicate Arbitral Tribunal jurisdiction over tort claims, but rather jurisdiction over contract claims. As Respondents have pointed out, the Purchase Contract, in Article 19, states that "[i]f any claim, dispute or conflict … between the Parties ('Dispute') arise under this contract…[it] shall be finally settled through binding arbitration under the Rules of Arbitration of the International Chamber of Commerce."[100]  Article 13 of the Operations Agreement provides that "any dispute(s) … arising out of this Agreement" are subject to arbitration.[101]

107.   Claimants rely on Article 13.1 of the Operations Agreement, and do not rely on the Purchase Contract, as providing jurisdiction over tort claims. In the Arbitral Tribunal's view, there is no evidence that the Parties intended to provide tort jurisdiction in one of the two basic contracts in this case, but not the other.

108.   The tort claims raised by Claimants are as follows: (1) Respondents engaged in tortious interference with the contractual relationship between ABSG and Lockheed "by demanding a breach of contract on Lockheed's part and threatening litigation if such breach did not occur;"[102] (2) Respondents engaged in tortious interference with ABSG's

---

[100] Purchase Contract, Article 19 (CE-1).

[101] Operations Agreement, Article 13 (CE-2).

[102] Statement of Claim, pp. 62-63, citing letter from Y. Kim (KTSAT) to M. Hamel (Lockheed), December 13, 2013 (CE-56).

prospective economic advantage;[103] (3) Respondents engaged in "both an independent tortious act of defamation and "wrongful means;"[104] (4) Respondents "committed fraud and intentional misrepresentation or at least negligent misrepresentation or material omission, and injury" by making "material misrepresentations of fact regarding their procurement of all necessary Korean approvals and consents…on April 30, 2010." Claimants allege that these representations "were made for the purpose of inducing ABS to rely upon these assurances in signing the Operations Agreement."[105]

109.    In their Reply Memorial, Claimants head their Part IV as follows:

ABS'S RESPONSE TO RESPONDENTS' JURISDICTIONAL OBJECTIONS

      A.   ABS's Tort Claims Arise from Legal Duties Independent from the Operations Agreement

110.    Nothing is said about tort jurisdiction under the Purchase Contract. Rather, Claimants rely on Article 13.1 of the Operations Agreement, which provides that "[s]ubject to a pre-requisite attempt to resolve any dispute(s) in accordance with Article 12, the Parties agree to subject any dispute arising out of this Agreement to arbitration,"[106] and conclude that this "broad language makes it unequivocal that tort claims are encompassed within its ambit."[107]

111.    The Arbitral Tribunal agrees with Respondents on this issue: in view of Article 12.1 of the Operations Agreement, jurisdiction is tied to the Parties' performance with respect to the

---

[103] Statement of Claim, pp. 63-64, citing letter from Y. Kim (KTSAT) to M. Hamel (Lockheed), December 13, 2013 (CE-56).

[104] Statement of Claim, p. 64.

[105] Statement of Claim, pp. 66-67.

[106] Operations Agreement, Article 13.1 (CE-2).

[107] Reply, p. 103, para. 202.

Operations Agreement.  Claimants maintain in their Sur-Rejoinder that "KT's insistence in its Rejoinder that this Tribunal's jurisdiction 'cannot be invoked' absent a 'pre-requisite attempt' to resolve disputes under Article 12 is a superficial, technical argument that should be disregarded."[108]  In the judgment of the Arbitral Tribunal, this is not a superficial, technical argument.  To the contrary, in the Arbitral Tribunal's view, the reference in Article 13 back to Article 12 of the Operations Agreement is decisive.  Article 13.1 requires that the Parties must first attempt to resolve any dispute(s) in accordance with Article 12, which ties performance of contractual obligations under the Operations Agreement and thus limits jurisdiction to contractual matters.

112.  As Respondents have noted, Article 12.1 states that "[d]uring the performance of the Agreement, if either Party has cause to believe that the other Party's performance or plan for performance is such that the obligations of the other Party will not be met," the concerned Party will give the other Party written notice and the Parties are to consult in an effort to reach an agreement to overcome the objections.[109]  Again, jurisdiction is tied to performance under the Agreement.  This is the essence of a contract claim under the Agreement, where it is provided that the claim must arise out of the Agreement itself, rather than from a non-contractual obligation.

113.  Article 12.2 provides that "[i]n the event that the concerns cannot be addressed to the reasonable satisfaction of the Parties…then either Party may request that the concerns be escalated…and an attempt shall be made to reach   agreement to overcome the

---

[108] Sur-Rejoinder, p. 38.

[109] Operations Agreement, Article 12.1 (CE-2).

objections." [110] And "[i]f agreement cannot be reached within fourteen (14) days thereafter, [then] either Party may invoke Article 13 (Arbitration)."[111]

114. The Arbitral Tribunal cannot presuppose that Claimants will negotiate in bad faith so as to reach Article 13.  Here we assume negotiations in good faith, and nevertheless agreement cannot be reached.  In the Arbitral Tribunal's judgment, Article 12 sets the framework for the negotiations that ties such negotiations to performance under the Operations Agreement.  Performance of a party's obligations under a contract is necessarily a contract issue.   Only if agreement cannot be reached under Article 12.2 *with respect to performance under the Operations Agreement* can there be arbitration under Article 13. In the Arbitral Tribunal's view, this falls far short of demonstrating intent by the Parties to have the Arbitral Tribunal exercise jurisdiction over claims sounding in tort filed by Claimants under the Operations Agreement. The Arbitral Tribunal finds that turning an issue that is necessarily a matter of contract into tort because the parties are unable to agree on the contract claim is not persuasive.  There is no evidence in the wording of Article 13.1 of such an intent to transform contract disputes into tort disputes and expand the jurisdiction of the Arbitral Tribunal.

115. The Parties have argued at length about particular cases under New York law raising the question whether the arbitration clause in a contract was sufficiently broad so as to permit jurisdiction over tort claims.  The Arbitral Tribunal agrees with Respondents that the Arbitral Tribunal "has jurisdiction only over those disputes that arise from the Parties'

---

[110] Operations Agreement, Article 12.2 (CE-2).

[111] Ibid.

contractual obligations."[112]   In the view of the Arbitral Tribunal, each of the torts alleged by Claimants do not "spring from circumstances extraneous to the contract," which would, according to Claimants, give jurisdiction to the Arbitral Tribunal.   The Arbitral Tribunal finds  that, in accord with the majority of the New York cases, the language used in the present contracts was not sufficiently broad to cover tort claims as well as breach of contract claims.   Further, in the instant case, as correctly noted by Respondents, the Operations Agreement does not call for the arbitration of any dispute among the Parties, but rather the wording is "limited to disputes arising out of the Parties' performance, or plan for performance, of their respective contractual obligations."[113]   The Arbitral Tribunal agrees with Respondents' statement in their Rejoinder that "the precise language used [in the arbitration clause] is critical to the inquiry."[114]   ABS argues that the broad language of Article 13.1 of the Operations Agreement creates a presumption of arbitrability of tort claims.   But as stated, under Article 12.1 of the Operations Agreement, jurisdiction is restricted to disputes arising out of the Parties' performance, or plan for performance, under that Agreement.   Even assuming a presumption of arbitrability under the broad language of Article 13.1, that presumption is overcome by Articles 12.1 and 12.2.

---

[112] Rejoinder, p. 87, citing Statement of Defense, Sec. III, and p. 88, citing fn. 356: Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y. 2d 382, 389 (N.Y. 1987) (RA-3) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.  This legal duty must spring from circumstances extraneous to, and not constituting elements of the contract….").

[113] Rejoinder, p. 92.

[114] Rejoinder, p. 90.

**DAMAGES**

### A. *Claimants' Damages Claim to Replace the Baseband Equipment*

116.  In its Partial Award dated July 18, 2017, the Arbitral Tribunal finds that "ABSH holds title to and thus owns the…Baseband Equipment" and orders "Respondents deliver to ABSH the Baseband Equipment and all associated flight data related to operation of the Satellite."[115]  Respondents have not complied, leading Claimants in September 2017 to reiterate their request for damages to account for the cost of replacing the Baseband Equipment.[116]

### 1. *Claimants' Position*

117.  Claimants assert that, under Article 5.8 of the Purchase Contract, Respondents are required to provide Claimants with the Baseband Equipment, and install the Equipment in Claimants' TT&C facilities.  Article 5.8 of the Purchase Contract states that Respondents shall "ship to and install in the ABS TT&C Facilities the Baseband Equipment and test compatibility of the ground equipment to ABS within thirty (30) days after the receipt of a request by ABS, subject to the reasonable and customary support of ABS."[117]

118.  Given Respondents' failure to deliver the Baseband Equipment to Claimants, Claimants request the Arbitral Tribunal to award damages of $2.5 million to account for the cost of replacing the Baseband Equipment and seek pre-award interest from the date of KT's breach of Article 5.8 of the Purchase Contract plus post-award interest.[118]

---

[115] Partial Award, paras. 299 and 301.

[116] ABS's List of Remaining Issues to Be Resolved and Remaining Requests for Relief Pursuant to PO No. 14, para. 1.

[117] Ibid.

[118] Ibid.

119.   According to Claimants' expert witness, Mr. John Jarosz of Analysis Group, Inc., the amount of $2.5 million would be sufficient to "obtain replacement baseband equipment, and to integrate this equipment into ABS's operation."  Mr. Jarosz states the requested amount includes $600,000 in hardware costs, $1,150,000 in costs related to software needed to operate the equipment, and $750,000 in expenses associated with installing and integrating the equipment into ABS's operation.[119]

120.   Mr. Jarosz stated during the Hearing on the Merits that he did not know if Claimants had purchased replacement Baseband Equipment, and may have "reconfigure[d] things in a way that don't use the Baseband Equipment."[120]  In addition, Mr. Jarosz noted that he could not recall reviewing (i) invoices for similar Baseband equipment; (ii) proposals from suppliers related to similar Baseband Equipment; or (iii) purchase orders that Claimants issued for replacement baseband equipment.  Mr. Jarosz asserted that he drew figures related to the Baseband Equipment from the testimony of Mr. Richard Pak, Chief Development Officer for ABS.[121]  In his declaration, Mr. Pak states that he ascertained the cost to replace and integrate new baseband equipment by "speaking with our engineers."[122]

121.   Mr. Jarosz contended during the Hearing on the Merits that it was appropriate to claim as damages the cost of replacing the Baseband Equipment rather than the market value of the existing Baseband equipment because any depreciation of the value would have been

---

[119] Jarosz Declaration at III.A.1.

[120] Hearing Transcript, p. 796.

[121] Hearing Transcript, pp. 796-798.

[122] Pak Declaration, para. 32.

minimal.  He noted that only $600,000 of the $2.5 million claimed related to a physical asset – with the remainder covering software and installation costs.[123]

### 2. *Respondents' Position*

122.   Respondents assert that Claimants' damages claim related to the Baseband Equipment is speculative.   Respondents' expert witness – Ned Barnes, CPA of Berkeley Research Group – highlights that Claimants make no indication that they have actually purchased replacement baseband equipment, and instead only estimate the cost of the equipment based on "speaking with our engineers."

123.   Mr. Barnes further notes that, if such equipment were necessary to control or operate the Satellite, Claimants would have been required to purchase it no later than July 2014, when Claimants began operational control of the Satellite.  He maintains that Claimants fail to prove they suffered actual damages due to Respondents failure to provide the Baseband Equipment.[124]

124.   During the Hearing on the Merits, Respondents also took issue with Claimants' claim for damages in an amount that would allow them to replace the Baseband Equipment with new equipment, rather than damages equal to the current market value of the existing Baseband Equipment.  Respondents highlighted that Mr. Jarosz admitted to not knowing "when KTSAT acquired the Baseband Equipment that was to be transferred to ABS," and thus was unable to take into account the age of the Equipment in his evaluation.[125]

---

[123] Hearing Transcript, pp. 801-802.

[124] Barnes Declaration, para 34.

[125] Hearing Transcript, pp. 799-802.

### 3. *Analysis of the Tribunal*

125. The Arbitral Tribunal finds that Claimants have failed to substantiate this claim for damages. There is no documentary evidence supporting the damages claimed. There is no evidence that replacement equipment was ever purchased. The expert testimony offered by Mr. Jarosz shows no independent valuation or review of actual documents. Accordingly, this claim for damages is denied.

## B. *Claimants' Damages Claims Related to their Mitigation Actions*

### 1. *Claimants' Position*

126. Claimants assert that they are entitled to compensation for their mitigation actions resulting from Respondents' failure to obtain and maintain authority from the Korean government to operate the Satellite on Claimants' behalf. Claimants contend that Respondents should pay damages totaling $2,218,878 plus pre-award and post-award interest[126] to account for the costs of (a) reconfiguring the Satellite's orbital slot and (b) fees paid for services by Lockheed Martin from November 2013 to July 2014.[127]

### a. *Claimed Orbital Slot Reconfiguration Costs*

127. According to Mr. Jarosz, Claimants incurred numerous costs while working to relocate the Satellite from the 116.0° East orbital slot to the 116.1° East orbital slot. These claimed costs include those related to (i) obtaining permission to operate under Papua New Guinea's (PNG) ITU filing at 116.1° East, and (ii) the actual physical relocation of the Satellite to PNG's filing.[128]

---

[126] Beginning on the date of Respondents' breach of Articles 5.3, 12.1, 12.2, and 18.1 of the Purchase Contract.

[127] ABS's List of Remaining Issues to Be Resolved and Remaining Requests for Relief Pursuant to PO No. 14, para. 3.

[128] Jarosz Declaration at III.A.3.

128. Under costs related to obtaining permission to operate under PNG's ITU filing, Mr. Jarosz cites two expenses totaling $720,314. *First*, he notes Claimants paid $38,249 in travel expenses incurred by officials of the National Information & Communications Technology Authority (NICTA) of PNG while supporting Claimants in meetings with the ITU concerning the Satellite operating under PNG's filing. *Second*, Mr. Jarosz notes that Claimants paid $682,065 in annual fees to NICTA for permitting the Satellite to operate under PNG's ITU filing.[129]

129. Additionally, according to Mr. Jarosz, Claimants also incurred costs while relocating the Satellite, including (i) $45,000 for third party liability insurance to cover the Satellite during its relocation; and (ii) approximately $750,000 in service outage credits expected to be paid to customers due to service interruptions during relocation.[130] Mr. Jarosz said during the Hearing on the Merits that negotiations over the service outage credits were still ongoing "with that particular customer," but could not recall who from ABS informed him of this information. Mr. Jarosz further acknowledged that these negotiations have been ongoing since "before 2015."[131]

130. Mr. Jarosz provides a billing document in support of Claimants' claim of $45,000 for third party liability insurance.[132] All other amounts related to the reconfiguration of the Satellite's orbital slot are sourced from Mr. Pak's declaration.

---

[129] Ibid.

[130] Ibid.

[131] Hearing Transcript, pp. 824-826.

[132] Insurance Document (Jarosz Exhibit 1).

### b. *Claimed Costs to Contract Lockheed Martin*

131. Claimants request damages of $703,564 for the cost of Lockheed Martin (Lockheed) taking over operational control of the Satellite and performing TT&C services for eight months.[133]

132. Mr. Jarosz asserts he arrives at this number in two steps. *First*, he states that he added (i) the $812,900 paid under the services contract with Lockheed; and (ii) the $424,000 paid to acquire and install a Kratos Integral Systems International, Inc. Ground System, which Lockheed required to effectively operate the Satellite. *Second*, Mr. Jarosz states he subtracted from that sum the amount in service fees that Claimants did not pay to Respondents for TT&C fees during the same period, which would have totaled $533,336.[134]

133. Claimants provide as documentary evidence an Engineering Services Contract, which they entered into with Lockheed on November 25, 2013.[135] The Contract contemplates a six-month period of work for a fee of $638,000. Claimants do not provide documentary evidence documenting an extension of Lockheed's contract, or for the payment of the remaining $174,900 that they reportedly made to Lockheed in additional monthly charges.[136]

---

[133] ABS's List of Remaining Issues to Be Resolved and Remaining Requests for Relief Pursuant to PO No. 14, para. 3.

[134] Jarosz Declaration at III.A.4.

[135] Engineering Services Contract for ABS-7 Flight Operations between Asia Broadcast Satellite, Ltd. And Lockheed Martin Corporation, November 25, 2013 (CE-52).

[136] Jarosz Declaration, Tab 9.

134.   Claimants also provide as documentary evidence a Purchase Agreement between ABSH and Kratos Integral Systems for the Ground System, which accounts for the full price of the Ground System cited by Mr. Jarosz and Mr. Pak in their declarations.[137]

### 2. *Respondents' Position*

135.   Mr. Barnes takes issue with Mr. Jarosz's claim that Claimants incurred $750,000 in damages related to service outage credits.  Mr. Barnes argues that it is unreasonable of Claimants to claim damages for these credits without any "evidence as to the actual payment of such credits or, at minimum, actual verifiable evidence as to an actual liability," particularly given the significant length of time that has passed since negotiations over the service outage credits reportedly began.[138]

### 3. *Analysis of the Tribunal*

136.   Having determined that (i) Respondents breached their obligations under the Purchase and Operations Agreements, and (ii) Claimants' relocation of the Satellite and contracting of Lockheed was reasonable and justified, the Arbitral Tribunal finds Respondents are liable for damages related to Claimants' mitigation actions.

137.   However, the Arbitral Tribunal agrees with Respondents that Claimants' damages claim relating to service outage credits is speculative and unsupported by the evidence.  The Arbitral Tribunal in particular notes the lack of evidence submitted by Claimants, the extraordinary duration of the negotiation on these credits, and the lack of clarity as to how Claimants' estimation of $750,000 was calculated.  The Arbitral Tribunal dismisses Claimants' damages claim for expected service outage credits.

---

[137] Kratos Contract (Jarosz Exhibit 2).

[138] Barnes Supplemental Declaration, para. 29.

138. Moreover, although Claimants' calculation of $720,314 in damages for coordinating with PNG to use their ITU filing is not controverted by Respondents, the sole evidence Claimants put forward in support of this claim is Mr. Pak's declaration. Given the absence of supporting documentary evidence, the Arbitral Tribunal denies this claim.

139. Respondents also do not specifically contest Claimants' damages calculation of (i) $703,564 to account for payments to Lockheed to take over operational control of the Satellite and perform TT&C services for 8 months, or (ii) $45,000 incurred for the purchase of third party liability insurance for moving the Satellite. Claimants provide documentary evidence that, in the view of the Arbitral Tribunal, amply supports the amounts claimed.[139] Although Claimants do not specifically provide documentary evidence showing an extension of Lockheed's contract or the $174,900 payment that they reportedly made to Lockheed in additional monthly charges, the additional charges claimed are consistent with the rate charged by Lockheed during the initial six-month contract. This consistency, along with the fact that the fees are uncontroverted by Respondents, is sufficient to satisfy the Arbitral Tribunal. The Arbitral Tribunal hereby awards Claimants $748,564 in damages related to Claimants' mitigation actions.

## C. *Claimants' Damages Claims Resulting from Alleged Harm to their Business and Reputation*

### 1. *Claimants' Position*

140. Claimants assert damages for the loss of profits and reputational harm that resulted from Respondents' claim of Satellite ownership. Claimants request damages of (a) up to $29.1 million in losses allegedly suffered by Respondents' alleged creation of uncertainty about

---

[139] *See* CE-52, Jarosz Exhibit 2, Jarosz Exhibit 1.

Claimants' ownership of the Satellite; (b) $21,963 to account for payments made to a Korean public relations firm; and (c) pre-award and post-award interest beginning on the date of Respondents' breach of Articles 5.3, 12.1, 12.2, and 18.1 of the Purchase Contract.[140]

### a. Claimed Losses Associated with Respondents' Creation of Uncertainty about Claimants' Ownership of the Satellite in the Satellite Community

141. Mr. Jarosz contends that he calculated damages resulting from Respondents' alleged creation of uncertainty surrounding the Satellite by comparing (i) Claimants' forecasts of their future revenues and profits related to the Satellite that were prepared in Claimants' normal course of business immediately prior to the start of Respondents' actions (i.e., in October 2013), and (ii) Claimants' current forecasts at the time of his analysis. Mr. Jarosz asserts that Ms. Fanny Ho, Chief Financial Officer of ABS, confirmed to him that the projections he utilized were prepared on a regular basis by Claimants as part of their on-going planning process.[141]

142. Mr. Jarosz asserts that he determined the figure of $29.1 million in a two-step process. *First*, he contends that he calculated the difference in Satellite profits in the most recent forecast available from the profits reflected in the October 2013 forecast, which was reportedly produced directly before the dispute arose. *Second*, Mr. Jarosz notes he applied a discount rate to account for the probability of Satellite power failure, given the Satellite is currently beyond its initially projected useful life. He states that he applied a discount

---

[140] ABS's List of Remaining Issues to Be Resolved and Remaining Requests for Relief Pursuant to PO No. 14, para. 4.

[141] Jarosz Declaration at III.A.5

rate of 20 percent, the same discount rate that Claimants utilized in their analysis of expected revenues from the Satellite at the time of acquisition.[142]

143.  Mr. Jarosz also notes that it was not possible to determine that the entire decline in the Satellite's projected profits was attributable to Respondents' actions.   He does state, however, that the uncertainty caused by Respondents likely impeded the ability of Claimants to maintain the fill rates and revenues that had been expected for the Satellite prior to Respondents' actions.[143]  As an example, Mr. Jarosz points to an ABS meeting presentation from December 2013 in which it is noted that one ABS customer was considering switching to other service providers in part due to "possible ownership issues" with the Satellite.[144]  Mr. Jarosz also cites an email written by Mr. Tom Choi, CEO of ABS, in which Mr. Choi notes "customers are very concerned with all the negative publicity."[145]

### b.  *Claimed Payments to Korean Public Relations Firm*

144.  According to Mr. Pak, the dispute with Respondents over ownership of the Satellite "cast a negative image and created a possible risk for potential partners and/or buyers to consider ABS for investment or partnership."  Mr. Pak asserts that, given the toxic media environment, Claimants contracted a Korean public relations agency, Newscom, to advise Claimants.   Mr. Pak claims that Claimants incurred $21,963 in costs for Newscom's services surrounding the Satellite dispute.[146]

---

[142] Ibid.

[143] Ibid.

[144] Jarosz Supplemental Declaration at III.A.5.

[145] Email from Tom Choi to Y. Kim, re ABS-7 Command Control, November 27, 2013 (CE-76).

[146] Pak Declaration, para. 43.

## 2. *Respondents' Position*

145. Mr. Barnes dismisses the $29.1 million figure calculated by Mr. Jarosz as "speculative, and not causally connected, in any reliable way, to any alleged breach by KTSAT." Mr. Barnes accuses Mr. Jarosz of failing to conduct an independent, objective analysis, and merely "parrot[ing]…certain figures set forth on two one-page documents that purportedly represent 'business plans' prepared by ABS."[147]

146. Mr. Barnes asserts that the documents relied upon by Mr. Jarosz do not provide any (i) meaningful information as to how they were prepared; (ii) underlying assumptions; (iii) explanation for any changes that were made from one plan to another; or (iv) discussion of or identification of specific customers, contracts, or other information that would typically be included in such plans. Mr. Barnes states that it is not possible to reasonably or reliably determine to what extent any change in the forecasts was caused by Respondents, as opposed to other unrelated factors.[148] He highlights an ABS board meeting presentation from December 2013 in which a significant decline in Satellite revenue is attributed to, "among other factors, lower beam fill rates, the migration of customers to ABS-2, and an economic slump affecting the Middle East and North Africa market."[149]

147. Mr. Barnes also contends that the forecasts upon which Mr. Jarosz relies vary greatly from other contemporaneous ABS business projections, and that these projections historically have varied widely from actual results.[150]

## 3. *Analysis of the Tribunal*

### a. *Claimed Losses Associated with Respondents' Creation of Uncertainty*

---

[147] Barnes Declaration, para. 43.

[148] Ibid.

[149] Barnes Supplemental Declaration, para. 34.

[150] Barnes Supplemental Declaration, paras. 34-35.

### *about Claimants' Ownership of the Satellite in the Satellite Community*

148.   The Arbitral Tribunal agrees with Respondents' position that Claimants' request for damages resulting from alleged harm to Claimants' business and reputation is speculative and unsubstantiated.   The Arbitral Tribunal concurs with Respondents that Claimants failed to provide sufficient detail and analysis to support their claims for reputational damages.

149.   The Arbitral Tribunal takes particular note of the fact that Mr. Jarosz, while broadly claiming "documentary evidence show[ing] that customers refused to renew their contracts with ABS due to serious concerns" over the Satellite's ownership, can only cite one specific example of a client that was "considering switching to other service providers."[151]   Moreover, during the Hearing on the Merits, Mr. Jarosz could not recall reviewing "any documents that describe or detail any amounts of money that ABS actually lost from customers who canceled their relationship with ABS because of any uncertainty."[152]

150.   The Arbitral Tribunal also finds Mr. Jarosz's evaluation of damages problematic given his repeated lack of certainty in his declarations and testimony about the factors leading to Claimants' forecasted lost profits.   For instance, Mr. Jarosz stated during the Hearing on the Merits that "we don't know with absolute certainty [whether any loss in profits were due to the actions of Respondents].   We have the timing of those forecasts, and we know what's going on in the marketplace.   But there's no document that says explicitly the reduction in forecasts is due to the KTSAT uncertainties."[153]

---

[151] Jarosz Supplemental Declaration at III.A.5.

[152] Hearing Transcript, p. 840.

[153] Hearing Transcript, p. 850.

151. Given the lack of documentary evidence and the uncertainty expressed by Claimants' expert witness, the Arbitral Tribunal finds that Claimants' damages claim for harm to their business and reputation fails.

### b. *Claimed Payments to Korean Public Relations Firm*

152. Claimants' damages claim rests on the theory that Respondents' actions created negative media attention that necessitated the hiring of Korean public relations firm Newscom. However, the Arbitral Tribunal agrees that the negative media climate leading to Claimants' contracting of Newscom was produced primarily by the actions of the Korean government rather than those of Respondents. As Claimants themselves note, negative press articles about ABS and KT business dealings that began to emerge in October 2013[154] were directly related to heightened political scrutiny from Korean politicians.[155] Claimants in particular highlight the involvement of one politician, Congresswoman Seung-Hee Yoo, who intensely scrutinized the sale of the Satellite for alleged political purposes and called the sale of the Satellite, among other things, "truly unfortunate and unjust" in a hearing on October 31, 2013.[156] As a result, the Arbitral Tribunal denies Claimants' application for damages related to the hiring of Newscom.

### D. *Claimants' Damages Claim Related to the Satellite's BSS Transponders*

153. Because the Arbitral Tribunal has found that Respondents did not breach the Agreements when it did not grant Claimants' request to access the BSS Transponders between

---

[154] *See, e.g.,* "KT Suspected of Illegal Satellite Sales," Business Korea, November 1, 2013 (CE-47); "KT sells retired satellites at giveaway price," Yonhap News Agency, October 31, 2013 (CE-45).

[155] *See* Statement of Claim p. 25, para 51.

[156] Reply, p. 52, para. 116.

September 2012 and November 2013,[157] Claimants' damages claims related to accessing the BSS Transponders fail.

### E.   Claimants' Damages Claim Related to the Successor Satellite

154.   As stated previously, it is the view of the Arbitral Tribunal that Respondents did not violate any obligation under the Agreements to provide Claimants with an opportunity to jointly develop and own a successor satellite to the Satellite.[158]   Therefore, the Arbitral Tribunal finds that Claimants' damages claim relating to the Successor Satellite fails.

### F.   Claimants' Damages Claims Sounding in Tort

155.   The Arbitral Tribunal has found that it has no jurisdiction with respect to Claimants' claims sounding in tort.[159]   As a result, the Arbitral Tribunal concludes that Claimants' damages claims sounding in tort fail.

### G.   Respondents' Damages Claim Related to Unpaid Service Fees

156.   Because the Arbitral Tribunal has found that Claimants properly terminated the Operations Agreement,[160] Respondents' claims for damages on the theory that they were owed service fees after an improper termination of the Agreement fail.

---

[157] See Decisions on the Merits and on Jurisdiction over Torts, Section D.

[158] See Decisions on the Merits and on Jurisdiction over Torts, Section E.

[159] See Decisions on the Merits and on Jurisdiction over Torts, Section F.

[160] See Decisions on the Merits and on Jurisdiction over Torts, Section A.

**H.** ***Respondents' Damages Claims Resulting from Claimants Taking Control of the Satellite***

157.   Because the Arbitral Tribunal has found that Claimants' actions to take control of the Satellite and move it to the 116.1° East orbital slot were warranted and reasonable,[161] Respondents' claims for damages on the theory that Claimants' actions were in breach of the Agreements fail.

**I.** ***Total Damages and Applicable Rate of Interest***

158.   The Arbitral Tribunal has found that $748,564 in total damages related to Claimants' mitigation actions shall be awarded to Claimants.[162]   The Arbitral Tribunal has also determined it will not award any amount in damages related to Respondents' counterclaims.   With respect to damages related to Claimants' mitigation actions, Claimants have requested pre-award and post-award interest beginning on the date of Respondents' breaches of the Purchase Contract and Operations Agreement.[163]   Claimants also request that that they be granted interest "at the maximum rate or rates permitted."[164] Respondents request that "ABS…pay KTSAT pre- and post-judgment interest as the Tribunal deems appropriate."[165]

159.   The Arbitral Tribunal determines that pre-award and post-award simple interest on the amount of $748,564 with respect to breaches of the Purchase Contract and Operations Agreement shall run from December 1, 2013, until paid at the rate of 9 percent per annum,

---

[161] *See* Decisions on the Merits and on Jurisdiction over Torts, Sections B and C.

[162] *See* Damages, Section B.

[163] ABS's List of Remaining Issues to Be Resolved and Remaining Requests for Relief Pursuant to PO No. 14, para. 3.

[164] Statement of Claim p. 70, para. 137.

[165] Statement of Defense, Request for Relief #10.

the statutory interest rate on civil law post-judgments set under the NY Civil Practice Law and Rules, section 1504. Damages inclusive of pre-award interest amount to $1,036,237.15, this being the sum of the principal amount ($748,564) and interest running from December 1, 2013 until the date of this award ($287,673.15). Post-award interest at the rate of 9 percent per annum will continue to accrue until the date of payment of the principal amount and all accrued interest.

### LEGAL FEES AND ARBITRATION COSTS

160. At its session of January 25, 2018, the Court fixed the Arbitral Tribunal's fees and the administrative expenses, which, together with the Arbitral Tribunal's expenses, amount to U.S. $646,000.

161. Claimants, in each of their submissions, asked for "damages to both ABSH and ABSG in amounts to be determined, pre- and post-award interest at the maximum rate or rates permitted, an order dismissing Respondents' purported counterclaims entirely, and such other and further relief as the Tribunal may deem just and proper."[166] In their letter dated December 8, 2017, Claimants requested $8,424,362.19 to cover all of their fees and expenses incurred during the arbitration.[167] They also requested $125,705.61 for fees and expenses incurred in connection with KT-initiated judicial proceedings in Federal district court in New York in which KT seeks to vacate the Partial Award.[168]

162. Respondents, in their submissions, refer, *inter alia*, to legal costs and the costs of the arbitration. Respondents requested the Arbitral Tribunal to order "ABS to pay

---

[166] *See* Statement of Claim, p. 70; Statement of Reply, pp. 176-177; Sur-Rejoinder, p. 53.

[167] ABS's Submission on Legal Fees and Arbitration Costs.

[168] Ibid.

compensatory damages in an amount quantified during the arbitration; to pay KTSAT pre-
and post-award interest, as the Tribunal deems appropriate; ABS to reimburse KTSAT all
costs incurred in this arbitration, including, but not limited to reasonable attorneys' fees
and costs, experts fees and costs, and the fees and expenses of the arbitrators and the ICC;
order and award any such further relief as the Tribunal deems just and appropriate and/or
as KTSAT may request during the course of the arbitration."[169]  In their letter dated
December 8, 2017, Respondents claimed USD 4,654,168.26, KRW 1,570,697,783.00, and
EUR 20,877.00  in costs and fees incurred during the arbitration.[170]

163.   Neither Claimants nor Respondents made submissions or contentions with regard to the
other Parties' claims for legal costs and the costs of arbitration, again except for Claimants
request for an order dismissing Respondents counterclaims in their entirety.

164.   Pursuant to Article 37 of the 2012 ICC Rules of Arbitration, the Arbitral Tribunal has
discretion to allocate the costs of the arbitration fixed by the Court and the Parties' legal
costs.  Paragraphs 4 and 5 of Rule 37 provide that "4. The final award shall fix the costs of
the arbitration and decide which of the parties shall bear them or in what proportion they
shall be borne by the parties. 5. In making decisions as to costs, the arbitral tribunal may
take into account such circumstances as it considers relevant, including the extent to
which each party has conducted the arbitration in an expeditious and cost-effective
manner."  The Purchase Contract and the Operations Contract also contain sections related
to costs and fees incurred during arbitration.  According to Article 19.3(e) of the Purchase
Contract, "The prevailing Party shall recover all costs of the arbitration, including but not

---

[169] *See* Statement of Defense, p. 92; Rejoinder, p. 121.

[170] KTSAT – Submission on Costs Executed.  Claimants terminated the Purchase Contract on November 24,
2013, and terminated the Operations Agreement on December 1, 2013.

limited to the fees and expenses of the arbitrator(s) and reasonable attorney fees, unless the award otherwise provides."[171]   Moreover, Article 13.4 of the Operations Agreement provides that "Each Party shall bear the cost of preparing and presenting its case. The cost of arbitration, including the fees and expenses of the third arbitrator, will be shared equally by the Parties unless the award otherwise provides."[172]

165.   In the Partial Award, the Arbitral Tribunal stated that it would "invite the Parties to make submissions on costs before a Final Award is issued,"[173] and the Parties provided these submissions in letters dated December 8, 2017.   However, such invitation proved to be unnecessary since the Arbitral Tribunal hereby decides that, under the circumstances of this case, it is appropriate that Claimants and Respondents shall bear their own legal fees and shall divide equally the costs of the arbitration.   The Arbitral Tribunal so holds because, in its judgment, the case was reasonably brought, the submissions of the Parties were reasonable and responsible in substance, and the hearings and other proceedings were carried out reasonably and responsibly by the Parties.

166.   More specifically, the Arbitral Tribunal holds that the ICC costs should be born in equal shares by the Parties since neither Party, in the view of the Arbitral Tribunal, made demands of the ICC beyond the normal in the course of the arbitration, despite the fact that the case was large and complex, and they took no steps of any kind that might tend to minimize efficiency or cost-effectiveness.   The legal fees were also reasonable given the size and complexity of the case, as it addressed questions of ownership of a

---

[171] CE-1.

[172] CE-2.

[173] Partial Award, p. 113, para. 295.

communications satellite, its control and proper orbit, and different views on governing law.

167.    The case was reasonably brought by Claimants, in the Arbitral Tribunal's view, because Claimants had good reason to believe that title had passed to them, and that KTSAT indicated it would not be able to service ABS's customers, both civilian and military, in light of MSIP's views.

168.    In the Arbitral Tribunal's judgment, the arbitration was initiated and conducted in good faith, without fraud or abusive conduct or improper activity of any kind by the Parties.  There were no extravagant or unreasonable claims or defenses, and the Parties did not over-lawyer their case, such as with surplus motions, so as to cause unnecessary delay. The legal experts were sharply divided on the legal questions. These considerations should result in each side bearing its own costs, with the ICC's costs divided evenly.

169.    The Parties' submissions, both written and oral, were all replete with cases and authorities, and provided a full picture to the Arbitral Tribunal of the Parties' disagreements as to the facts and the law.  In terms of reasonableness and responsibility, the Arbitral Tribunal could not have asked for more from the Parties.


**DISPOSITIVE**

170.    The Arbitral Tribunal notes that it declared the proceedings closed after the last hearing on September 16, 2016, but prior to the Partial Award of July 18, 2017.  The proceedings were re-opened in Procedural Order No. 14, dated August 28, 2017, for the limited purpose of receiving the submission(s) called for and submitted by the Parties in their letters dated September 8, 2017, requesting the Arbitral Tribunal to decide issues not resolved by the Partial Award.  On March 5, 2018, the Parties were advised by the

Arbitral Tribunal through email that the proceedings regarding the issues to be decided in the Final Award were closed.

171. The Final Award deals with all of the issues and Parties' claims not addressed in the Partial Award, including the Parties' most recent requests for relief, as set forth in their letters to the Arbitral Tribunal dated September 8, 2017, and nothing more than those issues. All other requests and claims are rejected.

172. Subsequent to the Partial Award, the Arbitral Tribunal hereby holds in this Final Award, pursuant to Procedural Order No. 14, and the Parties' letters to the full Arbitral Tribunal dated 8 September 2017:

   a) The Purchase Contract and the Operations Agreement were properly terminated by ABS in response to Respondents' breaches.

   b) ABS did not breach the Agreements by contracting with Lockheed Martin to take away control of the satellite from KTSAT.

   c) ABS did not breach the Agreements by moving the Satellite to the 116.1° East orbital slot.

   d) ABS and PNG did not deceive the ITU with false statements.

   e) KT did not breach the Agreements by not providing ABS with the use of the BSS transponders on the Satellite.

   f) KT did not breach the Agreements relating to providing ABS with an opportunity jointly to develop and own with KT a successor satellite to the Satellite.

   g) The Arbitral Tribunal has no jurisdiction with respect to Claimants' claims sounding in tort.

h)  Claimants' claim for U.S. $2.5 million to account for the cost of replacing the Baseband Equipment is denied.

i)  Claimants are awarded U.S. $748,564 in damages related to Claimants' mitigation actions; however, as subsets of this category:

  i.  Claimants' damages claim of U.S. $750,000 relating to service outage credits is denied; and

  ii.  Claimants' damages claim for U.S. $720,314 for coordinating with PNG to use their ITU filing is denied.

j)  Claimants' damages claims related to accessing the BSS transponders are denied.

k)  Claimants' damages claims relating to the Successor Satellite are denied.

l)  Claimants' damages claims sounding in tort are denied.

m)  Claimants' damages claims for U.S. $29.1 million resulting from alleged harm to their business and reputation, and Claimants' claim for U.S. $21,963 in costs incurred for Newscom's services are both denied.

n)  Respondents' damages claims resulting from Claimants taking control of the Satellite are denied.

o)  Respondents' damages claims related to unpaid service fees are denied.

p)  The Arbitral Tribunal holds that pre-award and post-award simple interest on the amount of $748,564 with respect to breaches of the Purchase Contract and Operations Agreement shall run from December 1, 2013, until paid at the rate of 9 percent per annum.   Damages inclusive of pre-award interest amount to

$1,036,237.15, this being the sum of the principal amount ($748,564) and interest running from December 1, 2013 until the date of this award ($287,673.15). Post-award interest at the rate of 9 percent per annum will continue to accrue until the date of payment of the principal amount and all accrued interest.

q) Claimants and Respondents shall bear their own legal fees and costs, and shall divide equally the costs of the arbitration.

Place of Arbitration: New York City (U.S.A.)          Date: March 9, 2018

Arthur W. Rovine, President

Daniel M. Price, co-arbitrator                   Gary Born, co-arbitrator
                                                 Dissenting

62